## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF RHODE ISLAND

| | | |
|---|---|---|
| **SHANNAH M. KURLAND, and** | : | |
| **GLADYS B. GOULD,** | : | |
| **Plaintiffs** | : | |
| | : | |
| **v.** | : | **C.A. No. 14-** |
| | : | |
| **CITY OF PROVIDENCE, by and** | : | **Jury Trial Demanded** |
| **through its Treasurer, James J. Lombardi,** | : | |
| **III, alias, and OSCAR PEREZ, alias,** | : | |
| **JOHN DOE, and JOHN ROE, each** | : | |
| **individually and in their official capacities** | : | |
| **as police officers in the City of** | : | |
| **Providence Police Department, and** | : | |
| **HUGH T. CLEMENTS, JR., alias,** | : | |
| **individually and in his official capacity as** | : | |
| **Chief of the City of Providence Police** | : | |
| **Department,** | : | |
| **Defendants** | : | |

## COMPLAINT

### I.    Introductory Statement

This action is brought by the Plaintiffs seeking declaratory and injunctive relief and compensatory and punitive damages for acts and/or omissions of Defendants in violation of Plaintiffs' rights to freedom of speech and freedom from unreasonable search and seizure and for malicious prosecution under the First, Fourth, and Fourteenth Amendments to the United States Constitution, actionable pursuant to 42 U.S.C. §1983, Article 1, §§6 and 21 of the Rhode Island Constitution, and under the laws of the State of Rhode Island.

### II.    Parties

1    Plaintiff Shannah M. Kurland ("Plaintiff Kurland") is a resident of the City of Providence, County of Providence and State of Rhode Island and was at all relevant times a third year law student at Roger Williams University Law School or a recent graduate of said Law School.

2 Plaintiff Gladys B. Gould ("Plaintiff Gould") is a resident of the City of Providence, County of Providence and State of Rhode Island.

3 Defendant City of Providence ("City") is a duly authorized and organized municipality under the laws of the State of Rhode Island and is sued by and through its Treasurer, James J. Lombardi, III, alias, the official designated by state law, R.I.G.L. §45-15-5, to be named in a suit for relief against the City.

4 Defendant Oscar Perez, alias, is sued individually and in his official capacity as a police officer in the City Police Department.

5 Defendant John Doe, is sued individually and in his official capacity as a police officer in the City Police Department.

6 Defendant John Roe, is sued individually and in his official capacity as a police officer in the City Police Department.

7 Defendant Hugh T. Clements, Jr., alias, is sued in his individual and official capacity as Chief of the City Police Department. On information and belief, at all relevant times, Chief Clements was the chief policy making official of the City Police Department.

### III. Jurisdiction

8 This Court has jurisdiction pursuant to 28 U.S.C. §§1331, 1343, 1367, 2201 and 2202.

### IV. Venue

9 Venue is proper in this Court since, on information and belief, all of the Defendants reside or may be found in the District of Rhode Island in compliance with the requirements set forth in 28 U.S.C. §1391. Venue is also proper because a substantial part of the events or omissions giving rise to the claims occurred in the District of Rhode Island.

## V.    Material Facts

### A.    Chronology of Events

#### *Peaceful Protest: First Amendment Violation*

10     Roger Williams Park ("park") is a public park owned by the City and open to the general public from 7:00 a.m. until 9:00 p.m. every day.

11     The Roger Williams Park Casino ("Casino") is a City owned facility situated entirely within the park and has an address of 1000 Elmwood Ave, Providence, RI 02907.

12     The Casino is frequently used for political fundraisers as well as for general public interest group events.

13     On or about September 26, 2013, the Casino was the site of a fundraising event targeting women and benefiting then-candidate for Governor of Rhode Island, and now Governor-elect, Gina Raimondo.

14     Gina Raimondo was a controversial figure due to the fact that, while serving as General Treasurer of Rhode Island, she had proposed and spearheaded pension reform legislation, currently being challenged in state court, which reduced or adversely altered the pension benefits of most past and present state and municipal workers.

15     Upon information and belief, Defendant Oscar Perez was the ranking police officer at the scene and directed the police response described herein.

16     Plaintiffs were among a group of 200 to 300 people who gathered at the site, which included individuals representing the Rhode Island Association of Firefighters, the American Federation of State, County and Municipal Employees (AFSCME), the American Federation of Teachers (AFT), the National Education Association (NEA), Direct Action for Rights and Equality (DARE), Fuerza Laboral, and other organizations who came to the park to express their dissent with regard to candidate Raimondo's polices and their opposition to her

candidacy for governor.

17    Directly in front of the Casino there is a sidewalk which varies in width from approximately twelve (12) to twenty (20) feet and which runs approximately one-hundred and sixty (160) feet in length.

18    Directly in front of the Casino and north of the sidewalk is a large, grass-covered area of the park bounded by Rose and Linden Avenues, which surround the area in a loop ("island").

19    To the northwest of the island is a main entrance to the park off Elmwood Avenue onto Rose Avenue through which many of the cars arriving at the event, as well as evening commuters and others, entered the park.

20    The sidewalk and island as well as the grassy areas both near the foregoing entrance and north of the island are separated from Rose Avenue and Linden Avenue and the vehicular traffic on them by curbs.

21    At no time did Plaintiffs or other protesters congregate in or block either street or the Casino sidewalk.

22    Over the course of the protest and the events described below, Plaintiffs and other protesters sought to express their message via signs and occasional chanting.

23    About an hour before the scheduled 5:00 p.m. start of the event, protesters began gathering near the entrance to the park in preparation for their protest.

24    Plaintiff Gould was among the protesters who arrived early at the Park and was among those who gathered near the entrance to the park.

25    Plaintiff Gould later moved to the grassy area north of the island with signs and sign making materials, where she and other protesters gathered to make and distribute signs.

26    At about 4:45 pm, approximately fifteen (15) minutes before the fundraising event

was scheduled to commence, Plaintiff Gould and the rest of the protesters who had arrived crossed the street onto the island with some signs and sign making materials which were placed near a tree.

27      Subsequently, Plaintiff Gould made her way south toward the sidewalk in front of the Casino while carrying a sign critical of candidate Raimondo.

28      Plaintiff Gould, alone, walked onto the sidewalk slightly to the southwest of the Casino entrance ("Position A" on map attached hereto and incorporated herein by reference as Exhibit A).

29      Almost immediately upon setting foot on the sidewalk, Plaintiff Gould was ordered off it by Defendant John Doe, a City police officer, who was accompanied by Defendant Perez, without being told a reason or an alternative location to which she could go.

30      Defendant Doe told her nothing other than stating that she could not be there and he motioned for her to leave the sidewalk and move away from the Casino toward the island.

31      At the time she was ordered off the sidewalk, there were no other protesters on the sidewalk; however, there were numerous other people on the sidewalk whose relationship to the event was unclear, some of whom were walking and others of whom were standing around congregating and/or conversing.

32      At the time Plaintiff Gould was ordered to leave the sidewalk, none of these other people were either carrying signs or moving to enter the Casino for the event.

33      None of these other people were told to move.

34      Plaintiff Gould then retreated back across Rose Avenue to the southern portion of the island where she stood holding her sign with about thirty other protesters facing both traffic driving into the Casino parking lot and people walking toward the Casino entrance ("Position B").

35    About fifteen minutes later, after speaking with a tall woman with short light colored hair, wearing red shoes ("woman"), Defendant John Roe, a City police officer, and/or one or more other City police officers approached protesters along the southern portion of the island, including Plaintiff Gould, and once again ordered them to move without explanation, rationale, or direction other than moving farther away from the Casino.

36    This time they were told they could not stand on the southern portion of the island.

37    Once again, no explanation or alternative location was provided to Plaintiff Gould or other protesters, who objected and argued that they were present for the purposes of political protest, were in a public park, and had the right to be there.

38    Ignoring the arguments and pleas of Plaintiff Gould and other protesters, City police continued to demand they move.

39    Faced with continued police intransigence regarding their location despite their objections and assertion of First Amendment rights, Plaintiff Gould and the other protesters on the southern portion of the island moved to the northwestern portion ("Position C").

40    Plaintiff Gould had by now been forced from a position within 50 feet of the Casino entrance (the sidewalk) to one approximately one-hundred and fifty (150) feet from the entrance (the southern edge of the island), and then to one approximately two-hundred and fifty (250) feet from the Casino entrance, the northwestern edge of the island.

41    Other protesters were either similarly forced to less and less visible and advantageous positions, or were simply barred from the earlier locations outright if they arrived subsequent to the relocation of the protesters by City police.

42    After this second relocation by City police, Plaintiff Gould, who was now joined by Plaintiff Kurland, was situated on the northwestern part of the island, adjacent to the portion

of Rose Avenue that provides access to and through the park from Elmwood Avenue and to the portion of Linden Avenue which provides access to the Casino parking lot.

43      This position also afforded a relatively unobstructed view of the Casino entrance as well as event goers walking to the Casino from the parking area, but was approximately two-hundred and fifty (250) feet away and partially obscured by a few large trees.

44      Plaintiffs and other protesters were holding signs so that they would be visible to those entering the Casino's parking lot, those traveling on Rose and Linden Avenues, and those entering the Casino, albeit from a substantial distance.

45      At this point, the majority of the protesters, some one-hundred and fifty (150) to two-hundred (200) people, were spread out in groups along the northwestern edge of the island, with Plaintiffs Gould and Kurland in a group on the western edge of both the island and this group of protesters.

46      At approximately 5:10 p.m., the City police, under the direction of and with the participation of Defendant Perez, once again told protesters to move farther from the Casino, this time demanding that they completely vacate the island.

47      Most protesters, following the commands of the City police, crossed Rose Avenue to the grassy area north of the island ("Position D"), a location approximately two hundred eighty-five (285) feet from the Casino entrance.

48      Although this site was the most proximate one to the Casino remaining, it was located yet further from the Casino entrance and was past the point from which automobiles entering the park via Elmwood Avenue would turn onto Linden Avenue to access the Casino parking lot.

49      Thus, this relocation once again made it more difficult for the protesters to display their signs and convey their message to the primary target audience:  individuals attending the

fundraiser.

50    It also made signs less visible to individuals traveling on Rose Avenue who were cutting through the park from Elmwood Avenue on the way home from work or for other reasons unrelated to the event, who were the secondary targets of the protest now that the protesters had been forced to move from locations more proximate to the Casino (Positions A and B).

51    At this time, Plaintiffs were unaware that the larger group of protesters who relocated to the grassy area had been instructed by City police to move.

52    After the larger group of protesters had finished moving across the road to the north side of Rose Avenue, Defendant Perez approached the Plaintiffs and about ten (10) to fifteen (15) protesters remaining with them on the northwestern portion of the island and told them they too had to move entirely off the island.

53    Plaintiff Kurland advised Defendant Perez that she and her fellow protesters had a right to remain at their location and peaceably protest, as they were in a public park and not causing any disturbance.

54    Plaintiff Kurland additionally informed Defendant Perez that the federal court for the District of Rhode Island had only six (6) months earlier ruled against the City and City Police Department in a similar situation involving First Amendment rights on a public sidewalk, mentioning the case of *Reilly v. City of Providence*[1] by name.

55    Defendant Perez responded to Plaintiff Kurland by saying words to the effect, "I know you, you're always giving me trouble" and "You're Luna, aren't you!?," apparently referencing Plaintiff's deceased ex-husband, former city councilor Miguel Luna.

56    After Plaintiff Kurland informed Defendant Perez that her name was not Luna he continued to refer to her as "Mrs. Luna."

---

[1] *Reilly v. City of Providence ex rel. Napolitano*, CA 10-461 S, 2013 WL 1193352 (D.R.I.).

57      Defendant Perez repeated that the protesters needed to move off the island.

58      Defendant Perez refused to provide a reason for his demand that Plaintiffs and other protesters move and refused to reply when asked whether there was a public safety issue or whether he was going to arrest the protesters.

59      Defendant Perez then left for a few moments and conferred with other officers and the woman the police had spoken with before forcing Plaintiff Gould and other protesters from the southern portion of the island.

60      Defendant Perez then came back over to where the Plaintiffs and other protesters were standing and reiterated his demand that they move, once again refusing to provide any rationale for the demand.

61      Defendant Perez and other police officers then began speaking with other protesters individually, reiterating the demand that they move, and as a result, most of these protesters began to leave the island, crossing over Rose Avenue to the grassy area north of the island ("Position D").

62      At this point, Plaintiffs and other protesters with them began chanting "Hey hey, ho ho, Gina Raimondo's got to go," and "Gina cooked the books."

63      Defendant Perez left and spoke again with other officers and the woman.

64      Defendant Perez returned a few minutes later and spoke with Plaintiffs and the remaining protesters again, saying "I need you to move" or words to the same or similar effect.

65      At no time did Defendant Perez provide any reason for his repeated demand that Plaintiffs move nor did he claim that the Plaintiffs or any other protesters were violating any law, obstructing traffic or the roads, or creating a disturbance—only that he insisted they could not stand anywhere on the island.

66      At approximately 5:20 p.m., one (1) protester crossed to the island from the

grassy area on the northerly side of Rose Avenue, saying that he wished to stand in the shade.

67    No other individuals subsequently crossed Rose Avenue to the island.

68    At approximately 5:30 p.m., Defendant Perez came back for the third time to address the Plaintiffs and other protesters remaining on the island who were standing quietly, and he said that everyone had to move across Rose Avenue to the grassy area or they would be arrested.

69    In response, Plaintiff Kurland, supported by Plaintiff Gould and the handful of other remaining protesters on the island, continued to calmly inform Defendant Perez that his order was, to the best of her knowledge, unconstitutional and illegal, and asked for clarification as to the legal basis of his order.

70    The position across the road was less visible to commuters and others passing through the park, especially those turning from Linden Avenue to access the Casino parking lot, and was also less visible to the Casino and the entrance thereto.

71    Moving across the road would have further impaired Plaintiff Kurland's ability to convey her message and display her demonstration to individuals attending the event as well as to the growing volume of commuter traffic on Rose Avenue entering the park from Elmwood Avenue.

72    Plaintiff Kurland did not cross Rose Avenue as Defendant Perez demanded and Defendant Perez arrested her.

73    At the time Plaintiff Kurland was arrested, Plaintiff Gould and a handful of other protesters were standing on the island with her.

74    Defendant Perez provided no reason for the arrest, despite Plaintiff Kurland's sustained attempts to determine the reasoning behind his demands, threats, and eventual decision to arrest, until after Plaintiff Kurland had been handcuffed and locked inside a police car.

75     At that point, Plaintiff Kurland asked Defendant Perez yet again what she was being arrested for, to which Defendant Perez replied, "failure to move," once again without providing any rationale as to why Plaintiff Kurland, Plaintiff Gould, or any one was legally obligated to move.

76     Following Plaintiff Kurland's arrest, and fearing that they too would be arrested if they continued to fail to comply with Defendant Perez's order to move, the remaining protesters, including Plaintiff Gould, left the island, moving across Rose Avenue to the grassy area.

### *Events Subsequent to Peaceful Protest-- Fourth Amendment Violation and Malicious Prosecution*

77     Plaintiff Kurland was taken to the Providence Public Safety Complex and placed in an isolation holding cell for two to three hours.

78     Eventually, Plaintiff Kurland was removed from the cell, and was booked and photographed by Defendant Perez.

79     As she was being released, Defendant Perez gave Plaintiff Kurland the agreement form to appear in Municipal Court with "Disorderly Conduct" checked off instead of "Failure to Move."

80     On or about October 21, 2013, Defendant City and Police Department entered into a Consent Judgment in *Reilly v. City of Providence* (Exhibit B attached hereto and incorporated herein by reference), a similar case in some respects involving the City's violation of free speech rights in a public forum referenced in detail below.

81     Defendants continued their prosecution of Plaintiff Kurland despite the entry of that judgment, which provided that the City Police Department practice of "clearing vast public places," under the circumstances of that case, wherein there was no real harm or threatened harm to a substantial governmental interest, was unconstitutional.

82     On information and belief, Defendants knew or should have known about the

decision rendered by the federal court to that same effect in *Reilly v. City of Providence* in March of 2013—six months earlier, as well as the subsequent entry of the consent judgment.

83      Nevertheless, Defendants willfully continued their prosecution of Plaintiff Kurland.

84      On or about October 31, 2013, Plaintiff Kurland appeared at Municipal Court for her arraignment and was informed by Inspector Quinn of the City Police Department that the charge was being dismissed under Rule 48(a), but that the City Solicitor's office was not present so Plaintiff Kurland would have to return on a day when the City Solicitor's office could sign off on the dismissal.

85      Plaintiff Kurland returned on or about November 13, 2013, but no one from the City Solicitor's office was present.

86      At the November 13, 2013 court date, Inspector Quinn notified Plaintiff Kurland that she would be required to appear in court again on December 11, 2013 and that she could also speak with the City Solicitor's office beforehand and attempt to resolve the issue without returning to court.

87      Plaintiff Kurland left several messages for Senior Assistant City Solicitor Stephen Ryan, hoping to avoid having to return to court on December 11, 2013, and finally spoke with Mr. Ryan by phone on or about December 6, 2013.

88      Mr. Ryan informed Plaintiff Kurland that the charge against her had been dismissed in Municipal Court but would be re-filed in state District Court.

89      Plaintiff Kurland asked Mr. Ryan who had made that decision, to which Mr. Ryan replied that he had, but when asked for what reason he said he could not remember.

90      Plaintiff Kurland also asked Mr. Ryan whether he was familiar with what happened, to which he responded that he had read the police report but had not spoken with

anyone who was present.

91    Mr. Ryan informed Plaintiff Kurland that she would need to appear at Municipal Court on December 11, 2013 to sign the agreement to appear in District Court.

92    Plaintiff Kurland appeared in Municipal Court on December 11, 2013 and was called into the Solicitor's conference room before the court proceedings began.

93    Accompanying Plaintiff Kurland were Sheila Wilhelm, Fred Ordoñez, Joseph Buchanan and Plaintiff Gould, as, out of an abundance of caution, Plaintiff Kurland wished to have trusted individuals with her.

94    In the conference room, Plaintiff Kurland again asked Mr. Ryan why he had decided to re-file the complaint in District Court.

95    Mr. Ryan stated he had a full calendar and was not going to take time out to explain anything to her and gave her the District Court complaint form.

96    Plaintiff Kurland then asked Mr. Ryan what subsection of the state disorderly conduct statute, R.I.G.L. §11-45-1, he was charging her with, as it was not indicated on the form, and he said he did not know, but it was "the one about traffic."

97    Plaintiff Kurland produced a copy of the state statute for Mr. Ryan, and he circled subsection (4) of the above statute, which prohibits "***obstruct[ing]*** a highway, street, sidewalk, railway, waterway, building entrance, elevator, aisle, stairway, or hallway to which the public or a substantial group of the public has access or any other place ordinarily used for the passage of persons, vehicles, or conveyance." (Emphasis added).

98    R.I.G.L. §11-45-1(d) expressly bars the above provision from "be[ing] construed to prevent lawful picketing or lawful demonstrations."

99    Plaintiff Kurland was arraigned in District Court on December 18, 2013 and referred to the Public Defender's office.

100     There were two pre-trial conferences on the matter in District Court; the first pre-trial conference was January 8, 2014 and the second pre-trial conference was scheduled for January 22, 2014, at which the parties believed a date would be set for trial.

101     At the January 22 pre-trial, the District Court judge suggested a disposition of "not-guilty filing," which Plaintiff Kurland accepted.

### Continuing Pattern of First Amendment Violations--Reilly v. City of Providence

102     Plaintiff Kurland's experience is not the first time City police have stifled protected speech without regard to the laws of Rhode Island and the United States.

103     On February 2, 2010, City police officers violated the free speech rights of Judith Reilly when they threatened her with arrest and barred her from distributing leaflets critical of then-Mayor David Cicilline on a public sidewalk outside his State of the City Address at the Providence Career and Technical Academy.[2]

104     The officer in charge and two of the patrolmen under her command stated that they did not believe they had done anything wrong, had acted in accord with the training they had received, and would take the same action again in similar circumstances.[3]

105     Then-Police Chief Esserman agreed that the training received by City police officers "'taught them that the directive to relocate Ms. Reilly in this case was within constitutional bounds.'"[4]

106     This Court found that the practice of "clearing vast public places" in the absence of a real, as opposed to speculative, harm or threatened harm to a substantial governmental interest, was unconstitutional.[5]

107     This Court also ruled that "[n]o reasonable officer could believe that it was

---

[2] *Reilly v. City of Providence ex rel. Napolitano*, CA 10-461 S, 2013 WL 1193352 (D.R.I.).
[3] *Id.* at *12.
[4] *Id.* at *11.
[5] *Id.* at * 5, 12.

constitutional to ban Plaintiff from the entire block absent any evidence that she was obstructing pedestrian traffic or interfering with any other substantial government interest."[6]

108    This Court made it abundantly clear that fears of traffic obstruction, when presented as justification for diminution or restriction of free speech rights of individuals in a public forum, must be supported by evidence of actual and significant traffic blockage.[7]

109    The above referenced decision in *Reilly v. City of Providence* was issued on March 22, 2013, more than six (6) months before the events in question in this case.

110    After the decision cited above was issued, the City agreed to a consent judgment that recognized the City "unconstitutionally interfered with [Reilly's] right to peaceably publish and distribute political flyers on the public sidewalk" and further provided "[t]hat the Defendant City Police Department's custom of clearing vast public spaces in order to keep exit passageways open was unconstitutionally applied in the context of this case."

111    The lawsuit, ruling, and consent judgment were widely reported in the Providence and Rhode Island media, including stories in the *Providence Journal* and on Rhode Island Public Radio.

112    The Defendants were thus clearly on notice as to the unconstitutionality of interfering with free speech rights in a public forum based on nebulous or insubstantial claims of traffic control and had more than sufficient time to remedy the training and custom found constitutionally deficient in *Reilly*.

113    During the course of litigation of the *Reilly* case, the City refused plaintiff Reilly's proposal that City police officers receive training relative to the First Amendment rights of individuals in a public forum as well as an offer on the part of plaintiff's counsel in that case to provide such training.

---

[6] *Id.* at *9.
[7] *Id.* at *5-7.

## B.    Applicable Law

### *Local and State Law*

114    City    police    General    Order    #44    permits    an    unlimited    number    of demonstrators/picketers to demonstrate on public sidewalks as long as there is no disorderly conduct or actual interference with pedestrian traffic or access to adjacent buildings.

115    Providence City Ordinance §16-13, entitled "Obstruction of Public Ways," expressly exempts from regulation situations such as this where individuals on public sidewalks or ways are exercising a right to protest and there is at least three (3) feet of unobstructed sidewalk access at all times.

116    Similarly, R.I.G.L. §11-45-1, entitled "Disorderly Conduct," expressly exempts from prohibited conduct lawful picketing or lawful demonstrations of any kind.

### *Constitutional Law*

117    Moreover, even if local or state law, expressly or by implication, were interpreted to prohibit the conduct of Plaintiffs at issue, it would be trumped by well-settled state and federal constitutional law protecting the right to peaceably demonstrate in public parks, on public sidewalks, and in other public forums.

### *Freedom of Speech*

118    Freedom of speech and of the press are fundamental personal rights and liberties, and "the exercise of these rights lies at the foundation of free government by free [people]."[8]

119    One who is rightfully in a public forum such as a public park or a public sidewalk "carries with him there as elsewhere the constitutional right to express his views in an orderly

---

[8] *Schneider v. State of New Jersey, Town of Irvington*, 308 U.S. 147, 161 (1939).

fashion [, including] . . . the communication of ideas by handbills and literature as well as by the spoken word."[9]

### Political Speech

120    The Supreme Court has recognized that the First Amendment reflects a "profound national commitment" to the principle that "debate on public issues should be uninhibited, robust, and wide-open," and has consistently commented on the central importance of protecting speech on public issues.[10]

121    Freedom of speech as guaranteed by the First Amendment "has its fullest and most urgent application precisely to the conduct of campaigns for public office."[11]

122    Political speech such as that involved in the case at bar is entitled to the fullest possible measure of constitutional protection.[12]

### Public Forum—Parks, Streets, and Sidewalks

123    "'Public places' historically associated with the free exercise of expressive activities, such as streets, sidewalks, and parks, are considered, without more, to be 'public forums.'"[13]

124    "Wherever the title of streets and parks may rest, they have immemorially been held in trust for the use of the public and, time out of mind, have been used for purposes of assembly, communicating thoughts between citizens, and discussing public questions."[14]

---

[9]  *Members of City Council of City of Los Angeles v. Taxpayers for Vincent*, 466 U.S. 789, 810 (1984) (quoting *Jamison v. Texas*, 318 U.S. 413, 416 (1943)).
[10]  *Boos v. Barry*, 485 U.S. 312, 318 (1988)(quoting *New York Times Co. v. Sullivan*, 376 U.S. 254, 270 (1964)).
[11]  *Buckley v. Valeo*, 424 U.S. 1, 15 (1976) (quoting *Monitor Patriot Co. v. Roy*, 401 U.S. 265, 272 (1971)).
[12]  *Taxpayers for Vincent*, 466 U.S. at 816.
[13]  *United States v. Grace*, 461 U.S. 171, 177 (1983); *Accord Perry Education Assn. v. Perry Local Educator's Assn.*, 460 U.S. 37,45, (1983); *Carey v. Brown*, 447 U.S. 455, 460 (1980); *Hudgens v. NLRB*, 424 U.S. 507, 515 (1976); *Cox v. New Hampshire*, 312 U.S. 569, 574 (1941); *Hague v. CIO*, 307 U.S. 496, 515 (1939).
[14]  *Hague v. CIO*, 307 U.S. at 515 (1939); *Accord Boos v. Barry*, 485 U.S. 312, 322 (1988); *United States v. Grace*, 461 U.S. 171, 180 (1983); *Hannan v. City of Haverhill*, 120 F.2d 87, 88 -89(1st Cir. 1941)("The streets are natural and proper places for purposes of assembly, of interchange of thought and opinion on religious, political and other matters, either by word of mouth or by the distribution of literature. Such use of the streets and public places,

125   "Such use of the streets and public places has, from ancient times, been a part of the privileges, immunities, rights, and liberties of citizens."[15]

126   Accordingly, parks, "[s]treets[,] and sidewalks are quintessential public forums, and the Supreme Court has consistently affirmed the right of demonstrators to use them."[16]

127   In such places, which occupy a "special position in terms of First Amendment protection," the government's ability to restrict expressive activity "is very limited."[17]

### Police Power Limitations on Free Speech

128   There is no right to be free of unwelcome speech in public forums.[18]

129   Individuals may not be punished for peacefully expressing unpopular views.[19]

130   The right to free speech includes the right to attempt to persuade others to change their views, and may not be curtailed simply because the speaker's message may be offensive to his or her audience.[20]

131   As a general matter, the Supreme Court has held that, in public debate, "our own citizens must tolerate insulting, and even outrageous, speech in order to provide adequate breathing space to the freedoms protected by the First Amendment."[21]

132   Free speech may not be curtailed merely because it is opposed to the views of the majority of the community or because of hostility to its assertion or exercise.[22]

133   "[A] a prohibition on classic speech [, including peaceable protest,] in limited parts of a [public forum such as a] public sidewalk [is not] permissible" absent a "record of

---

sanctioned by ancient usage, has become part of the liberties of the people protected by the Fourteenth Amendment from state encroachment.")

[15]   *Id.*
[16]   *Town of Barrington v. Blake*, 568 A.2d 1015, 1019 (R.I. 1990); *see also, supra,* note 8.
[17]   *United States v. Grace,* 461 U.S. at 177, 180.
[18]   *Schenck v. Pro-Choice Network of Western New York*, 519 U.S. 357, 383-384 (1997).
[19]   *Cox v. State of La.*, 379 U.S. 536 (1965).
[20]   *Hill v. Colorado*, 530 U.S. 703, 716 (2000).
[21]   *Boos v. Barry*, 485 U.S. at 322 (internal quotation marks omitted).
[22]   *Cox*, 379 U.S. at 551; *Edwards v. South Carolina*, 372 U.S. 229, 237 (1963).

abusive conduct"[23] or a showing that it is "likely to produce a clear and present danger of a serious substantive evil that rises *far above* public inconvenience, annoyance, or unrest."[24]

### Selective Enforcement—Viewpoint Discrimination and Content-Based Regulation

134    The First Amendment's hostility to content-based regulation of speech extends not only to restrictions on particular viewpoints, but also to prohibition of public discussion of an entire topic.[25]

135    As a general matter, "the First Amendment means that government has no power to restrict expression because of its message, its ideas, its subject matter, or its content."[26]

136    "To allow a government the choice of permissible subjects for public debate would be to allow that government control over the search for political truth."[27]

137    Any restriction on expressive activity because of its content undercuts the "profound national commitment to the principle that debate on public issues should be uninhibited, robust, and wide-open."[28]

---

[23] *Schenck v. Pro-Choice Network of Western New York*, 519 U.S. at 377.

[24] *Terminiello v. Chicago*, 337 U.S. 1, 4-5 (1949) ("[A] function of free speech under our system of government is to invite dispute. It may indeed best serve its high purpose when it induces a condition of unrest, creates dissatisfaction with conditions as they are, or even stirs people to anger. Speech is often provocative and challenging. It may strike at prejudices and preconceptions and have profound unsettling effects as it presses for acceptance of an idea. That is why freedom of speech . . . is . . . protected against censorship or punishment, unless shown likely to produce a clear and present danger of a serious substantive evil that rises far above public inconvenience, annoyance, or unrest.. . . There is no room under our Constitution for a more restrictive view. For the alternative would lead to standardization of ideas either by legislatures, courts, or dominant political or community groups.")(emphasis added in text quote); *see also United States v. Grace*, 461 U.S. 171, 180 (1983) (absent obstruction of sidewalk or access to adjacent building, threatened injury to any person or property, or interference with the orderly administration of the building or grounds thereof, the need to protect persons and property or to maintain proper order and decorum does not justify total ban on portion of sidewalk in front of Supreme Court building); *Edwards v. South Carolina*, 372 U.S. 229, 237-238 (1963) (where there was no obstruction of vehicle or pedestrian traffic nor any violence or threatened violence but opinions being peaceably expressed "were sufficiently opposed to the views of the majority of the community to attract a crowd and necessitate police protection," conduct did not constitute breach of peace and was constitutionally protected); *Cantwell v. State of Connecticut*, 310 U.S. 296, 309-310 (1940) (in absence of assault or threatening of bodily harm, truculent bearing, intentional discourtesy, or personal abuse, provocative speech offensive to listeners' religious beliefs was constitutionally protected and did not constitute breach of peace).

[25] *Consolidated Edison Co. of New York, Inc. v. Public Service Commission of New York*, 447 U.S. 530, 537-538 (1980))("With respect to noncommercial speech, the city may not choose the appropriate subjects for public discourse: 'To allow a government the choice of permissible subjects for public debate would be to allow that government control over the search for political truth.'"); *Accord, Boos v. Barry*, 485 U.S. at 319-320.

[26] *Id.; Police Dept. of City of Chicago v. Mosley*, 408 U.S. 92, 95 (1972), *and cases cited therein.*

[27] *Consolidated Edison Co.*, 447 U.S. at 538.

### *Free Speech Protection*

138    An absolute prohibition on a particular type of expression based on viewpoint or content will be upheld only if narrowly drawn to accomplish a *compelling governmental interest.*[29]

139    Where regulation of speech in a public forum is not based on viewpoint or content, it will be upheld only if narrowly tailored to serve a *significant government interest* and it leaves open ample alternative channels of communication.[30]

140    Nevertheless, where, as here, the challenged conduct involves *ad hoc* directives issued by police officers in the field, *heightened scrutiny* is the proper standard to evaluate the constitutionality of any resulting, non-viewpoint restrictions on free speech in a public forum.[31]

### *Free Speech and Obstruction of Traffic*

141    "[P]romoting the free flow of traffic on streets and sidewalks" is certainly within the ambit of "governmental interests."[32]

142    However, to say that the free flow of traffic is a government interest does not make it compelling or even significant; the weight of the interest is determined by the circumstances.  In some situations such an interest may be compelling,[33] but in many it is not.[34]

---

[28]  *Mosley*, 408 U.S. at 96 (citation and quotations omitted).

[29]  *U.S. v. Grace*, 461 U.S. 171, 177 (1983) (emphasis added).

[30]  *Ward v. Rock Against Racism*, 491 U.S. 781, 791 (1989) (emphasis added).

[31]  *See Madsen v. Women's Health Ctr., Inc.*, 512 U.S. 753, 764-66 (1994)(standard time, place, and manner analysis not sufficiently rigorous where challenged conduct (injunction) is not the result of a democratic, deliberative process and is not generally applicable, and therefore presents more risk of arbitrary action; the proper test required is heightened scrutiny); *McTernan v. City of York*, 564 F.3d 636, 654–55 (3d Cir.2009) (applying the *Madsen* standard to "a police directive, issued by officers in the field," because it "pose[d] risks similar to those presented by an injunction, warranting heightened scrutiny"); *Huminski v. Corsones*, 386 F.3d 116, 155 (2d Cir.2004) (applying heightened scrutiny under *Madsen* to a "Notice Against Trespass," issued by court security personnel to a protester); *Ross v. Early*, 758 F. Supp. 2d 313, 323-24 (D. Md. 2010), *reconsideration denied* (Feb. 25, 2011)(applying *Madsen* to content-neutral but not generally applicable restriction embodied in city protocol not promulgated through formal regulatory or legislative processes).; *see also, Reilly v. City of Providence*, 2013 WL 1193352 (D.R.I.)(discussing applicability of heightened scrutiny but declining to apply because not well settled at time).

[32]  *Schenck v. Pro-Choice Network of W. New York*, 519 U.S. 357, 376 (1997).

[33]  *See Madsen v. Women's Health Ctr., Inc.*, 512 U.S. 753, 767-68 (1994) (holding that "free flow of traffic was a sufficient interest, in conjunction with "protecting a woman's freedom to seek pregnancy-related services,"

143    "That the Government's asserted interests are important in the abstract does not mean, however, that the [restriction on speech] will in fact advance those interests . . . [The government] must demonstrate that the recited harms are real, not merely conjectural, and that the regulation will in fact alleviate these harms in a direct and material way."[35]

144    While no one may "insist upon a street meeting in the middle of Times Square at the rush hour as a form of freedom of speech"[36] the mere suggestion on the part of a police officer or other government official that there is or might be some possibility of obstruction is far from enough.[37]

145    The government must demonstrate actual obstruction or a real threat thereof[38] to the free flow of traffic is a significant government interest in the particular context asserted, that the regulation is narrowly tailored to serve that interest, and that ample alternative channels of communication exist.[39]

146    Mere convenience to law enforcement is insufficient to justify imposing restrictions on the exercise of First Amendment rights.[40]

---

"ensuring public safety and order . . . protecting property rights," "protecting residential privacy," and "protecting the medical privacy of patients whose psychological and physical well-being were threatened as they were held 'captive' by medical circumstance" to support a injunction creating a 36-foot buffer around "the clinic entrances and driveway" but not a similar buffer-zone around other portions of the clinic, including public roads and areas adjacent to them.)

[34] *Jews for Jesus, Inc. v. Mass. Bay Transp. Auth.*, 984 F.2d 1319, 1324 (1st Cir.1993), *abrogated on other grounds by Thomas v. Chicago Park Dist.*, 534 U.S. 316 (2002). (Noting that "[t]he Supreme Court has dismissed the danger to traffic congestion as a justification to ban leafleting.").

[35] *Turner Broad. Sys., Inc. v. FCC*, 512 U.S. 622, 664 (1994); *see also, Reilly v. City of Providence*, 2013 WL 1193352 *5.

[36] *Cox v. Louisiana*, 379 U.S. 536, 85 (1965).

[37] *Shuttlesworth v. City of Birmingham*, 382 U.S. 87 (1965).

[38] *Id.*

[39] *See Ward*, 491 U.S. at 799; *Asociation de Educacion Privada de P.R. v. Garcia-Padilla*, 490 F.3d 1, 8 (1st Cir. 2007).

[40] *McCullen v. Coakley*, 134 S.Ct. 2518, 2534, 2539 (2014) ("The government may attempt to suppress speech not only because it disagrees with the message being expressed, but also for mere convenience. Where certain speech is associated with particular problems, silencing the speech is sometimes the path of least resistance.". . . '[M]ak[ing] [the police's] job so much easier'. . . is not enough to satisfy the First Amendment. To meet the requirement of narrow tailoring, the government must demonstrate that alternative measures that burden substantially less speech would fail to achieve the government's interests, not simply that the chosen route is easier. A painted line on the sidewalk is easy to enforce, but the prime objective of the First Amendment is not efficiency.").

147    In short, the claim of "obstruction of traffic" is not a talisman that can be employed to turn bedrock First Amendment protections to dust.

### *Municipal Liability*

148    "[W]hen execution of [the municipal] government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury," it may be held liable.[41]

149    The custom or practice "must be so well-settled and widespread that the policymaking officials of the municipality can be said to have either actual or constructive knowledge of it yet did nothing to end the practice.... [and] the custom must have been the cause of and the moving force behind the deprivation of constitutional rights."[42]

150    Where "a program does not prevent constitutional violations, municipal decision makers may eventually be put on notice that a new program is called for,"[43] and thereby establish a basis for municipal liability for failure to train.

151    "[C]ontinued adherence to an approach [municipal decision makers] know or should know has failed to prevent tortious conduct by employees may establish the conscious disregard for the consequences of their action—the deliberate indifference—necessary to trigger municipal liability."[44]

### C.    Application of Law to Facts

152    Insofar as Plaintiffs were indisputably engaged in peaceful protest, regarding a politician and her campaign for public office, while in a public park, they were engaged in protected speech in a public forum and were therefore entitled to the fullest possible measure of constitutional protection.

---

[41] *Monell v. Dep't of Soc. Servs.,* 436 U.S. 658, 694 (1978).
[42] *Bordanaro v. McLeod,* 871 F.2d 1151, 1156 (1st Cir.1989) (citations omitted).
[43] *Board of County Comm'rs of Bryan County v. Brown,* 520 U.S. 397, 407 (1997).
[44] *Id.*

153    Insofar as Plaintiffs were at all times either peaceably protesting on the sidewalk or the island and in no way interfering with the flow of pedestrian traffic on the sidewalk or motor vehicle traffic in the street or ingress to and egress from the Casino, there was no legitimate governmental interest in relocating their protest on three different occasions.

154    Insofar as there was no breach of City Ordinance or state law nor any obstruction of any street or traffic, violence or threat of violence, or interference with the orderly administration of the building or grounds thereof, there is a compelling if not irrefutable inference that Defendants were motivated by the content of Plaintiffs' speech in ordering them several times to move farther from the Casino entrance and the event they were protesting.

155    To put it another way, if the protesters were instead carrying signs that said "Raimondo for Governor" or were all chanting "Hey hey, ho ho, Gina Raimondo for Governor,'' Plaintiffs would not have been asked to relocate and Plaintiff Kurland would not have been arrested.

156    Regardless of the Defendants' motivation, under the circumstances, there was no legitimate governmental interest let alone a compelling or significant one to justify interference with the Plaintiffs' constitutionally protected conduct.

157    Defendants' conduct in ordering Plaintiffs and others from the island to a location farther from the Casino entrance violated Plaintiffs' clearly established rights to freedom of speech.

158    In addition, Defendants' conduct in arresting and prosecuting Plaintiff Kurland when she questioned and challenged the unconstitutional order constituted a violation of Plaintiff's clearly established rights to freedom of speech and freedom from unreasonable search and seizure.

### D.    Municipal Liability

159    A number of City police officers, *see Reilly v. City of Providence*, including Defendant Perez, apparently were and currently remain unaware of the Plaintiffs' constitutional right to peaceably protest in a public park or other public forums in the City free from police interference.

160    On information and belief, this lack of knowledge, instruction and/or training relative to this important constitutional right possessed by people in public parks and in other public forums is and remains widespread in the City Police Department, despite the decision in *Reilly v. City of Providence*.

161    Defendants City and Clements failed to properly select, train, instruct, supervise and/or discipline officers in the City Police Department, including Defendants Perez, Doe, and Roe, relative to the constitutionally protected right of people to peaceably assemble and demonstrate in public parks and in other public forums.

162    On information and belief, during all relevant time periods, a custom or policy existed in the City Police Department wherein the Defendant City acquiesced to, permitted, condoned, encouraged and/or was deliberately indifferent to the deprivation of the constitutionally protected right of people to peaceably protest in public parks and in other public forums, as evidenced, in part, by the conduct successfully challenged in *Reilly v. City of Providence*.

163    The Defendants knew or should have known that threatening Plaintiffs with arrest, arresting Plaintiff Kurland, and otherwise interfering with the Plaintiffs' peaceable protest in a public park outside of a campaign event, where there was no real danger or threatened

danger to public health and safety, was unlawful under the circumstances based on well settled law, including *Reilly v. City of Providence*.[45]

164    Despite such knowledge, the Defendants, by and through their policy-making officials and agents, approved, acquiesced to, condoned, intentionally ignored, or were deliberately indifferent to such practice, and failed to change or eliminate such unlawful custom or policy.

### E.    Intentional Conduct

165    At all relevant times, Defendants acted intentionally, willfully, maliciously, and/or with deliberate, reckless, or callous indifference to Plaintiffs' clearly established constitutional rights.

166    Furthermore, at all relevant times, Defendants knew or should have known that their conduct would cause or contribute to the deprivation of Plaintiffs' clearly established constitutional rights.

167    At all relevant times, Defendants were motivated by malice, wantonness and/or willfulness of an extreme nature.

---

[45] *See United States v. Grace,* 461 U.S. 171, 182 (1983) (holding a ban on expressive conduct on the sidewalks surrounding the Supreme Court building unconstitutional because there was no indication that the plaintiffs' activities "in any way obstructed the sidewalks or access to the building, threatened injury to any person or property, or in any way interfered with the orderly administration of the building or other parts of the grounds"); *Bays v. City of Fairborn,* 668 F.3d 814, 823 (6th Cir.2012) (finding restrictions on solicitation at a festival unconstitutional where the defendants failed to "point[ ] to any specific space or crowd concerns"); *Saieg v. City of Dearborn,* 641 F.3d 727, 736–37 (6th Cir.2011) (dismissing the defendants' concerns about "pedestrian overcrowding" at a festival as "conjectural"); *Kuba v. 1–A Agric. Ass'n,* 387 F.3d 850, 859 (9th Cir.2004) (finding restrictions on demonstrations outside an arena unconstitutional because the defendant "failed to meet its burden of proving that demonstrators handing out leaflets and carrying signs on the parking lots and walkways outside the [venue] would cause [ ] congestion and danger to safety"); *Weinberg v. City of Chicago,* 310 F.3d 1029, 1039 (7th Cir.2002) (holding a ban on "peddling" within 1,000 feet of a sports arena unconstitutional because the defendant "provided no objective evidence that traffic flow on the sidewalk or street is disrupted when [the plaintiff] sells his book"); *Lederman v. United States,* 291 F.3d 36, 45 (D.C.Cir.2002) (invalidating a ban on demonstration activities on the sidewalk in front of the steps to the United States Capitol on the grounds that "[s]ome banned activities," such as leafleting, "cannot possibly" interfere with pedestrian traffic).

### F.    Restrictions on Plaintiff's Free Speech

168    Plaintiffs' right to freedom of expression was and continues to be substantially damaged and curtailed as a result of the conduct of Defendants.

169    Indeed, not only do the Plaintiffs have every reason to believe Defendants will continue to act to restrict and violate their free speech rights in the future, but Plaintiff Kurland has been subjected to two prosecutions, which mandated numerous court appearances, and the non-guilty filing imposed by the District Court on her record.

170    In the future, Plaintiffs would also like and intends to communicate, among other things, opposition to or support of various issues, and/or their support of or opposition to candidates for political office by demonstrating in public parks, on public sidewalks and in other public forums in the City, including the Casino where numerous political functions are held annually.

171    Nevertheless, Plaintiffs are reluctant to do so insofar as they face potential arbitrary interference, arrest, and criminal prosecution at the whim of the Defendants, notwithstanding their constitutionally protected right to engage in such conduct.

### G.    Violations of Plaintiff Kurland's Fourth Amendment Rights

172    Plaintiff Kurland was subject to seizure and arrest without probable cause in violation of the Fourth and Fourteenth Amendments of the United States Constitution, Article 1, §6 of the Rhode Island Constitution, and applicable state law.

173    Plaintiff Kurland was wrongfully detained by the Providence Police for two hours and held in an isolation cell.

174    She continued to live under conditions of restricted liberty during her release on personal recognizance bail from September 26, 2013 until January 22, 2014.

175     When faced with an obligation to travel out of state on January 16, 2014 in order to interview for a national fellowship program, Plaintiff Kurland had to seek permission from the Court due to the conditions of her personal recognizance.

176     As an applicant for admission to the Rhode Island Bar for June 2014, she was subjected to additional scrutiny and a second interview by the Character and Fitness committee after having passed the examination, resulting in significant emotional distress.

177     Plaintiff Kurland continues to have her liberty interest restricted as a result of a not guilty filing imposed by the District Court, which runs until January 22, 2015, all as a result of her unlawful and unconstitutional arrest and prosecution by Defendants.

### H.    Irreparable Harm and Damages

178     The Defendants' foregoing acts and/or omissions, including but not limited to those set forth herein, constitute a violation of the Plaintiffs' right to freedom of speech protected under the First and Fourteenth Amendments to the United States Constitution and Article 1, §21 of the Rhode Island Constitution.

179     The Defendants' foregoing acts and/or omissions, including but not limited to those set forth herein, constitute a violation of the Plaintiff Kurland's right to freedom from unreasonable search and seizure protected under the Fourth and Fourteenth Amendments to the United States Constitution and Article 1, §6 of the Rhode Island Constitution.

180     The Defendants' actions have placed Plaintiffs in the position of either refraining from constitutionally protected conduct in the future or facing arrest and criminal prosecution.

181     As a direct and proximate result of the Defendants' acts and/or omissions, including, but not limited to, those described herein, the Plaintiffs have suffered and will

continue to suffer deprivation of their state and federal constitutional rights, and have thereby sustained and will continue to sustain irreparable harm.[46]

182    As a direct and proximate result of the Defendants' acts and/or omissions, including but not limited to those described herein, the Plaintiffs have suffered and will continue to suffer mental anguish, pain and suffering, injury to reputation, impairment of their freedom of expression rights, deprivation of their civil rights, expenses for legal services, and other great damage.[47]

## VI.    Claims for Relief

183    Plaintiff incorporates in the counts below the allegations contained in ¶¶1 through 182 above.

### Count One
#### *Impairment of Freedom of Speech in Violation of 42 U.S.C. §1983*

184    Defendants, acting under the color of state law, by their individual and/or concerted acts and/or omissions, including but not limited to those described herein, have deprived Plaintiffs of and placed unlawful restrictions on their freedom of expression in violation of Plaintiffs' rights to freedom of speech, causing Plaintiffs to suffer harm as aforesaid, and have thereby deprived Plaintiffs of rights secured under the First and Fourteenth Amendments to the United States Constitution, actionable pursuant to 42 U.S.C. §1983.

### Count Two
#### *Impairment of Freedom of Speech in Violation of Article 1, §21 of the Rhode Island Constitution*

185    Defendants, acting under the color of state law, by their individual and/or concerted acts and/or omissions, including but not limited to those described herein, have

---

[46] *Elrod v. Burns,* 427 U.S. 347, 373 (1976)(even temporary deprivation of First Amendment freedom of expression rights is sufficient to establish irreparable harm); *see also Citizens for a Better Environment v. City of Park Ridge,* 567 F.2d 689, 691 (7th Cir. 1975).
[47] *Carey v. Piphus,* 435 U.S. 247, 266-267 and n. 24 and n. 25 (1978)(deprivation of constitutional rights actionable even without proof of actual injury).

deprived Plaintiffs of and placed unlawful restrictions on their freedom of expression in violation of Plaintiffs' rights to freedom of speech, causing Plaintiffs to suffer harm as aforesaid, and have thereby deprived Plaintiffs of rights secured under Article 1, §21 of the Rhode Island Constitution.

### Count Three
*False Arrest and False Imprisonment in Violation of Right to Freedom From Unreasonable Search and Seizure in Violation of 42 U.S.C. §1983*

186    Defendants, acting under the color of state law, by their individual and/or concerted acts and/or omissions, including but not limited to those described herein, have violated Plaintiff Kurland's right to freedom from unreasonable search and seizure, causing Plaintiff to suffer harm as aforesaid, and have thereby deprived Plaintiff of rights secured under the Fourth and Fourteenth Amendments to the United States Constitution, actionable pursuant to 42 U.S.C. §1983.

### Count Four
*False Arrest and False Imprisonment in Violation of Right to Freedom From Unreasonable Search and Seizure in Violation of Article 1, §6 of the Rhode Island Constitution.*

187    Defendants, acting under the color of state law, by their individual and/or concerted acts and/or omissions, including but not limited to those described herein, violated Plaintiff Kurland's right to freedom from unreasonable search and seizure, causing Plaintiff to suffer harm as aforesaid, and have thereby deprived Plaintiff of rights secured under Article 1, §6 of the Rhode Island Constitution.

### Count Five
*Malicious Prosecution*

188    Defendants, by their individual and/or concerted acts and/or omissions, including but not limited to those described herein, have maliciously caused criminal charges to be brought against Plaintiff Kurland, without probable cause and with malice, which were terminated in favor of the Plaintiff, causing Plaintiff to suffer harm as aforesaid.

## VII.    **Prayers for Relief**

**WHEREFORE,** Plaintiffs pray that this Court grant the following relief:

1.    Preliminary and permanent injunctions restraining and enjoining Defendants from interfering with the exercise of the Plaintiffs' right to freedom of speech guaranteed by the First and Fourteenth Amendments to the United States Constitution and Article 1, §21 of the Rhode Island Constitution;

2.    Preliminary and permanent injunctions directing the Defendants City and Clements to properly select, train, instruct, supervise and/or discipline officers in the City Police Department relative to the constitutionally protected right of people to peaceably demonstrate in public parks and in other public forums in the City;

3.    Preliminary and permanent injunctions requiring Defendants to seal and destroy the records derived from Plaintiff Kurland's unlawful arrest, including all photographs, fingerprints and other identification or descriptive information;

4.    A declaratory judgment that the Defendants, in the manner described herein, violated the First and Fourteenth Amendments to the United States Constitution and Article 1, §21 of the Rhode Island Constitution by impairing Plaintiffs' right to freedom of speech;

5.    A declaratory judgment that the Defendants, in the manner described herein, violated the Fourth and Fourteenth Amendments to the United States Constitution and Article 1, §6 of the Rhode Island Constitution by violating Plaintiff Kurland's right to be free from unreasonable search and seizure;

6.    An award of compensatory damages;

7.    An award of punitive damages;

8.    An award of reasonable counsel fees and costs of litigation to Plaintiffs pursuant to 42 U.S.C. §1988;

9.    Such other and further relief as this Court deems just and proper.

## VIII.  Demand for Jury Trial

Plaintiffs hereby demand a trial by jury on all counts so triable.

## IX.    Designation of Trial Counsel

Plaintiffs hereby designate Richard A. Sinapi, Esquire, as trial counsel.

                                     Plaintiffs,
                                     By their attorneys,

Date:  December 4, 2014

                                     Richard A. Sinapi, Esq. (#2977)
                                     **American Civil Liberties Union of Rhode Island**
                                     Sinapi Law Associates, LTD.
                                     175 Hillside Road
                                     Cranston, RI  02920
                                     Phone:  (401) 944-9692; FAX:  (401) 943-9040

## VERIFICATION OF COMPLAINT

Now comes the Plaintiff, **Shannah Kurland**, being duly sworn, and does hereby depose and say as follows:

1.    That I am a Plaintiff in the within matter.

2.    That I have read the above Complaint and acknowledge the factual allegations alleged therein to be true and accurate to the best of my knowledge, information, recollection and belief.

3.    That I have made this **Verification of Complaint** in support of my prayers therein for judgment and relief against the Defendants.

                                     Shannah M. Kurland

Subscribed and sworn to before me in **Cranston** on this 4 day of **December, 2014.**

(name) Lori A. Beagan
**NOTARY PUBLIC**
**My Commission Expires:** 1/19/18

LORI A. BEAGAN
Notary Public-State of Rhode Island
My Commission Expires
January 19, 2018