# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF RHODE ISLAND

| | | |
|---|---|---|
| SHANNAH M. KURLAND, and | : | |
| GLADYS B. GOULD, | : | |
| Plaintiffs | : | |
| v. | : | **C.A. No. 14-0524-WES-PAS** |
| | : | |
| CITY OF PROVIDENCE, by and | : | |
| through its Treasurer, James J. Lombardi,: | | |
| III, alias, and OSCAR PEREZ, alias, | : | |
| JOHN DOE, and JOHN ROE, each | : | |
| individually and in their official capacities : | | |
| as police officers in the City of | : | |
| Providence Police Department, and | : | |
| HUGH T. CLEMENTS, JR., alias, | : | |
| individually and in his official capacity as | : | |
| Chief of the City of Providence Police | : | |
| Department, | : | |
| Defendants | : | |

## PLAINTIFFS' COMBINED MEMORANDUM OF LAW IN SUPPORT OF THEIR MOTION FOR PARTIAL SUMMARY JUDGMENT AND OBJECTION TO THE DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

## I.       INTRODUCTION

This action is brought by the Plaintiffs seeking declaratory and injunctive relief and compensatory and punitive damages, as well as counsel fees and costs, for acts and/or omissions of Defendants in violation of Plaintiffs' right to freedom of speech and right to be free from unreasonable search and seizure protected under the First, Fourth, and Fourteenth Amendments to the United States Constitution, actionable pursuant to 42 U.S.C. §1983, and under Article 1, §§20 and 21 of the Rhode Island Constitution.

Defendants have moved for Summary Judgment and Plaintiffs have objected to that motion and move herein for Partial Summary Judgment on the issue of liability in their favor for the reasons set forth below.

## II.    SUMMARY

This case arises out of yet another example of the Providence Police Department (PPD) trampling on the free speech rights of people engaged in political speech.  The events that give raise to this case took place during a protest involving approximately three hundred (300) people in Roger Williams Park ("park") outside of the Roger Williams Casino ("Casino"), which was hosting a fundraising event for Gina Raimondo's candidacy for governor.  The protestors consisted primarily of active and retired public sector employees (firefighters and teachers) who desired to voice their opposition to certain pension reform measures advocated by gubernatorial candidate Gina Raimondo, then the General Treasurer of the State of Rhode Island.

Protesters were originally spread out over a large area of the park near the Casino, which encompasses the sidewalks and areas near the Casino, a large, grass-covered area of the park bounded by Rose and Linden Avenues, which surround the area in a loop directly in front of the Casino ("Island") and along Rose Avenue both across the street from the Island and toward the entrance to the park.  This area was, as a public park with no special status for the day or event, totally open to the public and covered an area of approximately 100,000 square feet, including nearly 30,000 square feet on the Island itself.

This action revolves, at its most fundamental level, around the repeated actions of the Defendants and other PPD officers who continually forced Plaintiffs and other protesters farther and farther from the Casino and the event they were protesting without any valid basis.  In short, Defendants, in a series of encounters, expelled Plaintiffs and protesters first from the sidewalk in front of the Casino designated herein as site "A," then from a portion of the large Island closer to the Casino designated herein as site "B," and then from the rest of Island, site "C."  Map of Casino Area in App. Ex. 1. (This exhibit has sites "A" through "D" marked on it, which said areas depict the locations from which the Plaintiffs and other protesters were moved from by the

Defendants and are referenced by the various deponents in this matter to describe the physical location of those events).  This resulted in Plaintiffs and other protesters finally being restricted to an area (site "D") some two hundred and seventy-five (275) feet, or nearly a football field worth of distance from the Casino, which was separated from the Casino by two wide roads and numerous large trees, many with low-hanging branches.

No other patrons of the park, including event attendees, were so restricted, *only those present for protest purposes.  **This fact is undisputed**.*  Indeed, event attendees were, according to the testimony of PPD officers present, allowed free reign to move about the area as they pleased and were crossing roads and approaching the Casino from "all over" during the entire period in question—*including at the time Plaintiff Kurland was arrested.*  Protesters however, based exclusively on the content of their speech, were increasingly restricted from more and more areas of the park near the event they were protesting.  When Plaintiffs and other protesters eventually refused to comply with these arbitrary demands to move farther and farther from the Casino and the event they were protesting, they were threatened with arrest and Ms. Kurland was eventually arrested.

Defendants proffered a concern about vehicle traffic to justify their relocation of protesters to site "D," far from the event they were protesting.  However, there is no support for this claim in the evidence and it does not hold up to even the most rudimentary logical inquiry.  The sheer size of the Island alone could easily have accommodated the entire protest in various locations both closer to the event and with less proximity of protesters to busy roads.  The area around the Casino, where protesters were first expelled from, site "A" and the adjacent sidewalks and areas opposite it, is roughly 22,000 square feet, depending on how one defines the area, and does not abut any major roadway, yet protesters were barred from this area before a large crowd had even assembled—***an area both closer to the Casino and least exposed to vehicle traffic.***

The next area protesters were barred from, site "B," a portion of the Island closer to the Casino, also does not abut any major roadway and yet protesters were barred from there too.  Finally, the remaining protesters at site "C" were barred from the entire Island, an area encompassing in total nearly 30,000 square feet of open park land, where there was nearly 100 square feet of space per protester.  It is also worth nothing here that the area of the Island protesters were barred from first was the portion closer to the event that was not on a major roadway, *only later were protesters also barred from <u>the other portion</u>, which did in fact abut the busiest portion of road at issue in this incident.*  The area Defendants forced protesters to move to, with threats of arrest and an actual arrest was, by contrast, exclusively abutting the busiest roads during these events.  Moreover, based on the photos of the event in the record, this area included a number of protesters standing in the street near the curb, now that the protesters were forced into an area with far heavier vehicular traffic at site "D."  There was no testimony from any of the PPD officers or from any of the various witnesses at the scene that any of these protesters were directed to get out of the road at the time Plaintiff Kurland was being confronted at site "C."  Instead, the sole focus of the PPD and Defendant Perez was to ensure that Plaintiffs and other protesters, who were safely and quietly standing at site "C," were removed for purported public safety reasons—while all other park patrons and event attendees continued to move freely on the Island.  Protesters in the street at a site with heavier vehicular traffic was apparently not a concern, now that the real goal of moving protesters farther from the Casino had been achieved.

Then, Defendants doubled down on their illegal orders, removal of protesters, and illegal arrest.  *Defendant Perez's supervisors, Defendant Chief Clements and Major Verdi, both testified that **Defendant Perez's actions were in accordance with the training and policy of the PPD and that they would expect officers to act in the same way in the future if presented with a similar situation**.*  Additionally, the Defendant City declined to investigate the charges at all

beyond the contents of the police report, which facially lacked any factual evidence to support the charge.  Indeed, rather than investigating further and dismissing the baseless charges against Ms. Kurland quickly, the Defendant City subjected her to a series of court appearances.  First Defendant City forced Ms. Kurland to attend three (3) court dates in Municipal Court, informing her at her first two court appearances that the case would be dismissed when a city solicitor was present, which they were not at either of those court dates, ***despite requiring that Ms. Kurland nevertheless appear under the threat of a bail violation and jail.***  Ms. Kurland attempted regularly to make contact with Senior Assistant City Solicitor Stephen Ryan by phone during this period, but he did not return her calls until December 6, when she had already been on bail for some seventy-two (72) days, and appeared at court twice without being able to proceed because of his absence.  Mr. Ryan then informed Ms. Kurland that he would be refilling the charges in Rhode Island State District Court but that she would have to attend yet another Municipal Court date, on December 11, to sign the paperwork allowing him to do so.  Ms. Kurland was then subjected to three more court dates in District Court until, finally, on January 22, after having been to six (6) court appearance and having been on bail for one-hundred and thirteen (113) days, the District Court Judge issued a disposition of a "not-guilty filing" which Defendant City's Agent Solicitor Nelson opposed, but which was entered by the Judge over his objection.

## III.    MATERIAL FACTS

### *The Location and Nature of the Event*

Roger Williams Park ("park") is a public park owned by the City and open to the general public from 7:00 a.m. until 9:00 p.m. every day.  Plaintiffs' Statement of Undisputed Facts in Support of Their Motion for Partial Summary Judgment and of Additional Facts in Opposition to Defendants' Motion For Summary Judgment (Pl.'s SUF) at ¶6.  The Roger Williams Park Casino ("Casino") is a City owned facility situated entirely within the park and has an address of

1000 Elmwood Ave, Providence, RI 02907. Pl.'s SUF at ¶7.  The Casino is frequently used for political fundraisers as well as for general public interest group events.  Pl.'s SUF at ¶8.  On or about September 26, 2013 the Casino was the site of a fundraising event targeting women and benefiting then-candidate for Governor of Rhode Island, and now Governor, Gina Raimondo ("Event").  Pl.'s SUF at 9.  Plaintiffs Kurland and Gould were among a group of 200 to 300 people who gathered at the site, which included members and/or representatives of numerous labor unions and community action groups and other organization who came to the park to express their dissent with regard to candidate Raimondo's policies and their opposition to her candidacy for governor.  Pl.'s SUF at ¶11.

Directly in front of the Casino there is a sidewalk which varies in width from approximately twelve (12) to twenty (20) feet and which runs approximately one-hundred and sixty (160) feet in length. Pl.'s SUF at ¶12. Directly in front of the Casino and north of the sidewalk is a large, grass-covered area of the park bounded by Rose and Linden Avenues, which surround the area in a loop ("Island"). Pl.'s SUF at ¶13.  The Island has an area of some 29,650 square feet, or about 100 square feet per protester even if the high end estimate of 300 or so protestors is correct. Pl.'s SUF at 63; Island Area Map in App. Ex. 2.  For comparison the ballroom of the Rhode Island Convention Center is 20,000 square feet, and has a capacity of 2,300 people in a theater configuration, or 1,400 people in a banquet configuration.  Pl.'s SUF at ¶63.  There is a crosswalk located on Rose Avenue between the Island and the grassy area of land north of the Island.  Pl.'s SUF at ¶15.  The events described herein took place between approximately 4:00 p.m. and 7:30 p.m.. Pl.'s SUF at ¶17.

*Plaintiff Gould and First and Second Illegal Orders to Move*

Ms. Gould was among the protesters who arrived early at the Park, sometime between 4:00 p.m. and 4:30 p.m. when there were about fifty (50) protesters in and around sites C and D.

Pl.'s SUF at ¶18-19. Upon arriving Ms. Gould set up sign making materials by a tree on the Island and waited in the area of the Island closer to the Casino (B on the Map) with approximately thirty (30) other protesters.  Pl.'s SUF at ¶20.

Eventually Ms. Gould moved to the sidewalk in front of the Casino (A on the Map). Pl.'s SUF at 21.  Gould felt this was "a great place for me to go and, you know, display my sign." Pl.'s SUF at ¶22.  Almost immediately upon setting foot on the sidewalk, Ms. Gould was ordered off it by a City police officer, who was 20ft away, near the entrance of the parking lot, without being told a reason or an alternative location to which she could go and who told her "you can't be here, waved and signaled for her to move away."  Pl.'s SUF at ¶23.  At the time she was ordered off the sidewalk, there were no other protesters on the sidewalk; however, there were numerous other people on the sidewalk who were not protesters, some of whom were walking and others of whom were standing around congregating and/or conversing, and who were not ordered to leave the area.  The sidewalk where she was situated was not crowded with people and she was not interfering with the pedestrian flow.  Pl.'s SUF at ¶24-25.

Ms. Gould then retreated back across Rose Avenue to the southern portion of the Island where she stood holding her sign with about thirty other protesters facing both traffic driving into the Casino parking lot and people walking toward the Casino entrance near B or between B and C.  Pl.'s SUF at ¶26.  Shortly thereafter, about fifteen minutes, additional police officers arrived on the scene.  Pl.'s SUF at ¶27.  At this time, as at all others, the site and protesters were orderly. Pl.'s SUF at ¶28.  About the time the additional officers arrived, Defendant City Police Officers ordered Gould and other protesters to move further away from the Casino on the Island from B to C on the map.  Pl.'s SUF at ¶29.  Gould felt that as a result of this move "my rights to express myself were being violated at that point . . . but I complied.  I didn't want to risk, you know, arrest."  Pl.'s SUF at ¶30.  One again no explanation was given to Gould or other protesters as to

why they had to move.  Pl.'s SUF at ¶31.  Ms. Gould had by now been forced from a position

within 50 feet of the Casino entrance (the sidewalk at site A) to one approximately one-hundred

(100) feet from the entrance (the southern edge of the Island at site B), and then to one

approximately two-hundred and twenty-five (225) feet from the Casino entrance (the

northwestern edge of the Island at site C).  Pl.'s SUF at ¶32; Map of Casino Area in Record

Appendix ("App."). Ex. 1; Distance Maps in App. Ex. 3;

### *Plaintiff Kurland, Third Illegal Order to Move, and False Arrest*

At this point Gould, who was now joined by Ms. Kurland, was situated on the

northwestern part of the Island, adjacent to the portion of Rose Avenue that provides access to

and through the park from Elmwood Avenue and to the portion of Linden Avenue which provides

access to the Casino access road and parking lot (C on the map). Pl.'s SUF at ¶33.  This position

also afforded a partial view of the Casino entrance as well as event goers walking to the Casino

from the parking area, but was approximately two-hundred and fifty (250) feet away and

partially obscured by a few large trees. Pl.'s SUF at ¶34.

At some point around this time, Defendant Perez decided that he wanted all the protesters

to move across Rose Avenue off the Island to site D on the map and convinced Paul Valletta of

the Cranston Fire Fighters Union to assist him in getting protesters to move.  Pl.'s SUF at ¶35.

Relocating across Rose Avenue once again made it more difficult for the protesters to display

their signs and convey their message to the primary target audience: individuals attending the

fundraiser.  Pl.'s SUF at ¶36.  Before Defendant Perez arrived on the scene and decided to bar

protesters from the Island, Officer Pryde had determined that in order to minimize people

crossing Rose Avenue it would be best to concentrate protesters on the Island.  Pl.'s SUF at ¶37.

Nevertheless Defendant Perez and Officers under his direction demanded Plaintiffs and those

with them leave the Island when they did not move with the rest of the protesters.  Pl.'s SUF at

¶38.   At this point Ms. Gould and Ms. Kurland and the others on the Island "were peaceful," were "in the middle of a public park," were in a place that "generally speaking, yea, safe to stand."  Pl.'s SUF at ¶39; Dep. Perez 48:9-50:8.  In the words of Defendant Perez, the only thing Plaintiffs were doing was "standing there, holding a sign near that tree on the Island."  Pl.'s SUF at ¶40; Dep. Perez 72:11-18.

Defendant Perez based his demand that Plaintiffs and protesters with them move on the fact that a few middle-aged, mature people, mostly teachers and firefighters, some retired, might be encouraged to cross back to the Island, in the vicinity of a crosswalk, with police in position to manage traffic and the crossing, might cross the street to join the Plaintiffs.  Pl.'s SUF at ¶41. These protestors were not only capable of crossing busy streets, but often assist others, including children in doing so. Pl.'s SUF at ¶42.  There were seven (7) officers of Defendant City on duty at the scene to control the flow of traffic and assist people in crossing the street. Pl.'s SUF at ¶43. Defendant Perez explicitly testified that "but for [his] concern about the migration of people to 'D' to 'C' [he] had no problem with people being at 'B' and 'C' . . . on the Island."  Pl.'s SUF at ¶44; Dep. Perez 55:14-17.

Plaintiffs did not wave for anyone to come to the Island or otherwise encourage anyone to come to the Island.  Pl.'s SUF at ¶45.   Additionally, the only incident Defendants identified of a protester crossing the street occurred when and as a consequence of Defendant Perez confronting Plaintiffs and other protesters with them on the Island.  Pl.'s SUF at ¶46.  This event involving an alleged protester crossing over the street was not even mentioned in Defendant Perez's police report.  Pl.'s SUF at ¶47.  Further, before Perez arrived and demanded Plaintiffs and others move, Officer Pryde had addressed the potential for protesters crossing the street simply by "position[ing] myself along the access road and I just told people to stay out of the road."  Pl.'s SUF at ¶48; Dep. Pryde 32:16-24.  It is uncontested that patrons of the fundraiser continued to

cross the street from D to C and walk through and across the Island throughout the entire relevant period of time, including when Perez was demanding that Plaintiffs and other protesters leave the Island and threatening them with arrest if they did not comply.  Pl.'s SUF at ¶49.  As the fundraiser took place indoors, once inside, attendees would no longer hear or see the protesters, therefore, the only chance the protestors had to express their message was through targeting attendees on their drive/walk to the casino entrance, which became more difficult each time they were ordered farther away from the casino.  Pl.'s SUF at ¶50.

Defendant Perez and other officers under his direction had a number of conversations with Plaintiffs, continuing to insist that they move.  Pl.'s SUF at ¶51.  Ms. Kurland advised Defendant Perez that she and her fellow protesters had a right to remain at their location and peaceably protest, as they were in a public park and not causing any disturbance.  Pl.'s SUF at ¶52.  Ms. Kurland additionally informed Defendant Perez that the federal court for the District of Rhode Island had only six (6) months earlier ruled against the City and City Police Department in a similar situation involving First Amendment rights on a public sidewalk, mentioning the case of *Reilly v. City of Providence* [CA 10-461 S, 2013 WL 1193352 (D.R.I.)].  Pl.'s SUF at ¶53.  Despite this, Defendant Perez continued to insist that Plaintiffs and those with them had to move or they would be arrested and informed his Superior, Major Verdi, as much who supported his decision.  Pl.'s SUF at ¶54.  Because Ms. Kurland continued to remain on the Island, Defendant Perez arrested her, but did not arrest Plaintiff Gould or anyone else with her.  Pl.'s SUF at ¶55.  Following Plaintiff Kurland's arrest, and fearing that they too would be arrested if they continued to fail to comply with Defendant Perez's order to move, the remaining protesters, including Ms. Gould, left the Island, moving across Rose Avenue to the grassy area.  Pl.'s SUF at ¶56.

### *Lack of Substantial Government Interest*

The only basis Defendant Perez proffered for forcing Plaintiffs farther from the Casino from site "C" to "D" was a worry that some protesters might cross the street if there were protesters at both "C" and "D."  Pl.'s SUF at ¶60.  Indeed Defendant Perez explicitly testified that "but for [his] concern about the migration of people from 'D' to 'C' [he] had no problem with people being at 'B' and 'C' . . . on the Island." Pl.'s SUF at ¶61; Dep. Perez 55:14-17.  More specifically, Defendant Perez's sole basis that Plaintiffs and protesters with them could not be at "C" was a concern that a few middle-aged, mature people, mostly teachers and firefighters, some retired, might be encouraged to cross back to the Island, across a crosswalk, with seven (7) police in position to manage traffic and crossing, and who often assisted others, including children, in crossing busy streets, might cross the street to join the Plaintiffs.  Pl.'s SUF at ¶62.

The Island has an area of some 29,650 square feet, or about 100 square feet per protester even if the high end estimate of 300 or so protestors is correct.  Further, even if only the perimeter of the Island is in question, that is a distance of nearly 900 feet, or some three feet of space per protester if they never, not even once, were more than one protester deep.  Pl.'s SUF at ¶63; Island Area Map.  For comparison the ballroom of the Rhode Island Convention Center is 20,000 square feet, and has a capacity of 2,300 people in a theater configuration, or 1,400 people in a banquet configuration. Pl.'s SUF at ¶64; Rhode Island Convention Center Ball Room Floor Plan and Capacities, http://riconvention.s3.amazonaws.com/img/ricc_floorplans_ballrooms-updated.jpg (last visited April 3, 2019) in App. Ex. 21.  Indeed, Officer Pryde had previously determined that in order to minimize people crossing Rose Avenue it would be best to concentrate protesters on the Island.  Pl.'s SUF at ¶65.  Further, before Perez arrived and demanded Plaintiffs and others move, Officer Pryde had addressed the potential for protesters

crossing the street simply by "position[ing] myself along the access road and I just told people to stay out of the road." Pl.'s SUF at ¶66.

### *Lack of Narrow Tailoring and Burdens Imposed on Speech*

The purpose of the protest, at least from the point of view of Plaintiffs, was to get the attention of patrons as they went by them. It was an indoor event and once persons were inside, they would not be able to hear them. The goal was to disrupt the patrons to make them feel uncomfortable so that they would ask why the protesters were all there. This was better accomplished closer to the Casino. Dep. Gould. Pl.'s SUF at ¶67. It was not the goal to slow down or stop traffic. That was not a tactic for this protest. Pl.'s SUF at ¶68. The fact that large numbers of people would be walking all over the park and crossing streets to reach the Casino was standard fare for the site and did not require any sort of out of the ordinary policing and traffic control. Pl.'s SUF at ¶69; Dep. Clements 43:24-44:3 (Clements: "I would answer that for large events, I have been there for large events, and I am not quite sure how many attended that event. They come from all over and they walk not only in the crosswalk, but on the grass."). The effect of moving protesters from A to D was that they have been forced from a position within fifty (50) feet of the Casino entrance (the sidewalk at A) to one approximately one-hundred (100) feet from the entrance (the southern edge of the Island at B), and then to one more than two-hundred and twenty-five (225) feet from the Casino entrance (the northwestern edge of the Island at C). Defendant Perez's order to move to D, if complied with, would put an additional forty (40) to (50) feet between protesters and the event, leaving them about two hundred seventy-five (275) feet from the Casino and the event. Pl.'s SUF at ¶70; Distance Maps in App. Ex. 3.

### *Lack of Probable Cause*

At no time did Plaintiffs or any other protesters obstruct anyone from accessing the Casino or the Event. Pl.'s SUF at ¶71. The protesters at the site of the event were orderly and

compliant as was the protest generally.  Pl.'s SUF at ¶72.  This was not surprising in light of the composition of the group.  Pl.'s SUF at ¶73.  There was no evidence of gang or other criminal elements or activity at the site of the event. Pl.'s SUF at ¶74.  Plaintiffs did not obstruct the street nor were they in the street at any point.  Pl.'s SUF at ¶75.  Indeed the only thing Plaintiff Kurland was doing when Defendant Perez arrested her, according to his own sworn testimony, was "standing there, holding a sign near that tree on the Island."  Pl.'s SUF at ¶76.  The protest and the protesters were peaceful.  Pl.'s SUF at ¶77.  There was no violence at the site of the event.  Pl.'s SUF at ¶78.  There were not threats of violence at the site of the event.  Pl.'s SUF at ¶79.  There was no concern that there was going to be any violence at the event.  Pl.'s SUF at ¶80.  There was no fighting at the site of event.   Pl.'s SUF at ¶81.  There was no property damage at the site of the event.  Pl.'s SUF at ¶82.  There was no threat of property damage at the site of the event.  Pl.'s SUF at ¶83.  There was no interference with the event taking place inside of the Casino.  Pl.'s SUF at ¶84.  No one was obstructed from entering the Casino.  Pl.'s SUF at ¶85. None of the protesters blocked motor vehicles dropping guests off to attend the fundraiser.  Pl.'s SUF at ¶86.  There were no incidents before Ms. Kurland's arrest.  Pl.'s SUF at ¶87.  There were no incidents after Ms. Kurland's arrest.  Pl.'s SUF at ¶88.  There was no breach of the peace. Pl.'s SUF at ¶89.  There was no concern that there would be any disruption at the event. Pl.'s SUF at ¶90.  Nothing unusual happened at the protest.  Pl.'s SUF at ¶91.

### *Malicious Prosecution*

Plaintiff Kurland was taken to the Providence Public Safety Complex and placed in an isolation holding cell for two to three hours.  Pl.'s SUF at ¶92.  Eventually, Plaintiff Kurland was removed from the cell, and was booked and photographed by Defendant Perez.  Pl.'s SUF at ¶93. The Police Report prepared by Defendant Perez alleged that Plaintiff Kurland had been arrested under Providence City Ordinance §16-3 (D), disorderly conduct wherein "Any person, who

alone or in concert with others, obstructs any place ordinarily used for the passage of persons, vehicles or conveyances or otherwise engages in conduct with obstructs or interferes physically with a lawful meeting, procession or gathering" rather than the "Failure to Move" charge Defendant Perez had indicated earlier.  Pl.'s SUF at ¶94.  As she was being released, Defendant Perez gave Plaintiff Kurland the agreement form to appear in Municipal Court with "Disorderly Conduct" checked off instead of "Failure to Move."  Pl.'s SUF at ¶95.  The charge in the Municipal Court paperwork appears to have been under Providence City Ordinance §16-3 (C); "[a]ny person who shall in a public place use "fighting words" or offensive language or words which by their very utterance inflict injury or are likely to provoke a violent reaction on the part of the average person so addressed."  Pl.'s SUF at ¶96.  Defendants continued their prosecution of Plaintiff Kurland despite the subsequent entry of a Consent Judgment in *Reilly v. City of Providence*, which provided that the City Police Department practice of "clearing vast public places," under the circumstances of that case, wherein there was no real harm or threatened harm to a substantial governmental interest, was unconstitutional.  Pl.'s SUF at ¶97.  The contents of the police report did not provide probable cause to support an arrest for either of the charges filed against Plaintiff Kurland.  Pl.'s SUF at ¶98.  Nor did the Defendants proffer any evidence to support the alternate charges brought against Plaintiff Kurland over the course of her prolonged prosecution.  Pl.'s SUF at ¶99.

At no time did Defendants have any information to support probable cause other than what was contained in the police report produced by Defendant Perez.  Pl.'s SUF at ¶100.  No further investigation was done by Defendants or any agents thereof during the entirety of Plaintiff Kurland's prosecution. Pl.'s SUF at ¶101.  Nevertheless, Defendants willfully continued their prosecution of Plaintiff Kurland.  Pl.'s SUF at ¶102.

On or about October 31, 2013, Plaintiff Kurland appeared at Municipal Court for her

arraignment and was informed by Inspector Quinn of the City Police Department that the charge was being dismissed under Rule 48(a), but that the City Solicitor's office was not present so Plaintiff Kurland would have to return on a day when the City Solicitor's office could sign off on the dismissal. Pl.'s SUF at ¶103. Plaintiff Kurland returned on or about November 13, 2013, but no one from the City Solicitor's office was present. Pl.'s SUF at ¶104. At the November 13, 2013 court date, Inspector Quinn notified Plaintiff Kurland that she would be required to appear in court again on December 11, 2013 and that she could also speak with the City Solicitor's office beforehand and attempt to resolve the issue without returning to court. Pl.'s SUF at ¶105.

Plaintiff Kurland left several messages for Senior Assistant City Solicitor Stephen Ryan, hoping to avoid having to return to court on December 11, 2013, and finally spoke with Mr. Ryan by phone on or about December 6, 2013. Pl.'s SUF at ¶106. Mr. Ryan informed Plaintiff Kurland that the charge against her had been dismissed in Municipal Court but would be re-filed in state District Court. Pl.'s SUF at ¶107. Plaintiff Kurland asked Mr. Ryan who had made that decision, to which Mr. Ryan replied that he had. Pl.'s SUF at ¶108. Plaintiff Kurland also asked Mr. Ryan whether he was familiar with what happened, to which he responded that he had read the police report but had not spoken with anyone who was present. Pl.'s SUF at ¶109. Mr. Ryan informed Plaintiff Kurland that she would need to appear at Municipal Court on December 11, 2013 to sign the agreement to appear in District Court. Pl.'s SUF at ¶110. Plaintiff Kurland appeared in Municipal Court on December 11, 2013 and was called into the Solicitor's conference room before the court proceedings began and again asked Mr. Ryan why he had decided to re-file the complaint in District Court. Pl.'s SUF at ¶111. Mr. Ryan stated he had a full calendar and was not going to take time out to explain anything to her and gave her the District Court complaint form. Pl.'s SUF at ¶112.

Plaintiff Kurland was arraigned in District Court on December 18, 2013 and referred to

the Public Defender's office.  Pl.'s SUF at ¶113.  There were two pre-trial conferences on the matter in District Court; the first pre-trial conference was January 8, 2014 and the second pre-trial conference was scheduled for January 22, 2014, at which the parties believed a date would be set for trial.  Pl.'s SUF at ¶114.  At the January 22 pre-trial, the District Court judge proposed a disposition of a "not-guilty filing" over the objection of Defendant City's Agent Solicitor Nelson, which Plaintiff Kurland accepted.  Pl.'s SUF at ¶115.

Plaintiff Kurland was known to Defendant City Officers and Prosecutors as a community organizer, activist, and advocate for the rights of those treated adversely by police or harmed by police misconduct.  Pl.'s SUF at ¶116.  Indeed Defendant Perez even said to Ms. Kurland as soon as she questioned his orders that "I know you.  You're a troublemaker."  He then said "Yeah, you're Luna aren't you?"  Pl.'s SUF at ¶117.  Plaintiff Kurland has often been in an adversarial position with regards to the Defendant City Police Department.  Pl.'s SUF at ¶118.

Mr. Ryan testified that he did no investigation in determining whether probable cause existed or not, that he simply assumed it based on the conclusions of the police report, that he had no idea where Ms. Kurland was standing, and was essentially totally ignorant about what had actually happened at the park when prosecuting Ms. Kurland.  Pl.'s SUF at ¶119.  When questioned during his deposition about probable cause to arrest and to prosecute Ms. Kurland, Mr. Ryan referenced the police report as the basis but was unable to point to any facts or evidence therein that supported probable cause.  Pl.'s SUF at ¶120.  Mr. Nelson testified in similar fashion that he did no investigation beyond reading the police report and was essentially totally ignorant about what had actually happened at the park when prosecuting Ms. Kurland.  Dep. Pl.'s SUF at ¶121.

### *Liability of the City and Lack of Qualified Immunity*

Defendant Perez avers that all his actions were in conformity with Defendant City Police Policy. Pl.'s SUF at ¶122. Defendant Chief of Police Clements agrees that Defendant Perez acted entirely in conformity with Defendant City Police Policy. Pl.'s SUF at ¶123. Defendant Perez contends that when he arrested Ms. Kurland, he acted in accordance with the training he received by from the Defendant City. Pl.'s SUF at ¶124.

Defendant Chief of Police Clements agrees that Defendant Perez acted entirely in conformity with Defendant City Police training. Pl.'s SUF at ¶125. Defendant Perez believes he did nothing wrong and would do the same thing in the future under the same circumstances that he was presented on that date. Pl.'s SUF at ¶126. Defendant Chief of Police Clements testified that Defendant Perez did nothing wrong in arresting Plaintiff Kurland and that he would expect Officers of Defendant City under his direction to do the same in the future in a similar situation. Pl.'s SUF at ¶127. Defendant Chief of Police Clements also testified that the behavior of Officers in forcing Plaintiff Gould and others to move off the sidewalk in front of the Casino was appropriate, consistent with training, would not violate the First Amendment, officers would not be disciplined for this behavior and would expect Officers of Defendant City under his direction to act the same in future similar situations. Pl.'s SUF at ¶128. Defendant Perez was never disciplined for any actions outlined above. Pl.'s SUF at ¶129. Indeed Defendant Perez was promoted not long after these events. Pl.'s SUF at ¶130. No change in policy subsequent to Plaintiff Kurland's arrest would direct any Officers of Defendant City to act differently in the same situation. Pl.'s SUF at ¶131.

Similarly, Defendant City and Defendant Clements took no action following the entry of the consent judgment in *Reilly* to alert Officers of Defendant City to the judgment or the implications thereof and many Officers with Defendant City Police Department are unaware of

the case, judgment, or any implications thereof.  Pl.'s SUF at ¶132.  Indeed, Officer Stanzione, who was himself involved in the *Reilly* case and had in-fact illegally ordered Ms. Reilly to move in that case was apparently never told about the result of that case, never saw the consent judgment, and did not receive any training or any other education in the aftermath of that case.  Pl.'s SUF at ¶133.  Defendant City and Defendant Clements made no changes in policy or training following the entry of the consent judgment in *Reilly* to ensure that such constitutional violations would not occur in the future.  ggPl.'s SUF at ¶134.  Indeed Senior Assistant Solicitor, Stephen Ryan had no knowledge of the Reilly Consent Judgment before or after the event involving Plaintiff Kurland.  Pl.'s SUF at ¶135.   Senior Solicitor Ryan additionally testified no other attorney has ever mentioned the Reilly Consent Judgment to him.  Pl.'s SUF at ¶136.

## IV.    STANDARD OF REVIEW

Summary judgment is appropriate where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits . . . show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Grubb v. KMS Patriots, L.P.,* 88 F.3d 1, 3 (1st Cir. 1996); *see also, Kelly v. United States*, 924 F.2d 355, 357 (1st Cir. 1991); Fed.R.Civ.P. 56(c).  All justifiable inferences to be drawn from the underlying facts must be viewed in the light most favorable to the party opposing the motion. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587 (1986).  When considering cross-motions for summary judgment, the Court will make all inferences in favor of the party against whom the motion under consideration was made.  *Allen v. City of Chi.,* 351 F.3d 306, 311 (7th Cir.2003).  The court's task is not to "weigh the evidence and determine the truth of the matter but [to] determine whether there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249 (1986).

Nevertheless, in making this determination, the court "must disregard all evidence favorable to the moving party that the jury is not required to believe." *Reeves v. Sanderson Plumbing Products, Inc.,* 530 U.S. 133, 151 (2000).[1]   Accordingly a court must disregard facts that are "patently untrue." *Penato v George,* 52 AD2d 939, 941 (N.Y. App. Dist. 2 Dept. 1976), *appeal dismissed* 42 N.Y.2d 908, (N.Y. 1977); *accord Leo v. Mt. St. Michael Acad.,* 272 A.D.2d 145, 146 (N.Y. App. Dist. 1 Dept. 2000).   Similarly, where documentary evidence conclusively establishes that an issue of fact is "not genuine, but feigned" a court must disregard facts supporting the feigned dispute. *Leo v. Mt. St. Michael Acad.,* 272 A.D.at 146; *Glick & Dolleck v. Tri–Pac Export Corp.,* 22 N.Y.2d 439, 441, (1968); *Carlin v. Crum & Forster Ins. Co.,* 191 A.D.2d 373, (N.Y. App. Dist. 1 Dept. 1993).   In essence, the inquiry is whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law. *Anderson,* 477 U.S. at 251-52.  A party opposing the motion must do more than simply show that there is some metaphysical doubt as to the material facts. *Matsushita Elec. Indus. Co.,* 475 U.S. at 586.  In order for a court to conclude that there are no genuine issues of material fact, the court must be satisfied that no reasonable trier of fact could have found for the nonmovant, or, in other words, that the evidence favoring the nonmovant is insufficient to enable a reasonable jury to return a verdict for the nonmovant. *Id.* at 250 n. 4.  If the record, viewed in this light, could not lead a rational trier of fact to find for

---

[1]   *See Scott v. Harris*, 550 U.S. 372, 380 (2007) (when the record contradicts a party's description of the facts, it does not create a genuine dispute); *accord Blaylock v. City of Philadelphia,* 504 F.3d 405, 413 (3d Cir.2007); *see also Cuesta v. School Bd. of Miami-Dade County,* 285 F.3d 962, 970 (11th Cir.2002) (Summary judgment proper "when the inferences that are drawn from the evidence, and upon which the non-movant relies, are implausible.")(internal quotations omitted); *Dillon, Read & Co., Inc. v. United States,* 875 F.2d 293, 300 (Fed.Cir.1989) *(*trial court has duty to reject stipulations which are demonstrably false*); Cf. Bill Johnson's Restaurants, Inc. v. N.L.R.B.,* 461 U.S. 731, 746 (1983) (in determining whether case involves genuine issues of material fact for purposes of reasonable-basis determinations, NLRB may reject "plainly unsupportable inferences" and "patently erroneous submissions.").

the party opposing the motion, summary judgment is proper.  *Matsushita Elec. Indus. Co.,* 475

U.S. at 587.

The availability of summary judgment thus turns upon whether a proper jury question is

presented.  *Anderson*, 477 U.S. at 249.  A court may grant summary judgment on less than all

claims or issues or with respect to liability only.  *See* Fed.R.Civ.P. 56(c) and (d).

## V.   ARGUMENT

### A.  Summary of Legal Claims

**Illegal Viewpoint/Content-Based Restrictions Imposed on Plaintiffs.**  Defendants

imposed unconstitutional viewpoint and/or content-based restrictions on Plaintiffs' speech,

forcing protesters progressively farther and farther from the Casino, the event, and the event

attendees, the primary targets of the protest, eventually forcing protesters to an area some two

hundred and seventy-five (275) feet, or nearly a football field worth of distance from the Casino,

which was separated from the Casino by two wide roads and a number of large trees.  Plaintiffs

and other protesters were denied access to areas of the park closer to the Casino solely because

of the content of their speech, while allowing others, particularly event attendees, free and

unfettered use of the park.  The proffered basis for forcing protesters to this area, traffic control,

not only does not meet the exacting standard of strict scrutiny, it is purely pretextual as it was not

served in anyway by moving protesters from the more than sufficiently spacious nearly 30,000

square foot Island where fewer protesters would be in close proximity to the traffic flow through

the park, then the farther location PPD officers, including Defendants, eventually forced them.

**Conduct of Defendants Illegal Even Under Content-Neutral Intermediate Scrutiny.**

Even if the Defendants had acted for content-neutral reasons, a scenario at odds with all the

undisputed evidence, the time, place, and manner restrictions here were not narrowly tailored and

did not serve a compelling governmental interest.  First, as above, there was no government

interest at all and the traffic issue cited is purely pretextual. Second, even if other protesters were causing a traffic issue the legal and constitutionally sound response to the traffic issue Defendants proffer was not to threaten and/or arrest Plaintiffs who had nothing to do with it, but rather to police the situation so as to prevent a traffic issue and to address those protesters whose actions created it, when and if such an issue came to be.  Restricting Plaintiffs' speech, which was not the cause of any purported disruption, does not meet the narrow tailoring requirements of intermediate scrutiny.

**Conduct of Defendants Constituted Independent Fourth Amendment Violations.**
Arresting Plaintiff Kurland under Providence City Ordinance §16.3(D) (or under the analogous state law) was a illegal seizure under the Fourth Amendment as a matter of law where 1) Defendants have admitted in sworn testimony that, among other statements, the event was peaceful and legal, 2) there was a total and utter lack of any probable cause to support Plaintiff Kurland's arrest; and, 3) Defendants and other PPD officers testifying that no one was obstructed from accessing the event, there was no disruption of the event, that protesters were orderly, that there was no obstruction of the street by Plaintiffs, that there was no violence or property destruction, and there was no breach of the peace.  This applies to Plaintiff Gould as well, who although not arrestted, had her movement restricted in a similarly baseless fashion.

**That the Conduct of Defendants was Illegal was Apparent with Obvious Clarity and Thus They Are Not Entitled To Qualified Immunity.**  In this case, Plaintiffs, based on the testimony of the Defendants and other officers at the scene, posed no "clear and present danger" of immediate harm or violence where they made no threats of physical harm to police or members of the public, did not incite violence or disorder and displayed no dangerous weapons at the time Defendants demanded they move or when Defendants arrested Ms Kurland.  Even under Defendants most favorable traffic issue fact pattern, only one protester may have had any

issue with traffic, and that was caused by Defendants harassing Plaintiffs for peacefully protesting in a public park, away from the roadway.  This one incident, created by police activity and a one off issue easily resolved by simply helping protesters cross the street safely as police were already doing for attendees of the event, did nothing to alter the peaceful and orderly tenor of the protest.  Taken as a whole, the undisputed facts, as gleaned from the sworn testimony of Defendants and other police officers, reveal an orderly, peaceful crowd.  Given the above, it is clear that there was no "clear and present danger" to justify interference with any protester's free speech rights during this protest, beyond the general police imperative to tell them to stay out of the road and to address a refusal to do such through normal and constitutionally valid police powers or to make any arrests.  That you cannot impose police power on people acting in a totally lawful manner is black letter law that even the most ignorant police officer is expected to know, it is the first and most basic concept that distinguishes a free society from a police state.

**The City of Providence Is Liable as a Municipality.**  In light of the illegality of Defendants conduct, Defendant City is municipally liable because a) Chief of Police Defendant Clements testified that Defendant Perez and other PPD officers did nothing wrong and that he would expect Officers of Defendant City under his direction to do the same in the future in a similar situation b) there is a pattern of disregard for First Amendment Rights by Defendant City and Defendant City Police Officers; *see e.g Reilly v. Providence*, No. CA 10-461 S, 2013 WL 1193352 (D.R.I. Mar. 22, 2013) (illegal clearing of vast public spaces and restrictions on leafleting); *Prince v. Providence*, C.A. No. 15-378M (D.R.I) (illegal arrest and assault on someone peacefully filming police conduct); *Pombo v. Providence*, C.A. No. 1:15-cv-00291-ML-LDA (D.R.I) (illegal restrictions on a local street musician performing on the street); *Kurland v. City of Providence* C.A. No. 18-cv-00440-JJM-LDA (D.R.I) (illegal arrest of Ms. Kurland for standing on the sidewalk, not blocking anyone, and telling police officers they could

not bar people from the sidewalk in Kennedy Plaza who were not causing a disturbance or blocking flow of movement on the sidewalk); and c) Defendant City has left its agents woefully ignorant even when it is told by this Court that its policies, practices, and training are leading to First Amendment violations, specifically doing nothing to alert PPD officers or City Solicitors engaging in prosecutions of the outcome and holding in *Reilly*.

**Defendants Actions Against Plaintiff Kurland Amount to Malicious Prosecution.**  In prosecuting Plaintiff Kurland with a total absence of probable cause, in the failure of prosecutors to investigate the facts of the case at all in prosecuting Ms. Kurland, and in displaying particular animosity toward Plaintiff because she was "a troublemaker," Defendants engaged in an illegal malicious prosecution against Plaintiff.

### B.  First Amendment Legal Standards

#### *Freedom of Speech and of the Press*

"The First Amendment reflects 'a profound national commitment to the principle that debate on public issues should be uninhibited, robust, and wide-open.' " *Snyder v. Phelps*, 562 U.S. 443, 452 (2011).  Freedom of speech and that of the press are fundamental personal rights and liberties, and the exercise of these rights lies at the foundation of free government by free people.  *Schneider v. State of New Jersey, Town of Irvington*, 308 U.S. 147, 161 (1939).  One who is rightfully on a street open to the public "carries with him there as elsewhere the constitutional right to express his views in an orderly fashion [, including] . . . the communication of ideas by handbills and literature as well as by the spoken word." *Members of City Council of City of Los Angeles v. Taxpayers for Vincent*, 466 U.S. 789, 810 (1984) (quoting *Jamison v. Texas*, 318 U.S. 413, 416 (1943)).

### Political Speech

The Supreme Court has recognized that the First Amendment reflects a "profound national commitment" to the principle that "debate on public issues should be uninhibited, robust, and wide-open," and has consistently commented on the central importance of protecting speech on public issues. *Boos v. Barry*, 485 U.S. 312, 318 (1988)(quoting *New York Times Co. v. Sullivan*, 376 U.S. 254, 270 (1964)). Political speech such as that involved in the case at bar is entitled to the fullest possible measure of constitutional protection. *Taxpayers for Vincent*, 466 U.S. at 816.

### Three Step Free Speech Analysis

Free speech claims challenging restrictions on expressive conduct are analyzed in three steps. *Cornelius v. NAACP Legal Defense & Educational Fund, Inc.,* 473 U.S. 788A 797 (1985). The first step is to determine whether the plaintiff's conduct is protected speech. As they must in light of the case law cited above, Defendants concede that the Plaintiffs' activity constitutes protected First Amendment conduct. Defendants' Memorandum of Law ("Defs' Memo) at 16. The second step is to "'identify the nature of the forum, because the extent to which the Government may limit access depends on whether the forum is public or nonpublic.' " *Cornelius* at 797. Again, in light of the case law cited supra, the Defendants concede that the park where the protest took place is a public forum. Defs' Memo at 16.

Under these circumstances governmental interference with speech is limited to "reasonable time, place, and manner regulations as long as the restrictions are content-neutral, are narrowly tailored to serve a significant government interest, and leave open ample alternative channels of communication. *See Nat'l Amusements, Inc. v. Town of Dedham*, 43 F.3d 731, 736-37 (1st Cir. 1995).

### *Free Speech Imposes Limits on Police Power During Protests*

"The Supreme Court has declared that the First Amendment protects political demonstrations and protests—activities at the heart of what the Bill of Rights was designed to safeguard." *Jones v. Parmley*, 465 F.3d 46, 56 (2d Cir. 2006) (J. Sotomayor).  Indeed, organized political protest is "classically political speech" which is "at the core of the First Amendment" *Boos v. Barry,* 485 U.S. 312, 318, (1988).  As such "police may not interfere with orderly, nonviolent protests merely because they disagree with the content of the speech *or because they simply fear possible disorder.*"  *Jones*, 465 F.3d at 56 (emphasis added).  This includes challenging police orders and a right to dissent from illegal police action.  "The First Amendment protects a significant amount of verbal criticism and challenge directed at police officers.... The freedom of individuals verbally to oppose or challenge police action without thereby risking arrest is one of the principal characteristics by which we distinguish a free nation from a police state." *City of Houston v. Hill,* 482 U.S. 451, 461, 462–63, (1987).

### *Heighted Protection of Speech in a Traditional Public Forum*

" 'Public fora have achieved a special status in our law; the government must bear an extraordinarily heavy burden to regulate speech in such locales.'  Parks, in particular, 'have immemorially been held in trust for the use of the public and, time out of mind, have been used for purposes of assembly, communicating thoughts between citizens, and discussing public questions.' "  *Grossman v. City of Portland*, 33 F.3d 1200, 1204–05 (9th Cir. 1994) (quoting *Hague v. CIO,* 307 U.S. 496, 515 (1939).[2]  This venerable tradition of the park as public forum

---

[2]  *Hague v. CIO,* 307 U.S. 496, 515 (1939) (Roberts, J., plurality opinion) ("[F]rom ancient times, [streets and public places ] been a part of the privileges, immunities, rights, and liberties of citizens.... [S]treets and parks ... have immemorially been held in trust for the use of the public and, time out of mind, have been used for purposes of assembly, communicating thoughts between citizens, and discussing public questions.")*; see also Hurley v. Irish-American Gay, Lesbian and Bisexual Group of Boston,* 515 U.S. 557, 579 (1995) ("Having availed itself of the public thoroughfares 'for purposes of assembly [and] communicating thoughts between citizens,' the [petitioner] is engaged in a use of the streets that has 'from ancient times, been a part of the privileges, immunities, rights, and liberties of citizens.' ") (quoting *Hague*, 307 U.S. at 515); *Perry Educ. Ass'n v. Perry Local Educators' Ass'n,* 460
*(Footnote continued on next page)*

has-as suggested by the attendant image of the speaker on a soapbox-a very practical side to it as well: parks provide a free forum for those who cannot afford newspaper advertisements, television infomercials, or billboards. *Id*. "The government's authority to regulate speech or expressive conduct on property that has traditionally been open to the public for such activity, such as public streets and parks, *is sharply circumscribed*." H*obbs v. County of Westchester*, 397 F.3d 133, 148 (2d Cir. 2005) (emphasis added).

### *Strict Scrutiny Applied to Viewpoint-Based and Content-Based Restrictions on Speech*

"It is axiomatic that the government may not regulate speech based on its substantive content or the message it conveys." *Rosenberger v. Rector & Visitors of Univ. of Virginia*, 515 U.S. 819, 828, (1995)(citing *Police Dept. of Chicago v. Mosley,* 408 U.S. 92, 96, (1972)). "Other principles follow from this precept. In the realm of private speech or expression, government regulation may not favor one speaker over another." *Id.* (citing *Members of City Council of Los Angeles v. Taxpayers for Vincent,* 466 U.S. 789, 804, (1984)). "Discrimination against speech because of its message is presumed to be unconstitutional." *Id*. When government officials target speech *because of* "particular views taken by speakers on a subject," viewpoint discrimination is afoot. *Id.* at 829. Courts must "apply the most exacting scrutiny to regulations that suppress, disadvantage, or impose differential burdens upon speech because of its content". *Turner Broad. Sys., Inc. v. F.C.C.,* 512 U.S. 622, 642 (1994) (citing *Simon & Schuster,* 502 U.S., at 115, 112 S.Ct., at 507–08; *id.,* (KENNEDY, J., concurring in judgment); *Perry Ed. Assn. v. Perry Local Educators' Assn.,* 460 U.S. 37, 45 (1983)). Indeed, "[c]ontent-based restrictions on constitutionally protected speech are "presumptively invalid." *Ysursa v. Pocatello Educ. Ass'n*, 555 U.S. 353, 358 (2009).

U.S. 37, 45 (1983) (noting that streets and parks are "[a]t one end of the spectrum" among "places which by long tradition or by government fiat have been devoted to assembly and debate").

### C.  Defendants Imposed Viewpoint/Content Based Restrictions on Plaintiffs' Speech in a Traditional Public Forum

In the case at bar Defendants imposed viewpoint and/or content based restrictions on Plaintiffs' political speech in a public park, requiring this Court to review their actions with the utmost scrutiny.  There is no dispute that Roger Williams Park is a public park and thus a traditional public forum.  Pl.'s SUF at ¶6.  Further, there is no dispute that everyone other than protestors were allowed to move about, stand around and use the park, in particular the Island, freely during the entirety of the demonstration and that only those Defendants identified as protesters were forced to move.  Pl.'s SUF at 24, 49.  Thus, were it not for the content of their speech, Plaintiffs would have been able to be wherever they wanted in the park.

### *Legal Standard*

The recent case of *Deferio v. City of Syracuse* is illustrative here.  In that case, the court noted that, "[w]hile the dispute in this case may seem parochial—defendants Sergeant Jamey Locastro and Captain Joseph Sweeny forced Plaintiff to move approximately forty feet from the north to the south side of West Kirkpatrick Street—the issues presented here affect the heart of the First Amendment's purpose."  306 F. Supp. 3d 492, 499 (N.D.N.Y. 2018), <u>appeal dismissed</u> (June 18, 2018).  In that case a city police officer forced a protestor to move forty (40) feet away from the event he was protesting and "[w]hen asked what was the distinction between Plaintiff and the many other people near him, [the officer] said, 'Nobody else was holding a large anti-gay sign, standing in the middle of the sidewalk, upsetting people.' "  *Id*. at 509.  This focus on the speech of the person moved was, as the court noted, clearly content based.  Similarly the officer's "second justification—Plaintiff's safety—was also content-based."  *Id*. at 510.  "It is a fundamental principle of First Amendment jurisprudence that '[l]isteners' reaction to speech is not a content-neutral basis for regulation.' "  *Id*. (quoting *Forsyth County v. Nationalist Movement*, 505 U.S. 123, 134, 112 S.Ct. 2395, 120 L.Ed.2d 101 (1992)).  As the court

elaborated, "[t]he Supreme Court ... has repeatedly affirmed the principle that 'constitutional rights may not be denied simply because of hostility to their assertion or exercise.'  If the speaker's message does not fall into one of the recognized categories of unprotected speech, the message does not lose its protection under the First Amendment due to the lawless reaction of those who hear it.  *Id.* (quoting *Bible Believers v. Wayne Cty., Mich.*, 805 F.3d 228, 252 (6th Cir. 2015).

### *Restrictions Applied Only to Protesters*

Here Defendants and other officers at the site during the incident have all admitted that people attending the event were free to move across streets and across any area of the park they wished undisturbed by police.  SUF at ¶¶24 49, 57.  Further, Defendants were not only aware and opposed to the protesters in general, but were aware of the content of their protest in their endeavor to move it as far away from the Raimondo fundraiser as they could.  SUF at ¶58. Finally, the only basis Defendants' provided for restricting Plaintiffs' speech was a concern about the actions of others, not of Plaintiffs themselves, which was on its face insubstantial and incoherent.  Specifically, Defendants postulate that protesters, mostly firefighters and teachers, might cross a street in the vicinity of  a cross walk and seven (7) uniformed Providence police in the area directing traffic, *which was being regularly crossed without incident by people attending the event,* would somehow be exposed to danger creating a public safety hazard.  SUF at ¶¶60-61.

### *Proffered Compelling State Interest is Pretextual and*
### *Without Basis in Any Evidence Disputed or Undisputed*

State actions restricting speech "can stand only if they survive strict scrutiny, which requires the Government to prove that the restriction furthers a compelling interest and is narrowly tailored to achieve that interest.' "  *Reed v. Town of Gilbert, Ariz.*, 135 S. Ct. 2218, 2231 (2015); *see also Bible Believers*, 805 F.3d at 248 (citing U*nited States v. Playboy Entm't*

*Grp.*, 529 U.S. 803, 813 (2000) ) ("No state action that limits protected speech will survive strict scrutiny unless the restriction is narrowly tailored to be the least-restrictive means available to serve a compelling interest."). Content-based restrictions on constitutionally protected speech are "presumptively invalid." *Ysursa v. Pocatello Educ. Ass'n*, 555 U.S. 353, 358 (2009). Here, Defendants restriction is far from narrowly tailored

Here, before even addressing the narrow tailoring requirement, Defendants fail the first prong of the test as they have not presented a compelling state interest.

In the first instance, in analyzing the Defendants' proffered reasons, it must be kept in mind that First Amendment standards "must give the benefit of any doubt to protecting rather than stifling speech." *Fed. Election Comm'n v. Wisconsin Right To Life, Inc.*, 551 U.S. 449, 469 (2007) (opinion of Roberts, C.J.)(citing *New York Times Co. v. Sullivan*, 376 U.S. 254, 269–270 (1964)). Here, the interest proffered by Defendants, traffic control and related safety concerns, while certainly a compelling government interest in a general sense as well as in certain factual scenarios, was in no way threatened by Plaintiffs exercise of their free speech rights, and was in no way served by the limitations Defendants imposed on Plaintiffs' speech, much less within the constraints of strict scrutiny.

The Defendants claim that traffic control concerns justified moving Plaintiffs from the Island to D, even farther from the event being protested. This claim is without substance. The facts demonstrating the baseless nature of this proffered interest are undisputed. The only basis Defendant Perez proffered for forcing Plaintiffs *farther* from the Casino from site C to D was a worry that some protesters might cross the street if there were protesters at both C and D. Pl.'s SUF  at ¶60. Indeed Defendant Perez explicitly testified that "but for [his] concern about the migration of people from 'D' to 'C' [he] had no problem with people being at 'B' and 'C' . . . on the Island." Pl.'s SUF  at ¶61. At a minimum, one would assume he was probably of the same

opinion with respect to site A, particularly insofar as Defendants have not offered any justification for moving Plaintiff Gould and other protesters from that site. However, what this alleged concern boils down to is that somehow seven (7) police in position to manage traffic and maintain order, who were more than capable of making sure people attending the event could cross the street in safety and safeguarding against any traffic issues, could not handle the possibility that a few middle-aged, mature people, mostly teachers and firefighters, who often assisted others, including children, in crossing busy streets, might be encouraged to cross the street to join the Plaintiffs and would thereby somehow create an unmanageable public safety danger. Pl.'s SUF at ¶62.

This is patently absurd. It is also an example of the sort of *ad-hoc* and discriminatory application of a facially neutral statute that simply does not pass constitutional muster. *See e.g. Johnson v. Bax*, 63 F.3d 154, 158 (2d Cir. 1995) (quoting *Cox v. Louisiana,* 379 U.S. 536, 558 ("The government may regulate the use of streets for public assembly through 'appropriate, limited discretion, under properly drawn statutes or ordinances, concerning the time, place, duration, or manner' of the use, but the government's 'limited discretion' must be exercised uniformly and systematically so as not to create any unfair discrimination.").

Indeed, the fact that large numbers of people would be walking all over the park and crossing streets to reach the Casino was standard fare for the site and did not require any sort of out of the ordinary policing and traffic control. Pl.'s SUF at ¶69; Dep. Clements 43:24-44:3 (Clements: "I would answer that for large events, I have been there for large events, and I am not quite sure how many attended that event. They come from all over and they walk not only in the crosswalk, but on the grass."). Similarly, Defendant Perez and other officers testified that event attendees walked across the Island even when they were demanding Plaintiffs move off the Island and threatening them with arrest for being there. Pl.'s SUF at 49; Dep. Perez 71:12-17

("Q. Any partons wandering through [the Island]?" "A. People getting out of ther cars that were parked along Rose to go to the event." "Q. So there were some people wandering through?" "A. I recall someone getting out of a car and walking through as I was speaking to them [Plaintiffs Gould and Kurland and another protester].").

Moreover, the Defendants' claimed governmental interest is further undermined by the fact that the Island as well as other areas from which Plaintiffs and other protesters were removed from—including the sidewalk at site A—remained open to foot traffic for everyone, except for Plaintiffs and other protesters—the only ones engaging in communicative activity. *See Reilly v. City of Providence,* 2013 WL 1193352 *6 (D.R.I.) ("Defendants' decision to ban only Plaintiff and her companion from the lower sidewalk while allowing all other pedestrians access to that same stretch of sidewalk undermines the credibility of their purported public safety justification.").[3]  It must be kept in mind that what Plaintiffs and other protesters were doing was no different—except they did not enter the building, but continued standing or walking around in the areas of sites "A," "B,", and "C" until removed by Defendants—a distinction without any significance under the circumstances presented.[4]

Further, the pretextual nature of Defendants' restriction on Plaintiffs' speech not only fails to come anywhere near the extremely narrow tailoring required to survive scrutiny, it also

---

[3]  *See also Saieg v. City of Dearborn*, 641 F.3d 727, 737  (6th Cir. 2011)(holding that the defendants' decision to keep sidewalks adjacent to the festival open to public traffic "erode[d] the significance of the government's interest in restricting leafleting on those same sidewalks");  *Kuba v. 1–A Agric. Ass'n,* 387 F.3d 850, 859, 806-61 (9th Cir.2004) (noting that the plaintiff was "not asking to protest in an area that he would otherwise be unable to access"); *City of Ladue v. Gilleo,* 512 U.S. 43, 52,(1994)("Exemptions from an otherwise legitimate regulation of a medium of speech . . . may diminish the credibility of the . . . rationale for restricting speech in the first place")..

[4]  *Saieg v. City of Dearborn*, 641 F.3d 727 (6th Cir. 2011) (governmental interest in crowd control and public safety not substantial where sidewalks remained open to normal pedestrian traffic); *Jews for Jesus, Inc. v. Massachusetts Bay Transp. Auth.*, 984 F.2d 1319, 1326 (1st Cir. 1993) (condoning similar activity undermined claim leafleting activities threatened public safety; *Ascherl v. City of Issaquah,* 2011 WL 4404145 *4 (W.D. Wash.) (governmental interest in crowd control undermined where it leaves adjacent sidewalks open for typical non-festival pedestrian traffic).

**Page 31 of 67**

supports the contention that Defendants' actions were based on the viewpoint and content of Plaintiffs speech.  First, to justify limitations on First Amendment freedoms, a " 'reasonable' burden on expression requires a justification far stronger than mere speculation about serious harms."[5]   The Defendants must do more than "assert[] interests [that] are important in the abstract"—they may not simply "posit the existence of the disease sought to be cured."[6]  The proponents of a restriction on free expression have the burden of "demonstrat[ing] that the recited harms are real, not merely conjectural, and that the regulation will in fact alleviate these harms in a material way."[7]  As mentioned above the Island from which Defendants barred Plaintiffs has an area of some 29,650 square feet, or about 100 square feet per protester even if the high end estimate of 300 or so protestors is correct.  Pl.'s SUF at 63; Island Area Map in App. Ex. 2.  Again, for the sake of comparison, the ballroom of the Rhode Island Convention Center, with limited points of ingress and egress and which must comply with fire, health, and

---

[5] *U.S. v. National Treasury Employees Union*, 513 U.S. 454, 475-476 (1995) (quoting *Whitney v. California*, 274 U.S. 357, 376 (1927))(Brandeis concurring opinion)("To justify suppression of free speech there must be reasonable ground to fear that serious evil will result if free speech is practiced.")); *Thomas v. Collins*, 323 U.S. 516, 530 (1945)("For these reasons any attempt to restrict [First Amendment] liberties must be justified by clear public interest, threatened not doubtfully or remotely, but by clear and present danger."); *Nat'l Amusements Inc. v. Town of Dedham*, 43 F.3d 731, 741 (1st Cir. 1995) "[G]overnmental interest woven exclusively out of the gossamer threads of speculation and surmise cannot be termed substantial."); *Multimedia Pub. Co. v. Greenville–Spartanburg Airport District,* 991 F.2d 154, 161–62 (4th Cir.1993) (record revealed government's asserted interests to be illusory, tenuous, and non-verified).

[6] *Turner Broadcasting System, Inc. v. F.C.C.*, 512 U.S. 622, 664 (1994) (citations and internal quotations omitted); *see Bl(a)ck Tea Society v. City of Boston*, 378 F.3d 8, 13 (1st Cir. 2004) ("Security is not a talisman that the government may invoke to justify any burden on speech (no matter how oppressive)."); *see also Bays v. City of Fairborn*, 668 F.3d at 823;  *Saieg v. City of Dearborn*, 641 F.3d at 738-737; *Ascherl,*  2011 WL 4404145 at *3.

[7] *Turner Broadcasting System,* 512 U.S. at 664; *see Members of City Council of City of Los Angeles v. Taxpayers for Vincent*, 466 U.S. 789, 803 (1984) (Court "may not simply assume that the ordinance will always advance the asserted state interests sufficiently to justify its abridgment of expressive activity.") (internal quotation marks omitted); *Home Box Office, Inc. v. FCC*, 567 F.2d 9, 36 (D.C. Cir. 1977) ("[A] 'regulation perfectly reasonable and appropriate in the face of a given problem may be highly capricious if that problem does not exist' ")(citation omitted); *see also Bays v. City of Fairborn*, 668 F.3d at 823 ("[Government must do more . . . than 'assert interests [in reduced congestion and crowed control] that are important in the abstract.'");  *Saieg*, 641 F.3d at 738-737 ("[General] interests [in public safety and order] that the defendants have named are merely 'conjectural,' as opposed to 'real.'"); *Ascherl,*  2011 WL 4404145 at *3 (City's identified interest of facilitating orderly flow of pedestrians during festival based more on conjecture than reality).

building codes to ensure a safe density of people is 20,000 square feet, and has a capacity of

2,300 people in a theater configuration, or 1,400 people in a banquet configuration, or between

8.7 and 14.28 square feet per person in the space.  Pl.'s SUF at ¶64.  The idea that there would be

insufficient space for 300 protestors in such an area is frankly preposterous.  Further, even if only

the perimeter of the Island is in question, that is a distance of nearly 900 feet, or some three feet

of space for protester if they never, not even once, were more than one protester deep. Pl.'s SUF

at ¶63.  In short, 300 people in a 30,000 square foot totally open public park area, with nearly

900 feet of perimeter, does not appear to provide a reasonable, forum-specific basis for the traffic

concerns cited by Defendants.[8]   The math does not support the Defendants' contention of

overcrowding even if the protesters congregated only on, say, the quarter of the Island nearest

the Casino (which they probably would).  As such, even if Defendants were worried about traffic

and wanted to concentrate protesters on one side of the street, they could easily have left them on

the Island, closer to the event, while allying these concerns.  That every time the Defendants

---

[8]   The Defendants' reliance on *Heffron v. Int'l Soc. for Krishna Consciousness, Inc.,* 452 U.S. 640, 650-51 (1981) is misplaced.  In *Heffron,* the Supreme Court upheld a regulation limiting literature distribution to fixed locations during the Minnesota State Fair given that the regulation applied to a temporary event where "the flow of the crowd and demands of safety [were] more pressing." 452 U.S. at 651.  However, the Minnesota State Fair in *Heffron* was held in a limited public forum, *i.e.,* a fenced in public fairgrounds where attendees were required to pay a fee for admission.  In addition, attendance at the Fair included 1.400 exhibitors and well over 100,000 daily visitors.  *Id.* at 650.  Moreover, as the Supreme Court noted there are considerable differences between fairgrounds and parks or public streets and sidewalks:

> A street is continually open, often uncongested, and constitutes not only a necessary conduit in the daily affairs of a locality's citizens, but also a place where people may enjoy the open air or the company of friends and neighbors in a relaxed environment.  The Minnesota Fair, as described above, is a temporary event attracting great numbers of visitors who come to the event for a short period to see and experience the host of exhibits and attractions at the Fair. The flow of the crowd and demands of safety are more pressing in the context of the Fair.

*Id.* at 651.  Accordingly, as the Court cautioned, "any comparisons to public streets are necessarily inexact."  *Id.*  In this context, any such comparison is inapposite.  A ban protesting in a, wide open public park is not comparable to restrictions on literature distribution to a fixed location at a crowded, fenced in state fair.

*Bl(a)ck Tea Soc'y,* 378 F.3d 8, 13 (1st Cir. 2004), another cased relied on by Defendants, involved challenges to security protocols restricting expressive activity at public forums surrounding national political conventions held in major cities, where the restrictions were imposed due to reasonable and legitimate public safety concerns, ***based on previous experience with enormous crowds at such events.***  300 people in a large public park is hardly comparable to the concerns of a national political convention held in the downtown of a major city.

moved the protesters farther and farther away from the event it also brought them closer to main roads and required large groups of people to cross the roads demonstrates that the motive had nothing to do with content-neutral traffic control, but was a content-based desire to get protesters far away from the event.[9]

### Heckler's Veto and Requirement to Police Actual Disruption, Not Peaceful Protected Speech

Finally, restricting the speech rights of Plaintiffs because *others* might cause a disruption—in this case, people other than attendees crossing the street, is similar to the constitutionally barred "heckler's veto.  As the Supreme Court has often stated "'constitutional rights may not be denied simply because of hostility to their assertion or exercise.'  If the speaker's message does not fall into one of the recognized categories of unprotected speech, the message does not lose its protection under the First Amendment due to the lawless reaction of those who hear it.  Simply stated, the First Amendment does not permit a heckler's veto." *Watson v. City of Memphis*, 373 U.S. 526, 535 (1963).  This is true even when a generally content neutral regulation is applied to effectuate a heckler's veto by police on the scene.  *Ctr. for Bio–Ethical Reform, Inc. v. L.A. Cty. Sheriff Dep't,* 533 F.3d 780, 787 (9th Cir.2008) (citing *Bachellar v. Maryland,* 397 U.S. 564, 567 (1970)). ("If the statute, as read by the police officers

---

[9] Plaintiff asserts that the record before the Court, if it does not support an application of strict scrutiny of a viewpoint or content-based restriction on speech, at the very least raises a material dispute of fact as to whether the Defendants were motivated by hostility toward Plaintiffs message and Plaintiff Kurland personally.  *See e.g.* Dep. Kurland 183:6-12. "I know you. You're a troublemaker". He then said "Yeah, you're Luna aren't you?" Additionally, Defendants began moving the Plaintiffs and the other protestors after  a woman associated with the event at the Casino scolded the police at the scene because she wanted the police to move the protestors away from the Casino event.  Pl.'s SUF ¶ 59.  Additionally, the opposing facts in the record juxtapose the bald faced assertions of the Defendants against the compelling inference based on numerous undisputed facts that the Defendants' purported public safety justification for moving Plaintiffs was false—a pretext, and that the Defendants were instead motivated by an intent to prevent or impede the exercise of Plaintiffs' First Amendment rights.  At trial, a finder of fact would be both permitted and justified, under the circumstances, to reject the Defendants' bald faced assertions and find they acted based on hostility toward Plaintiffs' speech.  While Plaintiff submits that even without drawing these inferences there is sufficient undisputed evidence that the Defendants engaged in viewpoint/content-based restriction of Plaintiffs' speech.  At the very least, this final factual dispute prevents a summary judgment ruling in Defendants favor.

on the scene, would allow or disallow speech depending on the reaction of the audience, then the ordinance would run afoul of an independent species of prohibitions on content-restrictive regulations, often described as a First Amendment-based ban on the 'heckler's veto.' "). "Listeners' reaction to speech is not a content-neutral basis for regulation," nor is it a basis or for taking an enforcement action against a peaceful speaker. *Forsyth,* 505 U.S.at 134; *see Brown v. Louisiana,* 383 U.S. 131, 133 n. 1 (1966).  While the heckler's veto is generally based on a hostile audience reaction, the rationale also applies here, where the basis for restricting Plaintiffs speech was not their actions, nor any danger they presented, but the possible actions of others.

*Further, heckler's veto cases direct the police to deal with the people creating the disturbance, not those peacefully exercising their free speech rights.*  In these cases the disturbances are often quite serious, and can be difficult for police to handle.  *See e.g.  Gregory v. City of Chicago,* 394 U.S. 111 (1969). (a group of civil rights protestors peacefully marched around the Mayor of Chicago's home to draw attention to and air their frustration with the slow pace of integration in Chicago's public schools.  The protestors were assaulted by onlookers with rocks and eggs, despite "a determined effort by the police to allow the marchers to peacefully demonstrate."  The protestors hurled invective back at their hecklers, but otherwise "maintained a decorum that sp[oke] well for their determination simply to" exercise their constitutional rights.  *Id.*  The police determined that the hecklers "were dangerously close to rioting," and therefore ordered the protestors to leave.  They were charged with and convicted of breach of the peace for refusing to vacate.  The Court, in a plurality opinion, called it a "simple case" because due process does not allow for a conviction for breach of the peace where there is no evidence that the protestors were themselves disorderly.); *Bible Believers*, 805 F.3d at 239. ("A group of young attendees responded by throwing plastic bottles, milk crates, and other debris at the [the speakers].").  The heckler's veto cases stand for the constitutional imperative that "[i]f the

**Page 35 of 67**

speaker, at his or her own risk, chooses to continue exercising the constitutional right to freedom of speech, he or she may do so without fear of retribution from the state, for the speaker is not the one threatening to breach the peace or break the law.. . . The rule to be followed is that when the police seek to enforce law and order, they must do so in a way that does not unnecessarily infringe upon the constitutional rights of law-abiding citizens—because it would be easier than policing those who would subvert their speech. *Bible Believers*, 805 F.3d at 252.

### Lack of Narrow Tailoring

While the particular thrust of the heckler's veto body of law is on hostile audiences, the principles that "the natural order of law enforcement and crime mitigation are not upended simply because . . . it easier to act against the speaker rather than the individuals actually breaking the law; " and that [i]n a balance between two important interests—free speech on one hand, and the state's power to maintain the peace on the other—the scale is heavily weighted in favor of the First Amendment." *Bible Believers*, 805 F.3d at 251-52.  Accordingly, it is black letter law that ease of or efficiency in policing does not justify restrictions on First Amendment freedoms. *McCullen v. Coakley,* 573 U.S. 464, 486 (2014) ("The tailoring requirement does not simply guard against an impermissible desire to censor.  The government may attempt to suppress speech not only because it disagrees with the message being expressed, *but also for mere convenience*.  Where certain speech is associated with particular problems, *silencing the speech is sometimes the path of least resistance*.  But by demanding a close fit between ends and means, the tailoring requirement prevents the government from too readily 'sacrific[ing] speech for efficiency.'")(citation omitted, emphasis added); *Riley v. Nat'l Fed'n of the Blind of N. Carolina, Inc.,* 487 U.S. 781, 795 (1988)("[W]e reaffirm simply and emphatically that the First Amendment does not permit the State to sacrifice speech for efficiency.").

In this case, the principle can easily be applied to a situation where the danger stemmed not from the Plaintiffs, but from others at the protest.  Dep. Perez 55:9-17 ("Q. But for your concern about the migration of people from 'D' to 'C,' you had no problem with people being at 'B' and "C,' correct, on the island?" "A. Correct. Yes.").  This could simply have been dealt with by, as Officer Pryde noted (before Perez arrived and demanded Plaintiffs move), simply "position[ing] myself along the access road and . . . [telling] people to stay out of the road."  Pl.'s SUF at 66; Dep. Pryde 32:16-24.  While the idea that seven (7) police officers couldn't control traffic passing through a park which may have been heavy  for that area, but not actually busy as compared to a busy street, when dealing with a complaint crowd of at most three hundred (300) firefighters and teachers in an area with a crosswalk is, frankly, preposterous.  The essential point of this analysis is that if there was a safety issue, the Defendants were legally obligated to police people going into the street, not to restrict Plaintiffs' speech as they stood peacefully on the grass at C not creating any issues.  In short, although Defendants make much of the speculative possibility that some demonstrators, although not the Plaintiffs, may cause a traffic disturbance, transforming the peaceful demonstration into a potentially disruptive one, the Supreme Court has expressly held that "[t]he right to associate does not lose all constitutional protection merely because some members of the group may have participated in conduct or advocated doctrine that itself is not protected."  *NAACP v. Claiborne Hardware Co.,* 458 U.S. 886, 908 (1982).

This is in accord with the general principle that the police should enforce laws that address actual disruption, not prohibit or burden peaceful protected speech.   In short, instead of banning Plaintiffs from the Island and unnecessarily infringing on expressive activity, the Defendants could have simply enforced existing law against those causing the safety issue, if the need arose.  *See e.g. Lederman v. United States,* 291 F.3d 36, 45 (D.C.Cir.2002) (enforcing existing laws barring disorderly conduct or obstructing or impeding passage against those

**Page 37 of 67**

causing it would have been substantially less restrictive and equally effective means to promote safety and orderly traffic flow on sidewalk to Capitol grounds as opposed to a blanket ban on leafleting).  If they were truly concerned with protesters and others impeding traffic and being in the street the Defendants could have relied on the enforcement of City Ordinance §16-3 on those actually in the street, not against Plaintiff and protesters standing well back from the street on the Island.

### D. Even If Defendants Had Enforced Their Demands That Plaintiffs Move as Content- Neutral Time, Place, and Manner Restrictions Defendants Have Failed to Meet Their Burden.[10]

Plaintiffs submit that Defendants utterly and completely fail to establish any legitimate governmental interest—let alone a "significant" one—to justify their conduct.  The facts and law compelling a determination in favor of the Plaintiffs in this case do not turn on semantics.  In analyzing the Defendants' proffered reasons, it must be kept in mind that First Amendment standards "must give the benefit of any doubt to protecting rather than stifling speech."  *Fed.*

---

[10]   For the reasons set forth above, Plaintiff contends there is case law and factual support for application of strict scrutiny to an adjudication of the Defendants' conduct in this case.  For the reasons set forth in the text above and on the basis of the doctrine first announced in *Madsen v. Women's Health Ctr., Inc.*, 512 U.S. 753, 764-66 (1994), heightened scrutiny is the proper standard for evaluating the Defendants' conduct in this case.  In *Masden*, the Court reasoned that because injunctions are not the result of a democratic, deliberative process and are not generally applicable, they present more risk of arbitrary action.  *Id.*  Accordingly, the Court ruled standard time, place, and manner analysis was not sufficiently rigorous and that the proper test required that "the injunction burden no more speech than necessary to serve a significant government interest."  *Id.*  For the same policy reasons, the Second and Third Circuits and at least one federal district court have adopted this approach in evaluating *ad hoc* police directives issued by officers in the field and non-statutory restrictions which burden free speech—both of which are present in this case, insofar as they both pose risks similar to those presented by an injunction.  *McTernan v. City of York,* 564 F.3d 636, 654–55 (3d Cir.2009) (applying the *Madsen* standard to "a police directive, issued by officers in the field," because it "pose[d] risks similar to those presented by an injunction, warranting heightened scrutiny"); *Huminski v. Corsones,* 386 F.3d 116, 155 (2d Cir.2004) (applying heightened scrutiny under *Madsen* to a "Notice Against Trespass," issued by court security personnel to a protester); *Ross v. Early,* 758 F. Supp. 2d 313, 323-24 (D. Md. 2010), *reconsideration denied* (Feb. 25, 2011)(applying *Masden* to content-neutral but not generally applicable restriction  embodied in City protocol not promulgated through formal regulatory or legislative processes).  ***Nevertheless, while Plaintiffs maintain that heightened scrutiny applies***, Plaintiffs also analyze the Defendants' conduct based on intermediate scrutiny, as the Defendants' conduct is clearly unconstitutional under well-settled law such that it could not satisfy either standard.

*Election Comm'n v. Wisconsin Right To Life, Inc.*, 551 U.S. 449, 469 (2007) (opinion of Roberts, C.J.) (citing *New York Times Co. v. Sullivan*, 376 U.S. 254, 269–270 (1964)).

Even if the Defendants had acted for content-neutral reasons, a scenario at odds with all the undisputed evidence, the time, place, and manner restrictions here were not narrowly tailored and did not serve a compelling governmental interest. Indeed they were sweeping and any governmental interest asserted against Plaintiffs was either pretextual or irrelevant to the actions of Plaintiffs.

### *Legal Standards*

To survive intermediate scrutiny, Defendants must show that their actions " 'promote[d] a substantial government interest that would be achieved less effectively absent the regulation,' and is 'not substantially broader than necessary to achieve the government's interest.' " *Marcavage v. City of New York*, 689 F.3d 98, 106 (2d Cir. 2012) (quoting *Ward*, 491 U.S. at 799–800). While the regulation of speech under this standard "need not be the least restrictive or least intrusive" means of promoting the government interest, "it does not mean that a time, place, or manner regulation may burden substantially more speech than is necessary to further the government's legitimate interests." *Ward*, 491 U.S. at 799. As important as preservation of the public peace is, " 'this aim cannot be accomplished by laws or ordinances which deny rights created or protected by the federal Constitution.' " *Cooper v. Aaron,* 358 U.S. 1, 16 (1958) (quoting *Buchanan v. Warley,* 245 U.S. 60 (1917)). Even when public safety is at stake, the government must choose a narrowly tailored response. *Ward*, 491 U.S. at 797–99 (1989).

Further, "in order to satisfy intermediate scrutiny, the government 'must demonstrate that the recited harms are real, not merely conjectural, and that the regulation will in fact alleviate these harms in a direct and material way." *Reilly v. City of Providence ex rel. Napolitano*, No. CA 10-461 S, 2013 WL 1193352, at *5 (D.R.I. Mar. 22, 2013) (quoting *Turner*, 512 U.S. at

664).  "Similarly the First Circuit has warned, 'a governmental interest woven exclusively out of the gossamer threads of speculation and surmise cannot be terms substantial.' "  *Id.* (quoting *Nat'l Amusements, Inc. v. Town of Dedham*, 43 F.3d 731, 741 (1st Cir. 1995)).  To justify limitations on First Amendment freedoms, a " 'reasonable' burden on expression requires a justification far stronger than mere speculation about serious harms."  *U.S. v. National Treasury Employees Union*, 513 U.S. 454, 475-476 (1995) (quoting *Whitney v. California*, 274 U.S. 357, 376 (1927)) (Brandeis concurring opinion) ("To justify suppression of free speech there must be reasonable ground to fear that serious evil will result if free speech is practiced.")); *Thomas v. Collins*, 323 U.S. 516, 530 (1945) ("For these reasons any attempt to restrict [First Amendment] liberties must be justified by clear public interest, threatened not doubtfully or remotely, but by clear and present danger.");  *Nat'l Amusements Inc.*, 43 F.3d at 741 "[G]overnmental interest woven exclusively out of the gossamer threads of speculation and surmise cannot be termed substantial."); *Multimedia Pub. Co. v. Greenville–Spartanburg Airport District,* 991 F.2d 154, 161–62 (4th Cir.1993) (record revealed government's asserted interests to be illusory, tenuous, and non-verified).  The Defendants must do more than "assert[] interests [that] are important in the abstract"—they may not simply "posit the existence of the disease sought to be cured." *Turner Broadcasting System*,  512 U.S. at 664 (1994) (citations and internal quotations omitted); *see Bl(a)ck Tea Society v. City of Boston*, 378 F.3d 8, 13 (1st Cir. 2004) ("Security is not a talisman that the government may invoke to justify any burden on speech (no matter how oppressive).");  *see also Bays v. City of Fairborn*, 668 F.3d at 823;  *Saieg v. City of Dearborn*, 641 F.3d at 738-737; *Ascherl,*  2011 WL 4404145 at *3.

The proponents of a restriction on free expression have the burden of "demonstrat[ing] that the recited harms are real, not merely conjectural, and that the regulation will in fact alleviate these harms in a material way."  *Turner Broadcasting System,* 512 U.S. at 664; *see*

*Members of City Council of City of Los Angeles v. Taxpayers for Vincent*, 466 U.S. 789, 803

(1984) (Court "may not simply assume that the ordinance will always advance the asserted state

interests sufficiently to justify its abridgment of expressive activity.") (internal quotation marks

omitted); *Home Box Office, Inc. v. FCC*, 567 F.2d 9, 36 (D.C. Cir. 1977) ("[A] 'regulation

perfectly reasonable and appropriate in the face of a given problem may be highly capricious if

that problem does not exist' ") (citation omitted); *see also Bays v. City of Fairborn*, 668 F.3d at

823 ("[Government must do more . . . than 'assert interests [in reduced congestion and crowed

control] that are important in the abstract.'"); *Saieg*, 641 F.3d at 738-737 ("[General] interests

[in public safety and order] that the defendants have named are merely 'conjectural,' as opposed

to 'real.'"); *Ascherl*, 2011 WL 4404145 at *3 (City's identified interest of facilitating orderly

flow of pedestrians during festival based more on conjecture than reality).

### *Lack of Government Interest to Support Restrictions on Speech*

Here, as outlined above, there was no government interest served at all, merely a

pretextual claim without evidentiary support, this does not pass constitutional muster.  First, even

if there was some slowing of traffic flow and inconvenience to drivers, the public safety danger

must be far more serious than mature, adult, protesters adjacent to a crosswalk with skill and

training crossing a street with a copious uniformed police traffic control presence to justify

interference with a peaceful protest.  *See .e.g. Jones* 465 F.3d at 57-58 (J. Sotomayor) (citing

*Edwards v. South Carolina*, 372 U.S. 229, 232, 237 (1963)) ("Neither energetic, even raucous,

protesters who annoy or anger audiences, nor demonstrations that slow traffic or inconvenience

pedestrians, justify police stopping or interrupting a public protest . . .  'clear and present danger'

means more than annoyance, inviting dispute or slowing traffic.")

Further, where, as here, there is no evidence that the people excising free speech would

actually pose a hazard, and where people not engaging in speech are free to use the public areas

without regulation, the proffered public safety/traffic control interest is less than convincing.  *See Reilly v. City of Providence,*  2013 WL 1193352, at *6 ("There is no evidence in the record, beyond Defendants' bald assertions, that Plaintiff's presence in this area would have posed a hazard in the event of a mass evacuation.  Additionally, because leafleters are only marginally more obstructive than other pedestrians, . . . Defendants' decision to ban only Plaintiff and her companion from the lower sidewalk while allowing all other pedestrians access to that same stretch of sidewalk undermines the credibility of their purported public safety justification.")(citation omitted).

The *Reilly* case quoted above is also illustrative in that it reaffirms what the First Circuit has recognized, "the Supreme Court has dismissed the danger to traffic congestion as a justification to ban leafleting.  The Court has explained that '[t]he distribution of literature does not require that the recipient stop in order to receive the message the speaker wishes to convey.' [*Lee v. Int'l Soc. for Krishna Consciousness, Inc.,* 505 U.S. 830, 831 (1992) (O'Connor, J., concurring) (quoting *United States v. Kokinda,* 497 U.S. 720, 734 (1990))].  *Bottlenecks, therefore, are unlikely to develop.*  Because leafleting is a particularly unobtrusive form of expression, the Court recently invalidated a ban on leafleting, even within a nonpublic forum." *Jews for Jesus, Inc.*, 984 F.2d at 1324 (1st Cir. 1993) (emphasis added; some internal quotations omitted) (citing *Lee,* 505 U.S. at 830) (*per curiam*)).  Here, Plaintiffs were not even handing out leaflets, they were merely standing in a small group, in a public park, in an open area nearly 30,000 square feet in size, holding signs and occasionally chanting, interfering with no one. Defendants have tacitly acknowledged that Plaintiffs were clearly doing nothing that could possibly justify restriction of their speech, hence their stretch to impute speculative street crossing chaos on the part of others to Plaintiffs.

Indeed, even if others were causing disruption "[e]njoining or preventing First Amendment activities before demonstrators have acted illegally or before the demonstration poses a clear and present danger is presumptively a First Amendment violation. The generally accepted way of dealing with unlawful conduct that may be intertwined with First Amendment activity is to punish it after it occurs, rather than to prevent the First Amendment activity from occurring in order to obviate the possible unlawful conduct. *Serv. Employee Int'l Union v. City of Los Angeles*, 114 F. Supp. 2d 966, 971 (C.D. Cal. 2000) (citing *Collins v. Jordan,* 110 F.3d 1363, 1373 (9th Cir.1996)). Here punishing the Plaintiffs, who were doing nothing, rather than any people who might actually cause a traffic disturbance, if anyone ever did, is presumptively unconstitutional. Once again, the fact that some demonstrators, although not the Plaintiffs, could possibly have caused a traffic disturbance, transforming the peaceful demonstration into a potentially disruptive one, the Supreme Court has expressly held that "[t]he right to associate does not lose all constitutional protection merely because some members of the group may have participated in conduct or advocated doctrine that itself is not protected." *NAACP v. Claiborne,* 458 U.S. at 908. ***The right response to the traffic issue Defendants proffer was not to threaten and/or arrest Plaintiffs who had nothing to do with it, but rather to police the situation so as to prevent a traffic issue and to address those protesters whose actions created it when and if such an issue came to be.***

The unconstitutionality of a "keep-moving" rule in *Abdullah v. Cty. of St. Louis, Mo.* similarly undermines Defendants' arguments. 2 F. Supp. 3d 936 (E.D. Mo. 2014). In the midst of the very chaotic and unruly protest situation following the shooting of Michael Brown by a Freguson, Missouri police office in which extensive property damage took place and violent confrontations with police became commonplace, police adopted a strategy which "called for law enforcement officers to tell protesters that they had to keep moving and that they could not

stand still on the sidewalks." *Id*. at 940-41.  In this context, the plaintiff in *Abdullah* attempted to carry out his job as a program associate for the American Civil Liberties Union, legal observing, passing out "Know Your Rights Cards," speaking with people at demonstrations about their concerns, and facilitating communications between police and the public.  *Id*. at 941.  Following the implementation of the "keep-moving" strategy, plaintiff was prevented from speaking to protesters without continually moving.  The court held, in ruling on a motion for an injunction, that, "[a]lthough the state has a valid interest in maintaining order on its streets and sidewalks and in preventing violence by crowds, this interest is not sufficient to apply such a blanket rule to people assembling peacefully. . .  The evidence showed that the strategy burdened substantially more speech than was necessary to achieve its legitimate goals.  In fact, one of the police witnesses testified that it only worked well during the daytime when there were no large crowds and no threats of violence—when the crowds grew unruly, telling them to keep moving was not an effective strategy.  Thus, defendants' own evidence shows that this strategy fails the requirement that 'the means chosen are not substantially broader than necessary to achieve the government's interest,' as described in *Ward v. Rock Against Racism,* 491 U.S. 781, 798–99, 109 S.Ct. 2746, 105 L.Ed.2d 661 (1989)." *Id*. at 947.  Similarly, here, where simply telling people to stay out of road would have resolved the proffered issue, the sweeping ban of protesters from a nearly 30,000 square foot area closer to the event being protested and moving them to even less advantageous protest site where there was more vehicular traffic does not meet even the intermediate scrutiny of a content-neutral restriction on speech.

Finally, enforcing what amounted to a two-hundred and fifty to two-hundred seventy-five (250-275) foot buffer zone between protesters and their intended audience was not a sufficient alternative channel of communication to satisfy intermediate scrutiny.  An alternative channel is not sufficient if the speakers are not permitted to reach their intended audience.  *Bay Area Peace*

*Navy,* 914 F.2d at 1229.  Recognizing this, the Ninth Circuit has struck down a number of "First Amendment zones."   *See id.* (75–yard "safety zone" between demonstrators and intended audience did not leave open alternative channel of communication); *Baugh,* 187 F.3d at 1044 (150–175 foot "safety zone" inadequate alternative means of communication); *Serv. Employee Int'l Union* 114 F. Supp. 2d at 972 (C.D. Cal. 2000) (The problem lies in the blanket preclusion of persons from *973 the area to the north and east of the Staples Center entrance where delegates enter and leave the facility. Any scheme that precludes plaintiffs from effectively communicating with those delegates will not withstand constitutional scrutiny.).  Here, simply moving protesters farther and farther away without any attempt to tailor a concern for traffic safety with access to their intended audience is yet another way in which Defendants actions fail to meet constitutional requirements, especially, when as outlined above, there was more than enough space on the Island to accommodate all protesters without creating traffic issues.

### E. Defendants' Arrest of Plaintiff Kurland Was Not Only A Violation of the First Amendment, But Also an Independent Fourth Amendment Violation as the Arrest Was Unsupported by Probable Cause.

In both the First and Fourth Amendment contexts "[i]t is plainly unreasonable for a law enforcement officer to effect a warrantless seizure of an individual simply because the law enforcement officer disagrees with the content or viewpoint of the individual's speech." *McCabe v. Macaulay,* 551 F. Supp. 2d 771, 793–94 (N.D. Iowa 2007) (citing *Barham v. Ramsey,* 434 F.3d 565, 576 (D.C.Cir.2006) (holding that the First Amendment and Fourth Amendment were coterminous on facts of the case, because "[t]he Fourth *794 Amendment demands nothing less"); *Mackinney v. Nielsen,* 69 F.3d 1002, 1007 (9th Cir.1995) ("[P]olice may not exercise 'the awesome power at their disposal to punish individuals for conduct that is not merely lawful, but protected by the First Amendment.' ") (quoting *Duran v. City of Douglas,* 904 F.2d 1372, 1378 (9th Cir.1990)).  However, even if the First Amendment issues were not at play, Defendants still

arrested Plaintiff Kurland without probable cause, giving rise to an independent violation of her Fourth Amendment rights.

Under the Fourth Amendment to the United States Constitution, the right to be free from unreasonable searches gives rise to a requirement that an arrest be supported by probable cause. *See Beck v. Ohio,* 379 U.S. 89, 91 (1964). Probable cause requires "the facts and circumstances within [the police officers'] knowledge and of which they had reasonably trustworthy information were sufficient to warrant a prudent [person] in believing that the [defendant] had committed or was committing an offense." *United States v. Figueroa,* 818 F.2d 1020, 1023 (1st Cir.1987) (quoting *Beck,* 379 U.S. at 91, 85 S.Ct. 223). Probable cause is evaluated as of the moment an arrest is made, based on the facts and circumstances within the arresting officer's knowledge and of which he had reasonably trustworthy information. *Beck,* 379 U.S. at 91.

The probable cause analysis entails " 'an objective assessment of the officer's actions in light of the facts and circumstances confronting him at the time,' and not of the officer's actual state of mind at the time the challenged action was taken." *Maryland v. Macon,* 472 U.S. 463, 470–471, (1985) (quoting *Scott v. United States,* 436 U.S. 128, 136 (1978)). "Where 'there is room for a difference of opinion concerning the facts or the reasonable inferences to be drawn from them,' the existence of probable cause for an arrest is an issue for the jury; on the other hand, where the historical facts are established or undisputed, the issue becomes a mixed question of law and fact suitable for determination by the court." *Nuon v. City of Lowell*, 768 F. Supp. 2d 323, 329–30 (D. Mass. 2011) (quoting *Maxwell v. City of Indianapolis,* 998 F.2d 431, 434 (7th Cir.1993)); s*ee also Ornelas v. United States,* 517 U.S. 690, 696 (1996); *Acosta v. Ames Dep't Stores, Inc.,* 386 F.3d 5, 8–9 (1st Cir.2004).

Plaintiff was initially charged under Providence City Ordinance §16.3(D) which defines disorderly conduct as "[a]ny person, who alone or in concert with others, obstructs any place

ordinarily used for the passage of persons, vehicles or conveyances or otherwise engages in conduct with obstructs or interferes physically with a lawful meeting, procession or gathering." Defendants at one point also charged her under Providence City Ordinance §16.3(C); "[a]ny person who shall in a public place use "fighting words" or offensive language or words which by their very utterance inflict injury or are likely to provoke a violent reaction on the part of the average person so addressed."

The state disorderly conduct statute the Plaintiff Kurland was prosecuted under in District Court, reads as follows in pertinent part:  "(a) A person commits disorderly conduct if he or she intentionally, knowingly, or recklessly: . . . 4) Alone or with others, obstructs a highway, street, sidewalk, railway, waterway, building entrance, elevator, aisle, stairway, or hallway to which the public or a substantial group of the public has access or any other place ordinarily used for the passage of persons, vehicles, or conveyances . . ."  R.I.G.L. § 11-45-1 (a)(4).

Under any of these provisions, and indeed under any other, Defendants have admitted in sworn testimony to a total and utter lack of any probable cause to support Plaintiff Kurland's arrest.  Based on the sworn testimony of Defendants and other officers it is uncontroverted that:

- At no time did Plaintiffs or any other protesters obstruct anyone from accessing the Casino or the event.   Pl.'s SUF at ¶71.

- The protesters at the site of the event were orderly and compliant as was the protest generally. Pl.'s SUF at ¶72.

- There was no evidence of gang or other criminal elements or activity at the site of the event.  Pl.'s SUF at ¶74.

- Plaintiffs did not obstruct the street nor were they in the street at any point. Pl.'s SUF at ¶75.

- Indeed the only thing Plaintiff Kurland was doing when Defendant Perez arrested her, according to his own sworn testimony, was "standing there, holding a sign near that tree on the Island." Pl.'s SUF at ¶76.

- The protest and the protesters were peaceful. Pl.'s SUF at ¶77.

- There was no violence at the site of the event. Pl's SUF at ¶78.

- There were not threats of violence at the site of the event. Pl.'s SUF at ¶79.

- There was no concern that there was going to be any violence at the event. Pl.'s SUF at ¶80.

- There was no fighting at the site of event.  Pl.'s SUF at ¶81.

- There was no property damage at the site of the Event.   Pl.'s SUF at ¶82.

- There was no threat of property damage at the site of the Event. Pl.'s SUF at ¶83.

- There was no interference with the event taking place inside of the Casino. Pl.'s SUF at ¶84.

- No one was obstructed from entering the Casino.  Pl.'s SUF at ¶85.

- None of the protesters blocked motor vehicles dropping guests off to attend the fundraiser. Pl.'s SUF at ¶86.

- There were no incidents before Ms. Kurland's arrest. Pl.'s SUF at ¶87.

- There were no incidents after Ms. Kurland's arrest. Pl.'s SUF at ¶88.

- There was no breach of the peace. Pl.'s SUF at ¶89.

- There was no concern that there would be any disruption at the Event. Pl.'s SUF at ¶90.

- Nothing unusual happened at the protest. Pl.'s SUF at ¶91.

There was simply no basis to arrest Ms. Kurland for disorderly conduct, or for any other charge,[11] simply because she was standing on the Island, holding a sign, near a tree, during a peaceful protest.  Even if there was a legitimate traffic control issue, arresting Ms. Kurland, who was not even near the road, had nothing to do with it and any police action directed at addressing traffic issues should have been addressed to protester standing in or crossing the road, not at Ms. Kurland.  Moreover, the utter lack of probable cause is underscored by the fact that there are express public demonstration exceptions to these provisions.[12]

**F.  Moving Plaintiff Gould, From the Sidewalk in front of the Casino, from the Portion of the Island Closer to the Casino, and then Further Away on the Island and then off the Island, Was a Fourth Amendment Violation Even Without an Arrest.**

Even though Ms. Gould was not arrested, she still suffered a series of Fourth Amendment violations at the hands of Defendants.  When police, even without an arrest, control the movement of a person, they effect a seizure under the Fourth Amendment, which must be legally supported so as not to run afoul of the Constitution.   A seizure is effected for Fourth Amendment purposes "only when there is a governmental termination of freedom of movement *through means intentionally applied."*  *Brower v. Cty. of Inyo*, 489 U.S. 593, 597, 109 S. Ct.

---

[11]   Defendants also cite to R.I.G.L. § 31-12-3 entitled "Obedience to police officers" ("No person shall willfully fail or refuse to comply with any lawful order or direction of any police officer invested by law with authority to direct, control, or regulate traffic, including any order or direction pertaining to fire lane parking violations whether on private or public property.") and R.I.G.L. § 11-32-1 entitled "Obstructing officer in execution of duty" ("Every person who shall obstruct any officer, civil, military, or otherwise, including any state, city, or town police, deputy sheriff, or fire fighter, while in the execution of his or her office or duty, shall be imprisoned not exceeding one year or be fined not exceeding five hundred dollars ($500.")). as justification for arresting Plaintiff. First, as argued at length in the text above, Defendant Perez's order that Plaintiff leave the Island was not lawful, but a clear violation of her both her First and Fourth Amendment rights. Second, for the same reasons combined with a healthy dose of common sense, Plaintiff Kurland's merely standing in the middle of a public park minding her own business did not constitute conduct obstructing any officer at the scene from executing his or her lawful duties.

[12]   R.I.G.L. §11-45-1, entitled "Disorderly Conduct," expressly exempts from prohibited conduct lawful picketing or lawful demonstrations of any kind.  *See* R.I.G.L. §11-45-1 (d).  Similarly,  Providence City Ordinance §16-13, entitled "Obstruction of Public Ways," expressly exempts from regulation situations where individuals on public sidewalks or ways are exercising a right to protest and there is at least three (3) feet of unobstructed sidewalk access at all times.  Finally, Defendants are also well aware of the standing general order protecting public demonstrations.  Providence police General Order #44 permits an unlimited number of demonstrators/picketers to demonstrate on public sidewalks as long as there is no disorderly conduct or actual interference with pedestrian traffic or access to adjacent buildings.

1378, 1381, 103 L. Ed. 2d 628 (1989).  This includes when police use force or the threat of force to move someone from a lawful position.  *See Marbet v. City of Portland,* No. CV 02-1448-HA, 2003 WL 23540258, at *10 (D. Or. Sept. 8, 2003) ("the protesters were physically moved back from their peaceful positions, according to the Amended Complaint.   In their supporting memorandum, Defendants appear to contend that the Fourth Amendment is not offended by the intentional use of force that physically injures a citizen and only *reduces* his or her freedom of movement.  If the citizen is able to walk or hobble away, according to Defendants, no Fourth Amendment violation has occurred.   However, as the Supreme Court has held, 'The word 'seizure' readily bears the meaning of laying on of hands or application of physical force to restrain movement, even when it is ultimately unsuccessful.'  *California v. Hodari D.,* 499 U.S. 621, 626 (1991)."); *see also Rauen v. City of Miami*, No. 06-21182-CIV, 2007 WL 686609, at *7 (S.D. Fla. Mar. 2, 2007) ("Further, the protesters were physically moved back from their peaceful positions, according to the Amended Complaint. Clearly, the effect of defendants' actions was to control plaintiffs' movement.  Additionally, certain plaintiffs assert that they were physically prevented from leaving an area cordoned off by the police. By physically moving certain plaintiffs and circumscribing the area of movement of other plaintiffs, defendants seized plaintiffs within the meaning of the Fourth Amendment . . . It was not fatal to the sufficiency of the Fourth Amendment claims that plaintiffs were not rendered completely immobile or forced to remain in one location; what was required was that a person's freedom of movement had been terminated, not that the person's movement itself had been terminated.").

Here, constantly forcing Plaintiffs to move from lawful positions, as outlined above, terminated their freedom of movement and affected a seizure under the Fourth Amendment.  As the seizure was not reasonable for the reasons outlined, it violated the Fourth Amendment, even without an arrest.

**Page 50 of 67**

## G. Qualified Immunity

The fact that Plaintiffs were deprived of their First Amendment right to freedom of speech and Fourth Amendment right to freedom from unreasonable search and seizure does not end the inquiry.  Defendants have raised the defense of qualified immunity which shields public officers from liability for civil damages if their conduct "does not violate clearly established statutory or constitutional rights of which a reasonable person would have known."  *Diaz–Bigio v. Santini,* 652 F.3d 45, 50 (1st Cir.2011) (quoting *Pearson v. Callahan,* 555 U.S. 223, 231 (2009)).  The qualified immunity analysis requires courts to ask "(1) whether the facts alleged or shown by the plaintiff make out a violation of a constitutional right; and (2) if so, whether the right was 'clearly established' at the time of the defendant's alleged violation." *Id.* (quoting *Maldonado v. Fontanes,* 568 F.3d 263, 269 (1st Cir.2009)). The second step of the qualified immunity inquiry "has two parts: (a) whether the legal contours of the right in question were sufficiently clear that a reasonable official would have understood that what he was doing violated that right, and (b) whether the particular factual violation in question would have been clear to a reasonable official." *Id.*

### Legal Standards

There are generally two ways a plaintiff may carry their burden and demonstrate that "officers were on notice that they were violating a 'clearly established' constitutional right." *Lyons v. City of Xenia,* 417 F.3d 565, 579 (6th Cir.2005).  First, "where the violation was sufficiently 'obvious' under the general standards of constitutional care ... the plaintiff need not show 'a body' of 'materially similar' case law." *Id.* (quoting *Brosseau v. Haugen,* 543 U.S. 194, 199, 125 S.Ct. 596, 160 L.Ed.2d 583 (2004)).[13]  Second, the violation may be shown "by the

---

[13]  The applicable standard does not require Plaintiffs to demonstrate that the very action at issue in the case had previously been found unlawful..  *See Young v. City of Providence*, 396 F. Supp. 2d 125, 135 (D.R.I. 2005)(citing *Anderson v. Creighton,* 483 U.S. 635, 640 (1987); *Savard v. Rhode Island,* 338 F.3d 23, 28 (1st
*(Footnote continued on next page)*

failure to adhere to a 'particularized' body of precedent that 'squarely govern[s] the case....' " *Id.* (quoting *Brosseau,* 543 U.S. at 201, 125 S.Ct. 596).   Defendants of course suggest that the second method swallows the first, but they are independent methods of carrying a plaintiff's burden in defeating qualified immunity. While, "to be clearly established, the right must have been recognized in a particularized rather than a general sense . . . the nature of the inquiry here . . . [is not] that [a court] should find qualified immunity unless a Supreme Court or [binding] Circuit case expressly denies it; that standard was rejected by the Supreme Court in favor of one in which courts must examine whether in 'the light of pre-existing law the unlawfulness [is] apparent.' *Jones*, 465 F.3d at 57. (quoting *Hope v. Pelzer,* 536 U.S. 730, 739 (2002)).   Indeed, the Eleventh Circuit has outlined two instances wherein analogous particularized facts in the case law is not required.

"First, the words of the pertinent federal statute or federal constitutional provision in some cases will be specific enough to establish clearly the law applicable to particular conduct and circumstances and to overcome qualified immunity, even in the *total absence of case law*. *Vinyard v. Wilson*, 311 F.3d 1340, 1350–51 (11th Cir. 2002) (citing *Lassiter v. Alabama A&M Univ.,* 28 F.3d 1146, 1150 n. 4 (11th Cir.1994) (*en banc*) (stating that "[w]e leave open the possibility that occasionally the words of a federal statute or federal constitutional provision will be specific enough to establish the law applicable to particular circumstances clearly and to overcome qualified immunity *even in the absence of case law*") (emphasis added in *Vinyard*). "This kind of case is one kind of "obvious clarity" case . . . [where] the words of a federal statute or federal constitutional provision may be so clear and the conduct so bad that case law is not needed to establish that the conduct cannot be lawful. *Id.* For example,  "[i]n excessive force

Cir.2003)  (plaintiff need not show that "materially indistinguishable conduct has previously been found unlawful"); *Limone v. Condon,* 372 F.3d 39, 48 (1st Cir.2004) ("[t]here is no requirement that the facts of previous cases be materially similar to the facts *sub judice*")).

cases in the Fourth Amendment context . . . "obvious clarity" cases [can] involve[e] conduct "far beyond the hazy border between excessive and acceptable force."  *Id.* at 1350 n. 18.  "{H}azy border decisions concluded the law was clearly established that the force involved was excessive in the absence of any case law (first type of "obvious clarity" notice). *Id.* (citing *Priester v. City of Riviera Beach,* 208 F.3d 919, 927 (11th Cir.2000) (concluding law was clearly established and force was "clearly-excessive-even-in-absence-of-case-law" when officer released police dog to attack plaintiff who was lying on the ground, did not pose a threat to officers or to anyone else, and was not attempting to flee or resist arrest); *Slicker v. Jackson,* 215 F.3d 1225, 1233 (11th Cir.2000) (concluding, without case law on point, that the evidence, if credited, suggested "the officers used excessive force in beating Slicker even though he was handcuffed and did not resist, attempt to flee, or struggle with the officers in any way"); *Smith v. Mattox,* 127 F.3d 1416, 1419–20 (11th Cir.1997) (concluding officer's conduct was "far beyond the hazy border" and unlawfulness was "readily apparent even without clarifying caselaw" when officer, while on plaintiff's back and handcuffing him, broke plaintiff's arm requiring surgery for multiple fractures even though plaintiff at the time was offering no resistance at all); *see also Lee v. Ferraro,* 284 F.3d 1188, 1199 (11th Cir.2002) (concluding "[a]s in *Slicker, Priester,* and *Smith,* the peculiar facts of this case are 'so far beyond the hazy border between excessive and acceptable force that [the officer] had to know he was violating the Constitution even without caselaw on point' ") (quoting *Smith v. Mattox,* 127 F.3d 1416, 1419 (1997))).

"Second if the conduct is not so egregious as to violate, for example, the Fourth Amendment on its face, we then *turn to case law.*" *Id*. at 1351.  "When looking at case law, some broad statements of principle in case law are not tied to particularized facts and can clearly establish law applicable in the future to different sets of detailed facts." *Id*.  (citing *Marsh v. Butler County, Ala.,* 268 F.3d 1014, 1031–32 n. 9 , *abrogated on other grounds by Bell Atl.*

*Corp. v. Twombly*, 550 U.S. 544, 561-63, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007)). "For example, if some authoritative judicial decision decides a case by determining that 'X Conduct' is unconstitutional *without tying* that determination to a particularized set of facts, the decision on 'X Conduct' can be read as having clearly established a constitutional principle: put differently, the precise facts surrounding 'X Conduct' are immaterial to the violation. These judicial decisions can control "with obvious clarity" a wide variety of later factual circumstances." *Id.* (citing *United States v. Lanier*, 520 U.S. 259, 271, (1997) (stating in some instances "a general constitutional rule already identified *in the decisional law* may apply with obvious clarity to the specific conduct in question, even though the very action in question has [not] previously been held unlawful"); *Hope*, 122 S.Ct. at 2516 (stating "*Lanier* thus makes clear that officials can still be on notice that their conduct violates clearly established law even in novel factual circumstances").

### Obvious Clarity of Defendants' Illegal Conduct

Here, as Plaintiffs outlined above, courts have long applied the "clear and present danger" test to protest cases to determine when police interference is constitutional. Moreover, although defendants make much of the fact that some demonstrators, although not the Plaintiffs, may have caused a traffic disturbance, transforming the peaceful demonstration into a potentially disruptive one, the Supreme Court has expressly held that "[t]he right to associate does not lose all constitutional protection merely because some members of the group may have participated in conduct or advocated doctrine that itself is not protected." *NAACP v. Claiborne* 458 U.S. at 908.

In this case, Plaintiffs, based on the testimony of the Defendants and other officers at the scene, ***undisputedly*** posed no "clear and present danger" of immediate harm or violence where they made no threats of physical harm to police or members of the public, did not incite violence or disorder and displayed no dangerous weapons at the time Defendants demanded they move or

when Defendants arrested Ms Kurland.  Even under Defendants most favorable traffic issue fact pattern, only one protester may have had any issue with traffic, and that was caused by Defendants harassing Plaintiffs for peacefully protesting in a public park, away from the roadway.  This one incident, created by police activity was a one off issue easily resolved by simply helping protesters cross the street safety as police were already doing for attendees of the event, did nothing to alter the peaceful and orderly tenor of the protest.  Taken as a whole, the undisputed facts, as gleaned from the sworn testimony of Defendants and other police officers, reveal an orderly, peaceful crowd. Given the above, it is clear that there was no "clear and present danger" to justify interference with any protester's free speech rights during this protest, beyond the general police imperative to tell them to stay out of the road and to address a refusal to do such through normal and constitutionally valid police powers.

Similarly, with regards to Ms. Kurland's arrest, the undisputed evidence is that her actions were entirely lawful and that she did nothing illegal.  '[W]hen conduct was entirely lawful, . . an arrest for disorderly conduct under these circumstances is so far beyond the 'hazy border' between lawful and unlawful conduct that a finding of qualified immunity is not appropriate.  *Willis v. Siegelman*, 307 F. Supp. 2d 1236, 1242–43 (M.D. Ala. 2004).  In short, "there [is] fulsome case law clearly establishing that an arrest without probable cause violates both First and Fourth Amendment rights."  *Davidson v. City of Stafford, Texas*, 848 F.3d 384, 393–94 (5th Cir. 2017), *as revised* (Mar. 31, 2017) (citing *Club Retro, L.L.C. v. Hilton*, 568 F.3d 181, 206 (5th Cir. 2009) ("The Fourth Amendment right to be free from false arrest—arrest without probable cause—was clearly established at the time of [the] arrests [in 2006]."); *Keenan v. Tejeda*, 290 F.3d 252, 262 (5th Cir. 2002) ("If no reasonable police officer could have believed that probable cause existed for the law enforcement actions of [the officers] against the plaintiffs, then their retaliation violated clearly established law of this circuit."

Indeed, even going beyond the "obvious clarity" standard, the facts in this case are quite similar to those in *Willis* where plaintiff, upset at the lack of an Alabama state flag adorning the official state Christmas tree "peacefully displayed his flag as a way of protesting the flag's absence from the Christmas tree and declaring his loyalty to the State of Alabama.  The Plaintiff conducted this protest on the steps of the Capitol [near the tree] in the same area where numerous other speeches, news conferences, and rallies have taken place over the years."  At some point later, Defendant Police officer "commanded the Plaintiff to exit the steps of the Capitol and move to the street below.  ([Defendant] stated that he only asked the Plaintiff to move away from the tree and to go farther down the Capitol steps to continue his demonstration.") In response to this order, the Plaintiff stated that he wanted to display his flag at or near the tree in order to call public attention to the need to honor both the Alabama State Flag and the United States Flag. After the Plaintiff refused to move, Callahan arrested the Plaintiff for disorderly conduct."  *Id.* at 1239.  The Court in Willis held, citing factual findings it had made in a May 13, 2003 opinion resolving a Motion for Judgment on the Pleadings that, "the present case falls into the 'obvious clarity' category of cases, as the evidence presented by the Plaintiff would not give a reasonable officer any indication that the Plaintiff's actions even remotely approached the disorderly conduct level. *Willis v. Siegelman*, 307 F. Supp. 2d 1236, 1242 (M.D. Ala. 2004).[14]

This was not a situation where the Defendants were faced with a fast-paced, evolving situation and were forced to make a "split-second decision[] . . . in the line of fire," on the basis

---

[14] In that earlier opinion the court in *Willis* had elaborated that "[e]ven assuming that the Plaintiff had protested Callahan's order to move his demonstration to the sidewalk, the Supreme Court has recognized that this type of conduct is lawful. *See City of Houston v. Hill*, 482 U.S. 451, 461 (1987) (stating that 'the First Amendment protects a significant amount of verbal criticism and challenge directed at police officers"); *Norwell v. City of Cincinnati*, 414 U.S. 14, 16 (1973) (*per curiam*) ("Surely, one is not to be punished for nonprovocatively voicing his objection to what he obviously felt was a highly questionable detention by a police officer." Memoradum Opinion on Defendants' Motion for Judgment on the Pleadings in *Willis v. Siegelman* C.A. No. 02-A-554-N ECF #36 in App. Ex. 24.

of complex and/or contradictory legal authority.  *Young v. City of Providence*, 396 F. Supp.2d 125, 136-37 (D.R.I. 2005).  To the contrary, the Defendants made a decision under no time or event pressures and with the guidance of clear and well-settled legal authority—and yet still made an objectively and appallingly wrong decision.  Under the circumstances presented, "a reasonable defendant would have understood that his conduct violated the plaintiffs' constitutional rights."  *Lopera v. Town of Coventry,* 652 F.Supp.2d 203, 211 (D.R.I. 2009).  To put it another way, no reasonable officer could have believed his conduct was lawful in the situation confronted.[15]

### H.  The City of Providence Is Liable as a Municipality

While "a local government may not be sued under § 1983 for an injury inflicted solely by its employees or agents," it may be held liable "when execution of [the] government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury." *Monell v. Dep't of Soc. Servs.,* 436 U.S. 658, 694 (1978).  A single action by a decision-maker possessing "final authority to establish municipal policy" may expose a municipality to liability.  *Pembaur v. City of Cincinnati,* 475 U.S. 469, 481 (1986) (plurality opinion).

One route to establishing municipal liability is for a plaintiff to establish two requirements, "[f]irst, the custom or practice must be attributable to the municipality. In other words, it must be so well-settled and widespread that the policymaking officials of the

---

[15] Nor is Defendant Perez shielded from liability because he may have mistakenly believed he could arrest Plaintiff Kurland who was merely standing in the middle of a public park engaging in undisputedly protected and favored political speech because other protesters at the scene—mostly retired policemen, firemen, and teachers— may decide to the cross the street in the vicinity of seven (7) police officers, who were safely assisting event attendees across the street, and may thereby somehow create a public safety hazard.  *See Anderson v. Creighton,* 483 U.S. 635, 641 (1987)(qualified immunity protects officials who act "reasonably but mistakenly").  As discussed in detail above, there was no probable cause to arrest  Plaintiff Kurland under any of the criminal provisions proffered and/or actually charged by Defendants.  Moreover, the lack of probable cause is made appallingly clear in light of the express exemptions for public demonstrations under applicable law.  *See, supra,* note 12.  As a well educated individual with a Master's Degree in criminal justice, Defendants' Statement of Undisputed Facts ¶ 4, Defendant Perez may have been mistaken, but there was nothing reasonable about it.

municipality can be said to have either actual or constructive knowledge of it yet did nothing to end the practice.... Second, the custom must have been the cause of and the moving force behind the deprivation of constitutional rights." *Reilly*, 2013 WL 1193352, at *11 (quoting *Bordanaro v. McLeod,* 871 F.2d 1151, 1156 (1st Cir.1989) (citations omitted)).

This Court has long recognized that the Chief of the Providence Police posseses' sufficient final policymaking authority for their policy and practice decision to render the Defendant City liable. *See e.g. Reilly*, 2013 WL 1193352, at *11 ("In the present case, Defendants do not seriously dispute Plaintiff's contention that [then Chief of Police] Esserman possessed final authority with respect to PPD policy. Indeed, Esserman testified that, as Chief of the PPD, he was "the ultimate authority" on all Department policy; *Young v. City of Providence,* 396 F.Supp.2d 125, 141–46 (D .R.I.2005) (holding that the plaintiff presented sufficient evidence that the Chief of the PPD possessed final policymaking authority on training issues to survive summary judgment).

In this case, Defendants asserted in their sworn testimony that all the actions taken by Defendants and other officers at the incident in question, including forcing Plaintiffs to move and arresting Ms. Kurland were entirely in conformity with the policy, practice, and training of the PPD.  Pl.'s SUF ¶¶122-131.  Indeed Chief of Police Defendant Clements testified that Defendant Perez did nothing wrong in arresting Plaintiff Kurland and that he would expect Officers of Defendant City under his direction to do the same in the future in a similar situation.  Pl.'s SUF at ¶127.  Similarly, Defendant Clements testified that the behavior of Officers in forcing Plaintiff Gould and others to move off the sidewalk in front of the Casino was appropriate, consistent with training, would not violate the First Amendment, officers would not be disciplined for this behavior and he would expect Officers of Defendant City under his direction to act the same in future similar situations.  Pl.'s SUF at ¶128.  This is consistent with the fact that Defendant Perez

was not disciplined for this incident, was not provided any additional training as a result of this incident, was promoted shortly after this incident, and believes he did nothing wrong and would do the same thing in the future under the same circumstances.  Pl.'s SUF ¶¶122-26.

This flagrant disregard for First Amendment rights on the part of Defendant City and Defendant Clements and their policy of directing PPD officers to engage in First Amendment violations and to provide no training or guidance in avoiding such is further evidenced by the fact that neither Defendant Clements nor the Defendant City took action following the entry of the consent judgment in *Reilly* to alert Officers of Defendant City to the judgment or the implications thereof and many Officers within Defendant City Police Department are still unaware of the case, judgment, or any implications thereof, and the Defendant City made no changes in policy or training following the entry of the consent judgment in *Reilly* to ensure that such constitutional violations would not occur in the future.  Pl.'s SUF ¶132.  Indeed, Officer Stanzione, who was himself involved in the *Reilly* case and had in-fact illegally ordered Ms. Reilly to move in that case, was apparently never told about the result of that case, never saw the consent judgment, and did not receive any training or any other education in the aftermath of that case.  Pl.'s SUF ¶133; Dep. Stanzione 49:16-51:21; 55:8-14.  Even Senior Assistant Solicitor Stephen Ryan, a senior member of the prosecutorial division of Defendant City's Law Department had no knowledge of the Reilly Consent Judgment before or after the event involving Plaintiff Kurland and testified no other attorney has ever mentioned the Reilly Consent Judgment to him.  Pl.'s SUF ¶¶135-36; Dep. Ryan  91:15-23; 92:23-25, 93:1-9.

As this Court noted in *Reilly*, when a municipal policy-maker is asked at a deposition if a practice is proper and responds in the affirmative, there can be little question of the fact that the policymaker is on notice of the practice and condones it for the purposes of municipal liability.  *Reilly* 2013 WL 1193352, at *11 ("Here, there is little question that Esserman, a municipal

policymaker, was on constructive, if not actual notice of the practice of clearing exit passageways. Indeed, when asked at his deposition whether keeping exit passageways open was a "proper uniform practice" of the PPD, Esserman responded in the affirmative."). This is a nearly identical situation to what occurred here. Defendant Chief Clements was asked during his deposition "do you believe that the arrest of Ms. Kurland was consistent with the policies and procedures of the Providence Police Department?" He gave a simple answer; "Yes." Dep. Clements 133:17-22. In response to a follow-up question, "And was the order to arrest Ms. Kurland consistent with the training provided to Providence Police officers by the city?," his response was also, "Yes." Clements Dep. 134:4-9.

Defendant Chief Clements based his responses explicitly and exclusively on the facts contained in the police report and on the experience of Defendant Perez. Clements Dep. 133:23-25 ("And you base that on the facts in this police report and Lieutenant Perez's experience correct?" "Correct") *Id*. 134:10-135:19 (Was the arrest of Ms. Kurland -- strike that. The training of Providence Police officers would have taught them that arresting her was appropriate under the circumstances; is that correct?" "Yes, under the circumstances." "And again, when you say circumstances, you're now testifying as alleged in the police report, correct?" "Correct." "And the training of Providence Police officers would have taught them that her arrest would not violate her First Amendment rights; is that correct?" "Correct." "And the training of Providence Police officers would have taught them that arresting her would not violate her Fourth Amendment rights; is that correct?" "Correct." "And it's your testimony that Lieutenant Perez did nothing wrong in arresting her; is that correct?" "Correct." "And Lieutenant Perez was not disciplined for arresting her; is that correct?" "Correct." "And you would expect police officers in the Providence Police Department to take the same action in the future in a similar situation; is that correct?" "Yes.").

**Page 60 of 67**

This view is bolstered by the testimony of Major Verdi, the ranking officer on the scene, who also explicitly agreed that the actions of Defendant Perez were consistent with PPD policy and training:

Q. And is it your testimony that in arresting Ms. Kurland, Officer Perez was acting in accordance with the training provided by the City of Providence?

A. It is based on both his observations and what he witnessed that evening, her actions that evening, in accordance with policy of the police department.

Q. Just to be clear, her actions on that evening, you said she refused to move from that point; is that correct?

A. That -- what you just described is she refused to move, she refused to comply, and coupled with the fact that it was -- or her not moving had created a risk because others were trying, the way Lieutenant Perez explained, to get to where she was and it was creating a public safety issue.

Q. The only thing she was doing was standing there in a public park; is that correct?

A. She was not complying with the officer's request.

Q. Again, is it your testimony that in arresting Ms. Kurland, that Officer Perez was acting in accordance with the training provided by the City of Providence?

A. Training and in accordance with the law.

Q. And you believe he did nothing wrong; is that correct?

A. Correct.

Q. And you believe he should do the same thing under the same circumstances in the future; is that correct?

A. He would do the same under the same set of circumstances, that's my opinion.

Q. And you believe he should in accordance with the training that he was provided; is that correct?

A. It's more than the training. It's the circumstances and the environment for that demonstration.

Q. Is it your testimony that in arresting Ms. Kurland, Officer Perez was acting in accordance with the policies and procedures of the City of Providence Police Department?

A. Yes.

Q. And he did nothing wrong; is that correct?

A. Correct.

Q. And under the same circumstances, he should act in the same way in the future; is that correct?

A. I think he would do the same under the same set of circumstances.

Q. And as his superior, do you believe he should do the same under the same set of circumstances?

A. Yes.

Q. And in doing so, he would be acting consistently with the policies and procedures of the Providence Police Department; is that correct?

A. Yes.

Q. I just want to make sure I have it clear, the circumstances of Ms. Kurland's arrest about which you testified.

**Page 61 of 67**

A. Okay.
Q. The circumstances include the fact that she was protesting in the middle of a public park; that's one circumstance, correct?
A. Yes.
Q. And another circumstance, as I understand it, is she was asked to move from that location; is that correct?
A. Correct.
Q. And she failed to comply with that request to move; is that correct?
A. Yes.
Dep. Verdi 56:24-61:4.

This testimony, coupled with the clear illegality of Defendants conduct, is sufficient alone to expose the City to liability. *See Reilly* 2013 WL 1193352, at *8–12; *Paul v. City of Altus,* 141 F.3d 1185, at *2–3 (10th Cir.1998) (table) (denying the defendant city's motion for summary judgment where an officer's incident report stated that the defendant officer's action was consistent with their training); *Parker v. Town of Swansea,* 270 F.Supp.2d 92, 101 (D.Mass.2003) (denying the defendant town's motion for summary judgment where an officer testified that the defendant officer's action was "in accordance" with police training and that "he would have done the same thing").

Further, this lack of respect for the First Amendment has been on display in a series of cases before this Court, demonstrating not only that such violations are part of a policy, practice, and/or custom of the PPD and a result of the training provided to PPD officers, but also that such violations are continuing despite being brought repeatedly to the attention of senior Defendant City officials and despite the direction of this Court. This conduct has continued despite a series of recent lawsuits in which the Defendant City has been sued for the same or similar free speech violations. *See e.g. Reilly v. Providence*, No. CA 10-461 S, 2013 WL 1193352 (D.R.I. Mar. 22, 2013) (illegal clearing of vast public spaces and restrictions on leafleting); *Prince v. Providence*, C.A. No. 15-378M (D.R.I) (illegal arrest and assault on someone peacefully filming police conduct); *Pombo v. Providence*, C.A. No. 1:15-cv-00291-ML-LDA (D.R.I) (illegal restrictions on a local street musician performing on the street); *Kurland v. City of Providence* C.A. No. 18-

cv-00440-JJM-LDA (D.R.I) (illegal arrest of Ms. Kurland for standing on the sidewalk, not blocking anyone, and telling police officers they could not bar people from the sidewalk in Kennedy Plaza who were not causing a disturbance or blocking flow of movement on the sidewalk).

## I.   Malicious Prosecution

The Rhode Island Supreme "Court has defined malicious prosecution 'as a suit for damages resulting from a prior criminal or civil legal proceeding that was instituted maliciously and without probable cause, and that terminated unsuccessfully for the plaintiff therein.' " *Horton v. Portsmouth Police Dep't*, 22 A.3d 1115, 1121–22 (R.I. 2011) (quoting *Clyne v. Doyle*, 740 A.2d 781, 782 (R.I.1999)).  The existence of probable cause is a complete defense to a false arrest claim." *Henshaw v. Doherty*, 881 A.2d 909, 919 (R.I.2005) (quoting *Weinstock v. Wilk*, 296 F.Supp.2d 241, 247 (D.Conn.2003)); *see Hill v. Rhode Island State Employees' Retirement Board*, 935 A.2d 608, 613 (R.I.2007). "Probable cause to arrest exists when the facts and circumstances within the police officer's knowledge and of which he has reasonably trustworthy information are sufficient to warrant a reasonable person's belief that a crime has been committed and that the person to be arrested has committed the crime." *State v. Girard*, 799 A.2d 238, 249 (R.I.2002) (quoting *State v. Kryla*, 742 A.2d 1178, 1182 (R.I.1999)). "[P]robable cause is determined under a flexible 'totality-of-the-circumstances' analysis." *Id.* (quoting *Kryla*, 742 A.2d at 1182).

While Rhode Island has not clearly outlined the malice element or its relationship to probable cause or lack thereof the general rule is that malice may be inferred from a lack of probable cause.  *Campbell v. Casey*, 166 F. Supp. 3d 144, 153 (D. Mass. 2016) ("Malice is defined as any wrong or unjustifiable motive. It may be inferred from a lack of probable cause." (internal citations omitted.); *Reilly v. Shepherd*, 643 S.E.2d 216, 219 (V.A. 2007) ("[m]alice may

be inferred from a lack of probable cause, but a lack of probable cause may not be inferred from malice."); *Alamo Rent-A-Car, Inc. v. Mancusi*, 632 So. 2d 1352, 1357 (Fla. 1994) ("In an action for malicious prosecution it is not necessary for a plaintiff to prove actual malice; legal malice is sufficient and may be inferred from, among other things, a lack of probable cause, gross negligence, or great indifference to persons, property, or the rights of others."); *Benjamin v. Hooper Elec. Supply Co.*, 568 So. 2d 1182, 1191 (Miss. 1990) ("absence of probable cause for the prosecution is circumstantial evidence of malice."); *Stillwagon v. City of Delaware*, 274 F. Supp. 3d 714, 778 (S.D. Ohio 2017), *aff'd in part, appeal dismissed in part sub nom. Stillwagon v. City of Delaware, Ohio*, 747 F. App'x 361 (6th Cir. 2018) ("Malice may be inferred from the absence of probable cause."); *Ingram v. Diamond Equip., Inc.*, 118 N.E.3d 1, 8 (Ind. Ct. App. 2018) ("Malice may be inferred from a total lack of probable cause necessary to bring suit."); *Lopp v. Anderson*, 795 S.E.2d 770, 779 (N.C. Ct. App. 2016) ("Malice can be inferred from the want of probable cause alone."); *Fortunato v. City of New York*, 63 A.D.3d 880, 881 (N.Y. App. Div. 2 Dept. 2009) ("Actual malice can be inferred by the absence of probable cause to effectuate an arrest or by conduct that is reckless or grossly negligent"); *Fry v. Bank of Am. Nat. Tr. & Sav. Ass'n*, 142 Cal. App. 2d 150, 158, 298 P.2d 34, 39 (Cal. App. 3 Dist. 1956) ("While there is no legal presumption of malice, nevertheless it may be inferred from want of probable cause."); *Thompson v. City of New York*, 23 N.Y.S.3d 839, 853 (N.Y. Sup. Ct. 2015); *In re Smith*, 489 B.R. 875, 888 (Bankr. M.D. Ga. 2013) ("the essential element "malice" can be inferred from the defendant's reckless disregard or conscious indifference, or from lack of probable cause."). This is true even though malice in fact may be an essential element of the cause of action, because a lack of probable cause is valid grounds for an inference of malice. *See e.g. Jalou II, Inc. v. Liner*, 43 So. 3d 1023, 1040 (La. App. 1 Cir. 2010) ("In a malicious prosecution action, there must be malice in fact. Any feeling of hatred, animosity, or ill will

toward the plaintiff, of course, amounts to malice . . . Malice may also be inferred from lack of probable cause or a finding of reckless disregard for the other person's rights.") (internal citations omitted). ***A failure to make a proper investigation of the facts is also evidence of malice.***

Here, as outlined above, as a matter of law there was a total and utter lack of probable cause to arrest Plaintiff Kurland and thus as a matter of law a malicious prosecution ensued.

Additionally, a failure to properly investigate a case by a prosecuting attorney can also support a claim of malicious prosecution. *See Junior Food Stores, Inc. v. Rice*, 671 So. 2d 67 (Miss. 1996) (In malicious prosecution case, where a reasonable person would investigate further before instituting a proceeding, the failure to do so is an absence of "probable cause" for prosecution and may be evidence of malice.); *Silas v. Arden*, 213 Cal. App. 4th 75, 92, (Cal. App. 2 Dist 2012) (failure to investigate evidence of malice). Here, the total failure of Defendant Clements and the Defendant City Prosecutors to properly investigate Defendant Perez's basis for the arrest and full-tilt continuation of their prosecution through 6 court dates in two different courts over 113 days, until they were finally stopped by the not guilty filling imposed by the State District Court Judge, over their baseless objection is further evidence of malice. Indeed, Attorney Ryan expressly testified that he bases his entire prosecution on the police report and did not conduct any further investigation. Pl.'s SUF at ¶¶119; Dep. Ryan 57 :17-25 ("Q. And before you said that -- strike that. Before you gave the opinion that there was probable cause to charge under the state statute, did you attempt to find out where she was standing? A. I didn't talk to Lieutenant Perez prior to transferring this to the District Court. Q. Is the answer, then, no, you did not attempt to find out where she was standing? A. No."). Attorney Nelson testified similarly. Dep. Nelson 56:19-61:6. Although he claimed his prosecution of Plaintiff Kurland was based on the police report, when pressed about probable cause to arrest and to prosecute Ms.

Kurland, Mr. Ryan was unable to point to any facts or evidence therein that supported probable cause.  Pl.'s SUF ¶120; Dep. Ryan 49:19-70:15.

Finally, Plaintiff Kurland also testified that Defendant Perez knew who she was and displayed animosity towards her. Pl.'s SUF at 115; Dep. Kurland 183:6-12 (Testifying that Defendant Perez stated "I know you. You're a troublemaker". He then said "Yeah, you're Luna aren't you?" Referring to the last name of Ms. Kurland's deceased husband.)  As Defendants presumably dispute this, even if this Court does not grant summary judgment for Plaintiff on this issue, this dispute of fact would prelude summary judgment for Defendants.

## VI.    CONCLUSION

**WHEREFORE**, for all the foregoing reasons, Plaintiffs respectfully pray that this Court:

1.      Grant partial summary judgment in favor of Plaintiffs and against the Defendants on the issue of liability on all Counts alleged in the Second Amended Complaint.

2.      Continue the matter for such further proceedings as may be necessary, including the determination of appropriate relief and damages and an award of attorney's fees pursuant to 42 U.S.C. §1988.

Plaintiffs,
By their attorneys,

**Date:  April 3, 2019**                    **/s/ Richard A. Sinapi**
                                             **Richard A. Sinapi, Esq.  (#2977)**
                                             **American Civil Liberties Union of Rhode Island**
                                             Sinapi Law Associates, Ltd.
                                             2374 Post Road, Suite 201
                                             Warwick, RI 02886
                                             Phone: (401) 739-9690; Fax (401) 739-9040
                                             Email:  ras@sinapilaw.com

## CERTIFICATION

**Michael J. Colucci Esq.  (#3302)**
**Olenn & Penza Address**
530 Greenwich Ave
Warwick, RI 02886-1824
mjc@olenn-penza.com

**Kevin F. McHugh Esq. (#3927)**
Kathryn M. Sabatini
**City of Providence Department of Law**
275 Westminster Street, Suite 200
Providence, RI 02903
kmchugh@providenceri.gov

I hereby certify that on **April 3, 2019,** a true copy of the within was filed electronically via the Court's CM/ECF System.  Notice of this filing will be sent by e-mail to all parties by operation of the Court's electronic filing system and the filing is available for viewing and downloading from the court's cm/ecf system.  Service on the counsel of record listed above has been effectuated by electronic means.

/s/ Richard A. Sinapi