# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF RHODE ISLAND

|  |  |
|---|---|
| ) | |
| Shannah M. Kurland and Gladys B. Gould, ) | |
| ) | |
|     Plaintiffs, ) | |
| ) | |
| ) | C.A. No. 1:14-cv-524-MSM-PAS |
|     v. ) | |
| ) | |
| ) | |
| City of Providence, et al. ) | |
| ) | |
|     Defendants. ) | |

## MEMORANDUM AND ORDER

Mary S. McElroy, United States District Judge.

This matter comes before the Court on the parties' Cross-Motions for Summary Judgment. The Plaintiffs, Shannah Kurland ("Kurland") and Gladys B. Gould ("Gould") filed this Action against the City of Providence (the "City"), Officer Oscar Perez ("Perez"), Chief Hugh T. Clements ("Clements"), and two unidentified police officers ("John Doe" and "John Roe") pursuant to 42 U.S.C. § 1983. In their Second Amended Complaint, the Plaintiffs allege First and Fourth Amendment violations, corresponding state constitutional violations, false arrest and imprisonment, and malicious prosecution following a political protest at Roger Williams Park (the "Park") in Providence, Rhode Island.

1

For the following reasons, the Defendants' Motion for Summary Judgment is DENIED. The Plaintiffs' Motion for Partial Summary Judgment as to liability is also DENIED.  There remain disputed issues of material fact with respect to the Defendants' liability for alleged unconstitutional restrictions of free speech and the existence of probable cause for arrest and prosecution.

## BACKGROUND

Upon reviewing the materials submitted by the parties, the Court finds the following facts undisputed, unless otherwise indicated.  On September 26, 2013, then candidate, and now Governor, Gina Raimondo's campaign held a fundraising event at the Casino[1] (the "Casino") located inside Roger Williams Park. (Statement of Undisputed Facts in Supp. Of Pls.' Mot. for Partial Summ. J. and in Opp'n to Defs.' Mot. for Summ. J. ("Pls.' SUF") ¶ 9, (ECF No. 59-2).  The Park is public, owned by the City of Providence, and plays host to various special events as well as to regular recreational visitors. *Id.* at ¶¶ 7, 8.

### I. The Park

Present in the Park on the relevant day were fundraiser attendees, demonstrators opposed to Raimondo's gubernatorial bid, unaffiliated park visitors, and at least six Providence police officers.  While the precise number of people in the Casino's vicinity is unknown, estimates suggest roughly 300 demonstrators convened

---

[1] The Roger Williams Park Casino is a two-storied building providing indoor event space.

to hold a peaceful protest outside the Casino.[2]  Neither party provides an estimate for how many people attended the fundraiser.[3] However, the parties do not dispute that both attendees and demonstrators parked along the surrounding streets inside the Park and walked to their destinations, as is typical of large events for which there is inadequate parking in the Casino lot.[4]  The parties agree that attendees and demonstrators walked along the street and throughout the park utilizing crosswalks and sidewalks to varying degrees.

Because this case involves a series of discrete locations, a map and explanation of the Park site is helpful.  For reference, the following aerial image (ECF No. 55) identifies the relevant areas in the Park, which the parties do not dispute:

---

[2] The Plaintiffs estimate 200-300 demonstrators. (Pls.' SUF ¶ 11, ECF No. 59-2).  The Defendants estimate at least 300 demonstrators were present.  (Statement of Undisputed Facts in Supp. of Defs.' Mot. for Summ. J. ("Defs.' SUF") ¶31, ECF No. 56.)

[3] According to its booking website, the Casino's event capacity ranges from 90 to 300 guests depending on event type. Roger Willliams Park Events, *The Casino*, https://rogerwilliamsparkevents.com/the-casino/ (last visited Feb. 27, 2020).

[4] The City's website indicates the Casino parking lot can accommodate up to 75 vehicles, and, according to the parties, the lot was filled to capacity during the fundraiser and protest. City of Providence, *Casino at Roger Williams Park*, http://www.providenceri.gov/providence-parks/casino/ (last visited Feb. 27, 2020).



Areas A, B, C, D, and E represent the locations where demonstrators, including Plaintiffs, congregated at different times during the protest. Area A is closest to the Casino, within about 50 feet, Area B is approximately 120 feet away, and Area C is approximately 215 feet away, while Areas D and E are farthest, at more than 270 feet from the Casino entrance. (ECF No. 60-3, Exhibit 3).

## II. Overview

While the campaign event proceeded in the Casino and the protest continued outside, the Plaintiffs and other demonstrators congregated in various locations and evening commuters passed through the Park. Eventually, the demonstrators, including the Plaintiffs, were restricted from certain areas, and relocated by police from Areas A, B, and C to Area D. Most demonstrators complied with police orders

4

to relocate.  When Kurland and Gould were asked to move from Area C to Area D, Kurland refused.  She was arrested and charged with disorderly conduct.  Following a charge filed first in municipal court and later in state district court, the prosecution eventually terminated in Kurland's favor.

## III. The Demonstration

Beginning at 4:00 p.m., demonstrators, including Gould, arrived at the Park and congregated at Areas C and D. (Pls.' SUF ¶ 18, ECF No. 59-2).  With the fundraiser set to begin at 5:00 p.m., some demonstrators continued to occupy Area D while Gould headed toward the Casino to protest first at Area B and then at Area A on the sidewalk near the Casino's entrance. *Id.* at ¶¶ 20-21.  The Plaintiffs allege that a police officer instructed Gould to move off the sidewalk.[5]  The Defendants have not disputed, in their papers or during oral argument, that non-demonstrators were permitted to access Area A.[6]  Gould left Area A, crossed the Rose Avenue access road and joined other demonstrators at Area B, the southern side of the Island. *Id.* at ¶ 26.  From this position across the roadway from the Casino, the demonstrators remained visible to event attendees, pedestrians in the Park, and traffic traveling on Rose Avenue. *Id.*

Because the campaign event and demonstration drew crowds, City police were also present in the Park to monitor vehicles and pedestrians using the Park and

---

[5] Plaintiffs' Second Amended Complaint does not identify the person who instructed Gould except as "Defendant John Doe, a City Police Officer." (ECF No. 3.)

[6] Presumably, the people permitted to access the sidewalk outside the Casino were those attending the campaign event though the record is not clear on this point.  At any rate, non-demonstrators were permitted to walk through and access Area A. (Dep. Furtado 49:16-22.)

attending the Casino event and protest. Defs.' SUF ¶¶ 9-11(ECF No. 56).  One officer, Frank Furtado, had been hired specifically by the Casino for the campaign event. *Id.* at ¶ 6.  By all accounts, including those from Defendants and officers present in the Park, the demonstrators were peaceful.  At 5:30 P.M., Defendant Officer Oscar Perez arrived at the Park along with Sergeant Julie Pryde.  *Id.* at ¶¶ 9-11.   The police at the Park understood that the demonstrators, mostly firefighters and teachers, opposed Raimondo's bid for governor.  *Id.* at ¶ 7.  With regular commuter traffic passing through the Park and event attendees and demonstrators walking along Rose Avenue, the officers discussed options for managing the cars and people in the Park. *Id.* at ¶ 18.   Officers Furtado, Perez, and Pryde were joined by Officers Jared Stanzione, Louis Pelaez, and Carla Cavanaugh.   *Id.* at ¶ 28.  Of the officers present in the Park, only Perez is identified as a defendant by name.

Officer Roe instructed Gould and other demonstrators to move out of Area B. Defs.' SUF ¶35 (ECF No. 56).   Plaintiffs allege that no reasons were given for the new restriction. (ECF No. 3, ¶¶ 35-37). Gould moved to Area C where she was joined by Kurland. Defs.' SUF ¶35 (ECF No. 56).  The Plaintiffs estimate that between 150 and 200 demonstrators lined the edge of the Island at Area C. *Id* at ¶45.   Shortly after 5:00 p.m., Perez instructed the demonstrators, including Gould and Kurland, to move to Area D, furthest away from the Casino. *Id.*  According to the Plaintiffs, Perez offered no reason for moving the demonstrators.  *Id.*

There is no question or dispute as to the demonstrators' peaceful activities. Instead, the Defendants allege the Island's size could not accommodate the

6

demonstrators' numbers and that the demonstrators were crossing the street between Areas C and D. Defs.' SUF ¶ 26 (ECF No. 56). The Defendants describe Area C on the island as too small for the demonstrators to remain without spilling onto the street. *Id.* at ¶ 25. According to the Defendants, Area D provided the safest space for demonstrators, allowing police to direct cars and pedestrians, while still enabling the demonstrators to protest effectively and reach passersby at the Elmwood Avenue entrance and Linden Avenue. *Id.* at ¶ 31. Although most demonstrators acquiesced and moved to Area D, "[t]here were still some [demonstrators] located by the entrance from Elmwood Avenue and some . . . in the areas of B and/or C." *Id.* at ¶ 32. According to the Defendants, Perez "was concerned that after we got the [demonstrators] to move to Area D, they would cross back over to join other protesters staying behind." *Id.* at ¶ 33.

As for accommodating the number of demonstrators, Kurland and Gould allege that the Island, which includes both Areas B and C, had plenty of space for the demonstrators to stand safely. According to the Plaintiffs, "The Island has an area of some 29,650 square feet, or about 100 square feet per protester . . . [E]ven if only the perimeter of the Island is in question, that is a distance of 900 feet or some three (3) [linear] feet of space" per protester. Pls.' SUF ¶ 63, (ECF No. 59-2). As for crossing the street, the Plaintiffs describe the demonstrators as "middle-aged, mature people, mostly teachers and firefighters, some retired . . . who often assisted others, including children in crossing busy streets." Id. at ¶ 62.

From these facts – the demonstrators' activities, the presence of traffic in the Park, and the Island's size – the parties draw different conclusions. The Defendants call it a safety hazard that could not be resolved by moving only some demonstrators to Area D. The Plaintiffs, however, paint a different picture, one of orderliness and compliance which did not include demonstrator-caused traffic or pedestrian safety hazards.

## IV. The Arrest

As Perez redoubled his efforts to move all the demonstrators to Area D, Kurland and Gould were among a group who refused to move. Defs.' SUF ⁋ 35 (ECF No. 56). Perez asked them several times to leave the Island in order to stop other demonstrators from "crossing back over to join back with them." *Id.* at ⁋ 38. The Defendants identify one demonstrator, Joe Buchanan, who crossed the street between Areas C and D. *Id.* at ⁋⁋ 37-38. Defendants also reference an unidentified demonstrator who crossed the street in front of a car while moving between Areas C and D, requiring an officer to respond quickly and stop traffic. *Id.* at ⁋ 40. These circumstances, according to Defendants, justified the decision to confine the demonstrators to Area D.

Gould and Kurland objected to being relocated. They argued to the officers that the increased distance from the Casino would inhibit their speech and reduce the impact of their message on event attendees. Pls.' SUF ⁋ 36 (ECF No. 59-2). When approached by Perez, the Plaintiffs asserted their rights to free speech and peaceful protest and refused to move across the street to Area D. *Id.* at ⁋⁋ 50-52. Although

Perez made it clear to the Plaintiffs that he would arrest them if they did not move to Area D, Kurland refused to cross the street. *Id.* at ¶¶ 54-55. Perez arrested Kurland for "failure to move/disorderly conduct."[7]  Gould moved to Area D and avoided arrest and no other arrests were made during the campaign event or protest.

Following the arrest, Kurland was transported to the Providence Public Safety Complex to be booked and photographed.  Perez charged Kurland with disorderly conduct under §16-3(d) and then issued her a notice to appear in Providence Municipal Court. *Id.* at ¶ 95.  Despite the intended charge, the notice to appear erroneously referenced § 16-3(c) for "fighting words." *Id.* at ¶ 96.  The Defendants concede this error but stress that it was a clerical mistake and that the City prosecuted Kurland under the appropriate state statute when the charge was refiled in state district court. Defs.' SUF ¶ 114 (ECF No. 56).[8]  After a detour through municipal court, where charges were dismissed, Kurland arrived in the district court on December 18, 2013 and entered a "not guilty" plea. Pls.' SUF ¶ 113 (ECF No. 59-

---

[7] Section 31-12-3 of the Rhode Island General Laws provides that "No person shall willfully fail or refuse to comply with any lawful order or direction of any police officer invested by law with authority to direct, control, or regulate traffic, including any order or direction pertaining to fire lane parking violations whether on private or public property." R.I. Gen. Laws § 31-12-3 (1956).

[8] Kurland was charged in state district court under R.I.G.L. § 11-45-1(a)(4) which provides, in relevant part, that "(a) A person commits disorderly conduct if he or she intentionally, knowingly, or recklessly . . . (4) Alone or with others, obstructs a highway, street, sidewalk, railway, waterway, building entrance, elevator, aisle, stairway, or hallway to which the public or a substantial group of the public has access or any other place ordinarily used for the passage of persons, vehicles, or conveyances…."

2).  Then, on January 22, 2014, at the second of two pretrial conferences, the presiding judge offered, and Kurland accepted, a "not-guilty filing."  *Id.* at ¶ 115.[9]

According to the Plaintiffs, the Defendants were familiar with Kurland as both an activist and community organizer.  *Id.* at ¶ 116.  Indeed, the Plaintiffs allege that Perez called Kurland a "troublemaker" before her arrest and that the police and prosecutors had no probable cause to arrest or prosecute her under any of the ordinances or statutes identified by the Defendants.  *Id.* at ¶¶117, 119, 120-121.

The Defendants do not dispute Perez's familiarity with Kurland, but they do argue he possessed probable cause to arrest and charge her with disorderly conduct given the officers' vehicular and pedestrian traffic safety concerns, Kurland's alleged interference with traffic control, and her refusal to comply with police instructions. (ECF No. 55).  Additionally, Solicitor Ryan and Solicitor Nelson testified in their depositions that, upon reviewing the police report and accounting for the clerical error in the charging papers, they concluded that probable cause existed both to arrest and prosecute Kurland for disorderly conduct.  Defs.' SUF ¶¶ 114-115, 117, 119-120 (ECF No. 56).  Perez did not participate in the prosecution after making the arrest and

---

[9]  Ultimately, the charge against Kurland terminated in her favor.  Pursuant to R.I.G.L. 12-10-12, the presiding judge may "file any complaint in a criminal case" and "[i]n the event the court filed the complaint under this section while the defendant maintained a plea of not guilty, if the court finds there to have been a violation but does not impose a sanction, it may proceed to the further disposition of the complaint according to law. If no action is taken on the complaint for a period of one year following the filing, the complaint shall be automatically expunged. No criminal record shall result; provided, that in any civil action for a tort, a plea of guilty or a finding of guilty should be admissible notwithstanding the fact that the complaint has been filed."

preparing the police report. *Id.* at ¶ 46.  The City solicitors relied solely upon the police report and did not communicate with Perez before or during Kurland's prosecution. *Id.* at ¶¶ 115, 117.

The parties agree that during the campaign event and protest, the police officers on site assisted with monitoring both the commuter traffic through the park as well as event attendees, demonstrators, and other pedestrians.  However, the parties dispute the severity of the circumstances that led to restricting the demonstrators to Area D and to Kurland's arrest.  The Defendants describe how officers directed traffic and instructed demonstrators to stay out of the street, illustrating a dangerous set of circumstances demanding police intervention with the protest. (ECF No. 55).  The Plaintiffs describe instead a "normal and manageable" amount of traffic.  They identify the Island containing Areas B and C as "about three-quarters of acre" with enough space for the demonstrators to safely gather. (Statement of Disputed Facts in Supp. Of Pls.' Mot. for Partial Summ. J. and in Opp'n to Defs.' Mot. for Summ. J. ("Pls.' SDF") ¶ 25, ECF No. 59-3).[10]  The Plaintiffs further emphasize that Gould and Kurland were not creating a traffic hazard or impeding cars or pedestrians.

## VI. The Present Action

---

[10] Pursuant to LR Cv 56(2)(3), the Plaintiffs submitted a Statement of Disputed Facts in support of their Cross Motion for Summary Judgment.

In their Second Amended Complaint, the Plaintiffs make six claims for which they seek injunctive relief, declaratory judgment, damages, attorney fees and costs. Pursuant to 42 U.S.C. § 1983, the Plaintiffs assert civil actions for First and Fourth Amendment rights violations (Counts I and III), alleging a violation of freedom of speech and an unreasonable seizure, respectively. In corresponding claims (Counts II and IV) for free speech violations and unreasonable seizure, the Plaintiffs assert violations of the Rhode Island Constitution Article I, Sections 6 and 21. In addition to these constitutional claims, the Plaintiffs also make state tort claims for malicious prosecution (Count V) and for false arrest and imprisonment (Count VI).

The Defendants seek summary judgment on all counts and assert qualified immunity as a defense for Defendants Perez and Clements. The Plaintiffs, in response, filed an objection to the Defendants' Motion as well as a cross-motion for partial summary judgment as to liability on all counts.

## STANDARD FOR SUMMARY JUDGMENT

A Court grants summary judgment when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56. An issue or dispute is considered "genuine if the evidence about the fact is such that a reasonable jury could resolve the point in the favor of the non-moving party." *Sanchez v. Alvarado*, 101 F.3d 223, 227 (1st Cir. 1996) (quoting *Rivera-Muriente v. Agosto-Alicea*, 959 F.2d 349, 352 (1st Cir. 1992)) (internal quotations omitted). Facts are material if they have "the

potential to affect the outcome of the suit under the applicable law." *Id.* (quoting *One National Bank v. Antonellis*, 80 F. 3d 606, 608 (1st Cir. 1996)).

This same standard applies when reviewing cross-motions for summary judgment. The Court must "'consider each motion separately, drawing all inferences in favor of each non-moving party in turn.'" *Green Mountain Realty Corp. v. Leonard*, 750 F.3d 30, 38 (1st Cir. 2014) (quoting *D & H Therapy Assocs., LLC v. Boston Mut. Life Ins. Co.*, 640 F.3d 27, 34 (1st Cir. 2013)).

## DISCUSSION

### I. Free Speech – Counts I & II

Kurland and Gould allege that the City of Providence and its police department, as well as individual officers, infringed upon their right to free speech as protected by the United States Constitution and the Rhode Island Constitution when restrictions were imposed in the Park that inhibited access to the speakers' target audience, applied only to demonstrators and not to other persons in the Park, and failed to address the Defendants' alleged traffic safety concerns.

The Supreme Court instructs courts to employ a three-step inquiry to determine whether a speech restriction violates the First Amendment. *Cornelius v. NAACP Legal Defense & Educational Fund, Inc.*, 473 U.S. 788, 797 (1985). The first question is whether the "speech is protected by the First Amendment." *Id.* If the answer is yes, the Court must then determine "whether the forum is public or non-public." *Id.* Third, and depending on the forum type, the Court then applies the

appropriate level of scrutiny to "assess whether the justifications for exclu[ding the speech] from the relevant forum satisfy the requisite standard." *Id.*

Here, the Defendants concede that Kurland and Gould were engaged in political speech protected under the First Amendment.  Further, the Defendants agree that the demonstration took place in a public forum.  Public parks like Roger Williams Park fall into the traditional public forum category.  "Traditional public fora are those places which 'by long tradition or by government fiat have been devoted to assembly and debate.'" *Id.* at 802 (quoting *Perry Education Ass'n v. Perry Local Educators' Ass'n*, 460 U.S. 37, 45 (1983)).  The first two steps in the free speech inquiry have, therefore, been established and the remaining question in this case is which level of scrutiny must be applied.

Whether strict scrutiny or intermediate scrutiny applies turns on whether the speech restriction in this case was content-based or content-neutral.  If content-based, the regulation must survive a strict scrutiny examination; if content-neutral, it must satisfy the lesser intermediate standard.  The Plaintiffs urge this Court to apply strict scrutiny claiming a content-based restriction based on their political message, but they also argue that even as a content-neutral "time, place, and manner" restriction, it cannot survive intermediate scrutiny.

Whether the restriction is content-neutral or content-based, and therefore whether it is subject to strict or intermediate scrutiny, depends upon the purpose of the regulation.  "The government's purpose is the controlling consideration." *Ward v. Rock Against Racism*, 491 U.S. 781, 791 (1989).  A content-based speech restriction

that "targets the content of speech … raises the special concern 'that the government is using its power to tilt public debate in a direction of its choosing.'" *March v. Mills*, 867 F.3d 46, 54 (1st Cir. 2017) (quoting *Cutting v. City of Portland*, 802 F.3d 79, 84 (1st Cir. 2015)).  If a speech restriction is content-based, strict scrutiny requires the government to establish that the regulation "serve[s] a compelling governmental interest by the least restrictive means." *Id.* (citing *McCullen v. Coakley*, 573 U.S. 464, 478 (2014)).

Content-based speech restrictions have everything to do with the speaker's message.  Some regulations are "deemed content based because the regulation of speech on its face draws distinctions based on the message a speaker conveys." *Id.* (quoting *Reed v. Town of Gilbert*, 576 U.S. 155, 163 (2015) (internal quotations omitted).  These content-based restrictions may be "obvious, defining regulated speech by particular subject matter" or they may be "more subtle, defining regulated speech by its function or purpose." *Id.* at 58 (quoting *Reed*, 576 U.S. at 163). Other content-based speech restrictions may appear facially neutral but "cannot be justified without reference to the content of the regulated speech" or have been "adopted by the government because of disagreement with message the speech conveys." *Reed*, 576 U.S. at 164 (quoting *Ward*, 491 U.S. at 791) (internal quotations omitted).

The First Circuit, underscoring free speech as one of "the most precious of our constitutional rights," has explained that "a court embarking on an inquiry into the constitutionality of governmental action will devote 'the most exacting scrutiny to regulations that suppress, disadvantage, or impose differential burdens on speech

15

because of its content.'" *Nat'l Amusements, Inc., v. Town of Dedham,* 43 F.3d 731, 736 (1st Cir. 1995) (quoting *Turner Broadcasting Sys., Inc. v. FCC*, 512 U.S. 622, 642 (1994)).  Whether this exacting standard applies depends upon whether the speech restriction "serves purposes unrelated to the context of expression . . ." *Rideout v. Gardner*, 838 F.3d 65, 71 (1st Cir. 2016) (quoting *Ward*, 491 U.S. at 791).

The Defendants maintain their content-neutral motivation to move the Plaintiffs and demonstrators amounted to a simple effort to ensure vehicle and pedestrian traffic safety. There are, however, some facts that, if believed, could lead a reasonable jury to conclude that the demonstrators were relocated because of disagreement with their message.  They include; (1) the officers' conceded knowledge of the demonstrators' political position, (2) the communication between the officers and an unidentified woman outside the Casino as Perez enforced the speech restriction,[11] (3) the Plaintiffs' and demonstrators' peaceful approach to protesting, (4) the Island's generous size, (5) the unfettered access to the Park enjoyed by other non-demonstrators, and (6) and the Plaintiffs' increasing distance from the Casino as the police continued relocating the demonstrators.

Here, a reasonable jury, resolving the disputed facts in the Plaintiffs' favor, could find that the speech restriction imposed in the Park disparately burdened the

---

[11] The Plaintiffs assert that the police interacted with an unidentified "woman involved with the event, either a member of Gina Raimondo's campaign staff or someone with the Casino, who 'was scolding the police' and who wanted the police to move the protesters away from the Casino" (Pls.' SUF ⁋ 59) and that while Perez attempted to relocate the Plaintiffs to Area D, he "left for a few moments and conferred with the other officers and the woman" and then "reiterated his demand that [Plaintiffs] move …" (ECF No. 20).

Plaintiffs' and demonstrators' speech compared with event attendees who were permitted unlimited access to the park. The jury could conclude, after resolving the facts, that moving the demonstrators to Area D did not serve any traffic or pedestrian safety purposes, but instead served only to distance the Plaintiffs and demonstrators from the campaign event inside the Casino. That type of content-based restriction would require the Defendants to overcome the presumption of unconstitutionality and establish that there was a compelling interest in moving the Plaintiffs and demonstrators and that relocating only those individuals to Area D was the least restrictive method available to the police in the Park.[12]

---

[12] If the jury, resolving the facts, accepted the defendants' contention that the restriction was content-neutral, intermediate scrutiny, with its three-part test to assess whether a time, place, or manner restriction has passed constitutional muster, would apply. *Bl(a)ck Tea Society v. City of Boston*, 378 F.3d 8, 12 (1st Cir. 2004). In a public forum "the government may enforce reasonable time, place, and manner regulations so long as the restrictions are content-neutral, are narrowly tailored to serve a significant government interest, and leave open ample alternative channels of communication." *Reilly v. City of Providence*, No. CA. 10-461 S, 2013 WL1193352, at 4* (D.R.I. Mar. 22, 2013) (quoting *United States v. Grace*, 461 U.S. 171, 177 (1983) (internal quotations omitted). A valid time, place, manner restriction "need not be the least restrictive or least intrusive means" available to achieve the government's goal. *McCullen*, 573 U.S. at 486 (quoting *Ward*, 491 U.S. at 798) (internal quotations omitted). At the same time, however, the regulation cannot "burden substantially more speech than is necessary to further the government's legitimate interests." *Id.* (quoting *Ward*, 491 U.S. at 799) (internal quotations omitted). The Court acknowledges that maintaining vehicular and pedestrian safety in public environments is a significant government interest. The question, if the restriction is content neutral, is whether the speech restrictions imposed by the Defendants were narrowly tailored to achieve those interests and whether sufficient alternative means for communication were available to the Plaintiffs and demonstrators. These too are factual disputes precluding summary judgment.

## II. Unconstitutional Seizure – Counts III & IV

When Officer Perez began relocating demonstrators to Area D, the Plaintiffs refused to comply, citing their First Amendment right to free speech.  After repeatedly ordering the Plaintiffs to move under threat of arrest, Perez arrested Kurland.  While Perez arrested only Kurland, both Plaintiffs allege a violation of the Fourth Amendment as well as Article I, Section 6 of the Rhode Island Constitution for unlawful seizure.

"The Fourth Amendment right to be free from unreasonable seizures of the person demands that an arrest be supported by probable cause." *Santiago v. Fenton*, 891 F.2d 373, 383 (1st Cir. 1989) (citing *Beck v. Ohio*, 379 U.S. 89, 91 (1964)). Kurland contends that Perez arrested her unlawfully because he lacked probable cause to conclude that Kurland had committed disorderly conduct, failure to move, or obstruction.

The Supreme Court has determined that police have probable cause to support an arrest if "at that moment [of arrest] . . .  the facts and circumstances within their knowledge and of which they had reasonably trustworthy information were sufficient to warrant a prudent person in believing that the defendant had committed or was committing an offense.'" *United States v. Figueroa*, 818 F.2d 1020, 1023 (1st Cir. 1987) (quoting *Beck*, 379 U.S. at 91).   The probable cause standard is an objective one. *Acosta v. Ames Dep't Stores, Inc.*, 386 F.3d 5, 9 (1st Cir. 2004) (citing *Valente v. Wallace*, 332 F.3d 30, 32 (1st Cir. 2003); *Roche v. John Hancock Mut. Life Ins. Co.*, 81 F.3d 249, 254 (1st Cir. 1996)).   Moreover, in evaluating whether probable cause

existed, "[t]he focus is not on certitude, but, rather, on the likelihood of criminal activity." *Acosta,* 386 F.3d at 9 (citation omitted).  The First Circuit instructs that the court, not the jury, should make the probable cause determination "unless the facts are disputed." *Id.* (quoting *Bolton v. Taylor*, 367 F.3d 5, 8 n.2 (1st Cir. 2004)).

### A. Kurland's Arrest

The Defendants identify several City and State provisions under which Perez had probable cause to arrest Kurland.  First, the Defendants argue probable cause existed to arrest Kurland for engaging in disorderly conduct and violating City Ordinance §16.3(d).[13] Second, the Defendants argue Perez had probable cause to arrest Kurland for violating the state disorderly conduct statute R.I.G.L. § 11-45-1(a)(4) under which the City pursued prosecution in the district court.  Finally, the Defendants cite R.I.G.L. §§ 31-12-3 and 11-32-1 and argue Perez had probable cause to arrest Kurland for "failure to move" to Area D and/or for obstructing an officer's duties.[14]

---

[13] Section 16-3 of the Code of Ordinances of the City of Providence provides, in relevant part, "Any person who engages in conduct which violates any of the following subsections thereby commits disorderly conduct . . . (d) Any person, who alone or in concert with others, obstructs any place ordinarily used for the passage of persons, vehicles or conveyances or otherwise engages in conduct with [sic] obstructs or interferes physically with the a lawful meeting, procession, or gathering."

[14] R.I.G.L. § 31-12-3 entitled "Obedience to police officers" provides, in relevant part, that "[n]o person shall willfully fail or refuse to comply with any lawful order or direction of any police officer invested by law with authority to direct, control, or regulate traffic …"

R.I.G.L. § 11-32-1, entitled "Obstructing [an] officer in execution of duty" provides that "Every person who shall obstruct any officer, civil, military, or otherwise, including any state, city, or town police, deputy sheriff, or fire fighter, while in the

The Plaintiffs urge – based upon their First Amendment argument that the Defendants imposed a content-based speech restriction – that Kurland's arrest was unreasonably based on her speech.  The Plaintiffs cite *McCabe v. Macaulay* for the proposition that "it is plainly unreasonable for a law enforcement officer to effect a warrantless seizure of an individual simply because the . . . officer disagrees with the content or viewpoint of the individual's speech." 551 F.Supp.2d 771, 793 (N.D. Iowa 2007) (citation omitted)   The Supreme Court, however, in a case involving a retaliatory arrest claim based on free speech, held that the plaintiff in such a case must "establish[] the absence of probable cause" and then "[t]he plaintiff must show that the retaliation was a substantial or motivating factor" for the arrest. *Nieves v. Bartlett*, 139 S.Ct. 1715, 1725 (2019) (citing *Lozman v. City of Riviera Beach, Fla.*, 138 S.Ct. 1945, 1952-53 (2018)).

"In a § 1983 suit, a jury must resolve any disputed facts, but where there are no disputed facts, the court must decide as a matter of law whether there was probable cause." *Petro v. Town of West Warwick ex rel. Moore*, 770 F.Supp.2d 475, 480 (D.R.I. 2011) (citing *Bolton,* 367 F.3d at 8).  If probable cause existed to arrest Kurland for violating any of these ordinances or statutes, then her Fourth Amendment claim fails. *See District of Columbia v. Wesby*, 138 S.Ct. 577, 584 n.2 (2018) ("Because probable cause is an objective standard, an arrest is lawful if the

execution of his or her office or duty, shall be imprisoned not exceeding one year or be fined not exceeding five hundred dollars ($500)."

officer had probable cause to arrest for any offense, not just the offense cited at the time of arrest or booking.").

In this case, as in *Santiago,* the facts that might establish probable cause are disputed. In *Santiago*, the officers claimed that the plaintiff had pushed and struck them and used loud and obscene language, and that this conduct was the basis for the arrest. The plaintiff, suing, *inter alia,* for an arrest made without probable cause, denied those allegations. The First Circuit concluded that the plaintiff's evidence, if believed, "would have permitted a jury to find that the officers lacked probable cause to arrest [the appellant] for allegedly abusive conduct." 891 F.2d at 384.

Kurland maintains that no facts could reasonably be found in her behavior constituting (1) obstructing "the passage of persons, vehicles or conveyances" or "interfering with a lawful meeting, procession, or gathering" under City Ordinance § 16.3(d) or (2) obstructing "a highway, street, sidewalk . . . to which the public or substantial group of the public has access . . ." under R.I.G.L. § 11-45-1(a)(4). Because Kurland contends she had been engaged in peaceful, protected speech while standing on the Island, and did not obstruct the street or sidewalk or interfere with anyone gathering in the Park, she disputes that any probable cause existed to arrest her for disorderly conduct under either of the above provisions. In contrast the Defendants argue that, even if the disorderly conduct charge was inappropriate, probable cause did exist to lawfully arrest Kurland for failing to obey Perez's order and interfering with his official duties because the facts, in their opinion, demonstrate that she declined to move to Area D when ordered to do so by Perez and her refusal to comply

21

with the order inhibited Perez's ability to safely control traffic and demonstrators who were attempting to cross the street.

Thus, there remain disputed facts as to whether Kurland contributed to or exacerbated the traffic safety issue or caused an obstruction and whether the order to move to Area D was lawful.  Therefore, the Court cannot say as a matter of law whether probable cause existed to arrest Kurland and this issue must be resolved by a jury.

## B. Gould's Fourth Amendment Rights

Plaintiff Gould contends that she was seized without legal justification when she was ordered to move from Area A, to Area B, to Area C, and then ordered by Perez to Area D.  A seizure does occur when police assert authority in directing a person's movement, and the person acquiesces to that authority.  *California v. Hodari D.*, 499 U.S. 621, 626-27 (1991).  Gould argues the police could not push her from one area to another, and that in their effort to do so, they unlawfully seized her.

However, Gould failed to assert this claim in the Plaintiffs' Second Amended Complaint.  Simply raising the claim in her cross-motion for summary judgment failed to provide notice to the Defendants necessary to conduct pertinent discovery or address the claim in their own Motion.  Pursuant to the Federal Rules of Civil Procedure, a complaint must provide at a minimum "a short and plain statement of the claim showing that the pleader is entitled to relief . . .." Fed. R. Civ. P. 8(a)(2). Gould's Fourth Amendment claim for unlawful seizure is not properly before this Court and is therefore dismissed.

### III. State Law Claims – Counts V & VI

In addition to the constitutional violations alleged by the Plaintiffs, the Second Amended Complaint asserts state law claims for false arrest and imprisonment as well as malicious prosecution stemming from Kurland's arrest, booking, and subsequent prosecution first in Providence Municipal Court and then in the state district court.

In evaluating a false arrest claim, "[t]he essential element . . . is the restraint of another person without legal justification or without any color of legal authority." *Henshaw v. Doherty*, 881 A.2d 909, 919 (R.I. 2005) (quoting *Mailer v. Estate of DePasquale*, 117 A.2d 376, 379 (R.I. 1962)) (internal quotations omitted). Where there is probable cause, "the false arrest claim must fail – since 'a necessary element of that claim is an illegal arrest.'" *Id.* (quoting *Acosta*, 386 F.3d at 12).

A claim of false imprisonment is similar to a false arrest claim. "The action for false imprisonment is derived from the ancient common-law action of trespass and protects the personal interest of freedom from restraint of movement." *Dyson v. City of Pawtucket*, 670 A.2d 233, 238-39 (R.I. 1996) (quoting *Moody v. McElroy*, 513 A.2d 5, 7 (R.I. 1986) (internal quotations omitted). In Rhode Island, a plaintiff must establish the following: "(1) the defendant intended to confine him, (2) the plaintiff was conscious of the confinement, (3) the plaintiff did not consent to the confinement, and (4) the confinement was not otherwise privileged." *Id.* (quoting *Moody*, 513 A.2d at 7) (internal quotations omitted). To prevail in a false imprisonment claim there

must be no "legal justification" for the detention. *Id.* (citing *Johnson v. Palange*, 406 A.2d 360, 362 (R.I. 1979)).

As to the malicious prosecution claim, the Rhode Island Supreme Court "has defined malicious prosecution as a suit for damages resulting from a prior criminal or civil proceeding that was instituted maliciously and without probable cause, and that terminated unsuccessfully for the plaintiff therein." *Horton v. Portsmouth Police Dept.*, 22 A.3d 1115, 1121 (R.I. 2011) (quoting *Palazzo v. Alves*, 944 A.2d 144, 152 (R.I. 2008) (internal quotations omitted). The elements required to prevail in a claim for malicious prosecution were described in *Ousley v. Town of Lincoln through its Fin. Dir.* as follows:

> Rhode Island requires a plaintiff to prove four elements in order to recover damages for malicious prosecution: (1) the defendants initiated a prior criminal proceeding against him; (2) there was a lack of probable cause to initiate such a proceeding; (3) the prior proceeding was instituted maliciously; and (4) the proceeding terminated in the plaintiff's favor."

313 F. Supp. 2d 78, 87 (D.R.I. 2004) (citing *Solitro v. Moffatt*, 523 A.2d 858, 861-62 (R.I. 1987)).

Malice can be implied by the second element because "a hostile motive may also be inferred from a showing of a lack of probable cause . . . but may not be drawn from the 'mere failure' of the original action.'" *Nagy v. McBurney*, 392 A.2d 365, 367 (R.I. 1978) (citations omitted). In other words, where no probable cause existed, malice may be presumed.

The Rhode Island Supreme Court held in *Beaudoin v. Levesque*, "[p]robable cause in our law is a necessary element in false arrest, false imprisonment, and

malicious prosecution claims." 697 A.2d 1065, 1067 (R.I. 1997).  The same disputed material facts that prevent summary judgment on Kurland's unconstitutional seizure claim requires, similar action on these claims.

## IV. Qualified Immunity

The Defendants assert Perez and Clements are entitled to qualified immunity. "The doctrine of qualified immunity protects public officials 'from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Diaz-Bigio v. Santini*, 652 F.3d 45, 50 (1st Cir. 2011) (quoting *Pearson*, 555 U.S. at 231).  In addition to immunity from liability, qualified immunity can "provide[] defendant public officials an immunity from suit" and, where applicable, excuse the individual from the case. *Maldonado v. Fontanes*, 568 F.3d 263, 268 (1st Cir. 2009) (citing *Mitchell v. Forsyth*, 472 U.S. 511, 526 (1985).  Moreover, "[q]ualified immunity protects 'supervisory officials from suit when they could not reasonably anticipate liability.'" *Young v. City of Providence*, 396 F. Supp. 2d 125, 131 (D.R.I. 2005) (quoting *Camilo-Robles v. Hoyos*, 151 F.3d 1, 6 (1st Cir. 1998)).

The Court must consider whether the defendant official acted with "objective reasonableness" and whether "the [official's] conduct violated 'clearly established … constitutional rights.'" *Santiago*, 891 F.2d at 386 (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)).  These considerations represent the two prongs of the qualified immunity analysis which the First Circuit has articulated as follows: "(1) whether the facts alleged or shown by the plaintiff make out a constitutional right; and (2) if

so, whether the right was 'clearly established' at the time of the defendant's alleged violation." *Diaz-Bigio*, 652 F.3d at 50 (quoting *Maldonado*, 568 F.3d at 269).[15]  This second prong itself "has two parts: (a) whether the legal contours of the right were sufficiently clear that a reasonable official would have understood that what he was doing violated that right, and (b) whether the particular factual violation in question would have been clear to a reasonable official." *Id.*

As the First Circuit advises, however, "The doctrinal intersection of qualified immunity principles and summary judgment principles is not well mapped.  Plotting that intersection can present thorny analytic problems–problems that are magnified because of the desire to resolve claims of qualified immunity at the earliest practicable stage of litigation" *Morelli v. Webster*, 552 F.3d 12, 18 (1st Cir. 2009) (citing *Cox v. Hainey*, 391 F.3d 25, 29 (1st Cir. 2004)).  The qualified immunity analysis is susceptible to summary judgment unless disputed material facts are at issue.  "Something of a 'black hole' exists in the law as to how to resolve factual disputes pertaining to qualified immunity when they cannot be resolved on summary judgment prior to trial" and  "judges have sometimes deferred a decision until the trial testimony was in or even submitted the factual issues to the jury." *Wiggins v.*

---

[15] After *Pearson v. Callahan*, courts may undertake the two-pronged qualified immunity inquiry in any order. 555 U.S. 223, 236 (2009). ("On reconsidering the procedure required in *Saucier*, we conclude that, while the sequence set forth there is often appropriate, it should no longer be regarded as mandatory. The judges of the district courts and the courts of appeals should be permitted to exercise their sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand.")

*Rhode Island*, 326 F. Supp. 2d, 297, 309 (D.R.I. 2004) (citing *Ringuette v. City of Fall River*, 146 F.3d 1, 6 (1st Cir. 1998) (internal quotations omitted).

In their Motion, the Defendants assert that qualified immunity applies to both Clements and Perez.

### A. Defendant Perez

With respect to the Plaintiffs' First Amendment claim, the Court has concluded that there exist disputed issues of fact that must be resolved by a jury. There remains an outstanding factual question as to whether the restriction had been motivated by the Plaintiffs' speech content and therefore whether the restriction must satisfy heightened or strict scrutiny that applies to content-based speech restrictions. As a result, the Court cannot determine if the Officer Perez's actions are entitled to the protection of qualified immunity or if they were violative of a "clearly established" law.

Determining whether Perez acted reasonably under the circumstances, and thus whether he is entitled to qualified immunity, depends not only on *what* the right was, but on the circumstances that led to the violation. If the undisputed facts gleaned at trial leave no "closely corresponding factual or legal precedent" that would have informed the officer that the speech restriction was unconstitutional, then he will be entitled to qualified immunity. *Diaz-Bigio*, 652 F.3d at 53. Whether the order to move to Area D was content-based or content-neutral will in turn affect the determination as to whether the right would be considered clearly established. Content-based speech restrictions must, as discussed above, "serve a compelling governmental interest by the least restrictive means." *March*, 867 F.3d at 54 (citing

*McCullen*, 573 U.S. at 478). To say the law has been clearly established with respect to content-based speech regulations would be an understatement. If the factfinder determines the order to move to Area D amounted to a content-based restriction motivated by the Plaintiffs' and demonstrators' protest and finds the Plaintiffs activities were not creating a safety hazard, then Perez will not be entitled to qualified immunity because no reasonable officer could find or mistakenly believe such a restriction was constitutional.

With respect to the Fourth Amendment violation claims, summary judgment on qualified immunity grounds cannot be granted for the same reasons.

> The qualified immunity doctrine is designed to afford officials an added measure of protection against civil liability. To achieve that goal, the doctrine eschews a line that separates the constitutional from the unconstitutional but objectively reasonable acts from obviously unconstitutional acts.

*Cox v. Hainey,* 391 F.3d 25, 31 (1st Cir. 2004) (citing *Camilo-Robles v. Zapata,* 175 F.3d 41 ,43 (1st Cir. 1999).

If the factfinder determines that the arrest was made without probable cause or if "probable cause is [not] at least arguable," then the first "clearly established" prong is met. *Gilk v. Cunniffee,* 655 F.3d 78, 88 (1st Cir. 2011) (quoting Ricci v. Urso, 974 F.2d 5, 7 (1st Cir. 1992)). The qualified immunity inquiry in this case then turns upon whether a reasonable officer would believe arresting Kurland was constitutional based upon the facts and circumstances. Given the competing and contradicting facts surrounding Kurland's arrest, the probable cause question must be determined by the factfinder.

### B. Defendant Clements

When it comes to supervisors, the First Circuit has "adopt[ed] an approach that comports with the core principle of qualified immunity by protecting supervisory officials from suit when they could not reasonably anticipate liability." *Camilo-Robles*, 151 F.3d at 6. "Although a superior officer cannot be held vicariously liable under 42 U.S.C § 1983 on a *respondeat superior* theory . . . he may be found liable under section 1983 on the basis of his own acts or omissions." *Maldonado-Denis v. Castillo-Rodriguez*, 23 F.3d 576, 581 (1st Cir. 1994) (internal citations omitted).

To successfully assert qualified immunity from supervisory liability, the defendant must show either "that the asserted right is not clearly established or . . . that the conduct attributed to him satisfies the test of objective legal reasonableness." *Camilo-Robles*, 151 F.3d at 7 (citing *Harlow*, 457 U.S. at 819). The "clearly established" inquiry has an added gloss when it comes to supervisors. The First Circuit has described the analysis as "bifurcated." *Id.* at 6. The first question is whether "the subordinate's actions violated a clearly established constitutional right." *Id.* (citing *Doe v. Taylor Indep. Sch. Dist.*, 15 F.3d 443, 456 (5th Cir. 1994); *Shaw v. Stroud*, 13 F.3d 791, 801 (4th Cir. 1994)). The second question is whether "it was clearly established that a supervisor would be liable for constitutional violations perpetrated by his subordinates in that context." *Id.* (citing *Doe*, 15 F.3d at 456; *Shaw*, 13 F.3d at 801). When the answer to both these questions is yes, the question then becomes whether the conduct was reasonable. *Id.* As discussed, however, the answers to these questions depend upon a jury's resolution of the disputed facts and

29

the determination as to Clements' qualified immunity, as with Perez's, cannot be made at the summary judgment stage.

## CONCLUSION

For the foregoing reasons, summary judgment for all parties is denied.

IT IS SO ORDERED.

Mary S. McElroy
United States District Judge

September 30, 2020